## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AD1 Urban Palm Bay, LLC,[1] | Case No. 23- 10074 (KBO) |
| Debtor. | (Joint Administration Requested) |

## DECLARATION OF ALEX FRIDZON IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY
## MOTIONS AND APPLICATIONS

I, Alex Fridzon, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the Chief Operating Officer and Partner of AD1 Global Hotels, LLC ("AD1 Global"), an indirect owner of each of the Debtors (as defined below).  I was appointed as the Responsible Fiduciary for the Debtors and authorized to oversee the filing of the petitions for relief and to manage the debtors in possession during the pendency of their chapter 11 cases.  AD1 Global covers all facets of the hospitality industry, ranging from the acquisition of existing hotels, new developments, management, and daily operations.  The total AD1 Global portfolio currently contains more than twenty-five (25) operating hotel properties with additional properties in development; however, only a subset of the hotels is being administered in these chapter 11 case. I have been with AD1 Global since 2009 and oversee every financial aspect of the company's operations and management.  I have a vast knowledge of the hospitality industry.  Prior to my current position, I worked for Marriott Hotels in controller and operations positions.  In addition to my position with AD1 Global, I also am an owner of AD1 Management, Inc., which provides

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AD1 Celebration Hotels, LLC (7980); AD1 Daytona Hotels, LLC (7940); AD1 LBV1, LLC (1125); AD1 PB Airport Hotels, LLC (6855); AD1 SW Property Holdings, LLC (2507); AD1 Urban Palm Bay, LLC (3713); AD1 Urban Palm Bay Place, LLC (2385); AD1 Celebration Holdings, LLC (3363); AD1 Daytona Holdings, LLC (2761); AD1 LBV Hotels, LLC (7709); AD1 Palm Beach Airport Hotels, LLC (2187); AD1 Urban Strategy Palm Bay, LLC (9412); and AD1 Urban SW, LLC (6934).  The mailing address for each of the Debtors is 1955 Harrison Street, Suite 200, Hollywood, FL 33020.

property-level management services to hospitality clients in the AD1 Global portfolio.  I hold a

Bachelor of Business Administration degree from Wofford College.

2.       On January 22, 2023 (the "Petition Date"), the above-captioned debtors and

debtors-in-possession (collectively, the "Debtors") commenced these chapter 11 cases (these

"Chapter 11 Cases") by filing voluntary petitions for relief (the "Petitions") under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with the

United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue

to operate their businesses and manage their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed

a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.       I submit this Declaration to provide an overview of the Debtors' business and these

Chapter 11 Cases and to support the Debtors' applications and motions for "first day" relief

(collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in

this Declaration are based upon my personal knowledge of the Debtors' operations and finances,

information learned from my review of relevant documents, information supplied to me by other

members of the Debtors' management, consultation with the Debtors' professional advisors, or

my opinion based on my experience, knowledge, and information concerning the Debtors'

operations and financial condition.  I believe all information herein to be true to the best of my

knowledge.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon

to testify, I could and would testify competently to the facts set forth herein.

4.       To familiarize the Court with the Debtors, the Chapter 11 Cases, and the relief

sought in the First Day Motions, this Declaration provides a summary overview of the Debtors

US.355199894.08

and the Chapter 11 Cases and is organized as follows. Part I describes the Debtors' business operations, corporate structure, key liabilities, and estate assets. Part II describes the events leading up to the commencement of the Chapter 11 Cases. Part III summarizes the Debtors' goals in commencing these Chapter 11 Cases. Part IV sets forth my basis for testifying to the facts underlying and described in the First Day Motions.

5.       Charts detailing the organizational structure of each of the Debtors as of the Petition Date is attached hereto as **Exhibit A** (the "Organizational Charts").

6.       As set forth in greater detail below, and as reflected in the First Day Motions, the Debtors have filed these Chapter 11 Cases to preserve and maximize the value of their assets for the benefit of their creditors and other stakeholders.

## BACKGROUND REGARDING THE DEBTORS

### A.       Overview of the AD1 Business

7.       As shown in detail in the below chart, the Debtors own and operate eight (8), either newly constructed or renovated, hotels throughout Florida that are under the "flags" of the IHG, Marriot, Hilton, and Hyatt brands (collectively, the "Properties").

| Debtor Owner | Hotel Property | Hotel Details |
|---|---|---|
| **AD1 Celebration Hotels, LLC** | Staybridge Suites Orlando Royale Parc Suites | 224 rooms<br>Built in 1988 |
| **AD1 Urban Palm Bay Place, LLC** | Hyatt Place Melbourne Palm Bay, FL | 106 rooms<br>Built in 2020 |
| **AD1 Daytona Hotels, LLC** | Rushhh Daytona Beach, Tapestry Collection by Hilton | 110 rooms<br>Built in 1972<br>Renovated in 2021 |
| **AD1 Urban Palm Bay, LLC** | Home2 Suites by Hilton Palm Bay I95 | 87 rooms<br>Built in 2020 |
| **AD1 LBV1, LLC** | Crowne Plaza Orlando Lake Buena Vista | 200 rooms<br>Built in 1988 |

| | | |
|---|---|---|
| **AD1 Urban SW, LLC** | Aloft Orlando International Drive | 144 rooms<br>Built in 2021 |
| | Element Orlando International Drive | 140 rooms<br>Built in 2021 |
| **AD1 PB Airport Hotels, LLC** | Holiday Inn Palm Beach Airport Conference Center | 199 rooms<br>Built in 1987 |

8.      The Properties collectively offer 1,210 rooms with four of the Properties situated within Orlando's primary tourism corridors: two properties (Aloft/Element) are in the International Drive submarket, one (Crowne Plaza) is in Lake Buena Vista and one (Staybridge) is in the Celebration area.  Two properties (Hyatt Place/Home2) are in the Melbourne/Palm Bay market, one (Crowne Plaza) is in the Palm Beach/West Palm Beach market, and one (Rushhh Tapestry) is in the Daytona Beach/Beachside market.

9.      Six of the Properties are either newly built or recently repositioned (after a transformative renovation), with the Holiday Inn Palm Beach Airport still being under renovation to convert to a Crowne Plaza branded-property, a process that has significantly been delayed by certain Lender (as defined below) actions described below.

10.      The beachfront Rushhh Tapestry in Daytona Beach underwent renovations in mid to late 2022 and was also scheduled to open in 2022 but was damaged because of Hurricane Nicole, and the opening has been delayed as a result.  Debtor AD1 Daytona Hotels, LLC has filed insurance claims for the damage.

11.      As noted above, each of the Properties is under the "flags" of either the IHG, Marriot, Hilton, or Hyatt brands (the "Flags").  The Debtors' relationships with the Flags are governed by a series of franchise and/or license agreements between the respective Debtor and either Holiday Hospitality Franchising, LLC, Hilton Franchise Holding LLC, Marriott International Inc., or Hyatt Place Franchising, L.L.C.

12.     None of the Debtors have any direct employees.  More specifically, all the staff that perform the day-to-day operations are either employed by AD1 Management, Inc., with whom each of the property-holding Debtors has executed a management agreement, or are employed by third-party contractors, which, among other things, provide the house-keeping staff at the Properties.

13.     In addition to the staff noted above, the Debtors are reliant upon a small number of vendors that provide certain goods and services and that could not be replaced without significant cost and time, both of which would significantly disrupt the Debtors' business.

**B.     Corporate and Capital Structure and Cash Management**

14.     As shown in the Organizational Charts, each of the Properties is owned by a limited liability company, the members of which are made up of certain AD1 Global affiliates and various investor members (the "Investor Members").  The Investor Members vary by Debtor and hold interests of varying size in one or more of the Debtors.

15.     Each of the Debtors is managed by an AD1 Global affiliate.  None of the Debtors is managed by any of the Investor Members.

16.     The Debtors' capital structure is not overly complicated as their operations are funded primarily though customer receipts generated by the Properties for room rentals, event space rentals, and through on-site amenities such as restaurants, room service, and spas.

17.     AD1 LBV1, LLC; AD1 Celebration Hotels, LLC; AD1 Daytona Hotels, LLC; AD1 PB Airport Hotels, LLC; AD1 SW Property Holdings, LLC; AD1 Urban Palm Pay Place, LLC; and AD1 Urban Palm Bay, LLC (collectively, the "Borrowers") are parties to that certain Loan Agreement dated as of December 10, 2021 by and between the Borrowers and HPS Investment Partners, LLC, as lender (the "Lender"), as amended by that First Amendment to Loan Agreement

5

dated as of June 30, 2022 by and among the Borrowers, the Lender and non-Debtor guarantors Jose Daniel Berman, myself, Arie Fridzon, and AD1 Management, Inc. (together, the "Prepetition Loan").

18.    In connection with entry into the Prepetition Loan, each of the Borrowers executed certain other documents related thereto (collectively, with the Guaranties (as defined herein) and the Loan Agreement, the "Loan Documents") pursuant to which the Lender may purport to have a security interest in certain or all the Debtors' real and personal assets.

19.    In connection with the Prepetition Loan, Debtors AD1 LBV Hotels, LLC; AD1 Celebration Holdings, LLC; AD1 Daytona Holdings, LLC; AD1 Palm Beach Airport Hotels, LLC; AD1 Urban Strategy Palm Bay, LLC; and AD1 Urban SW, LLC (collectively, the "Guarantors") each executed a Pledge Agreement and Pledgor Guaranty dated as of December 10, 2021 (collectively, the "Guaranties").

20.    As of the Petition Date, the outstanding principal amount under and in connection with the Loan Documents is approximately $165,000,000, plus accrued and accruing interest, charges, fees, costs, and expenses (including attorneys' fees and legal expenses) plus any and all other amounts required to be paid under and in connection with the Loan Documents (collectively, the "Prepetition Loan Obligations"), which amounts are subject to all rights and defenses of the Lender and the Debtors.

21.    The Debtors' cash management system consists of twenty-nine (29) bank accounts (collectively, the "Bank Accounts") at KeyBank National Association ("KeyBank") and Truist One Bank ("Truist") (collectively, and as may be amended, the "Banks").

22.    Certain of the Debtors' bank accounts ("Customer Deposit Accounts") receive credit card payments and other customer payments which are then transferred into a single

6

concentration deposit account (the "Concentration Deposit Account") at KeyBank, out of which various operational obligations of the Debtors (*e.g*., escrow tax payments, escrow insurance payments, and various debt services) are satisfied before remaining funds are disbursed to each Debtors' operating accounts held at Truist.

23.     Many of the Debtors' Bank Accounts, including the Concentration Deposit Account, are subject to Deposit Account Control Agreements ("DACAs") whereby upon the occurrence of certain conditions, the Lender can exercise complete control over the accounts, requiring the Borrowers to submit disbursement requests to the Lender for approval for use of funds and allowing the Lender to "sweep" the Borrowers' cash.

**C.     Principal Liabilities and Assets**

24.     The Debtors' most recent set of unaudited financial statements reflect assets with a book value totaling approximately $204,853,088.20 and liabilities totaling approximately $186,411,881.09 as of November 30, 2022.

25.     Berkadia Proprietary Holding LLC ("Berkadia"), a leading finance broker in the commercial real estate industry, issued a broker's opinion of value in October 2022 (the "Berkadia BOV") that valued the total portfolio of Properties at an "as-is" price of $210,500,00 and valued the Properties "as-stabilized value" at $262,000.000.  The prospective value "as stabilized" reflects the Properties' value as of the time the Properties are projected to achieve stabilized occupancy.

26.     I have reviewed the Berkadia BOV, and the factual averments therein are true and correct to the best of my knowledge.

27.     Attached as **Exhibit B**  hereto is a true and correct copy of the Berkadia BOV as it was provided to the Borrowers.

US.355199894.08

28.     As of the Petition Date, and notwithstanding the delay with the opening of the Rushhh Tapestry (Daytona Beach), the portfolio of Properties on an aggregated basis is in substantially the same or better condition than it was in October 2022.

29.     Based upon the Berkadia BOV as well as my general knowledge of the Debtors' business, assets and the hospitality industry, I believe that the aggregate value of their hotel assets as a going-concern is at least $210,500,000.

### EVENTS LEADING TO THE FILING OF THESE CHAPTER 11 CASES

30.     Although hotel revenues stabilize over time and experience predictable cash flows with normal seasonal variation, at all relevant times from the inception of the Prepetition Loan, the Properties have been in various states of development and capital improvement.  In light of the developmental nature of these Properties, as well as the uncertainty of the recovery in the hospitality market following the COVID pandemic, the Loan Agreement contains various covenants relating to, among other things, (i) the completion date for certain CAPEX projects; (ii) the maintenance of cash reserves for future capital expenditures; and (iii) the maintenance of significant cash reserves to pay monthly debt service payments to Lender in the event of short falls in operational cash flows.

31.     During the 2022 calendar year, the Borrowers experienced several significant setbacks that impacted operating cash flows, including (i) the unprecedented rise in interest rates, which considerably increased the debt service on the Prepetition Loan, (ii) a significant inflation increase for goods and services, (iii) construction delays outside of the Borrowers' Control, and the impact of Hurricane Nicole on the Rushhh Tapestry (Daytona Beach).

32.     Beginning in September 2022, the Lender began being inconsistent on providing access to cash for certain necessary expenses, which created a strain on the Debtors' operations.

33.    By October 2022, the interest reserve account ("IR Account") established to cover operating cash flow shortfalls was depleted and the Borrowers' operating cash flows were insufficient to pay all of the Borrowers' operating expenses and the monthly debt service due under the Loan Agreement.

34.    As a result of the above-described events, on November 2, 2022, Lender declared that certain events of default had occurred under the Loan Documents and were continuing (the "Notice of Default").

35.    In connection therewith, the Lender exercised its rights under certain Deposit Account Control Agreements ("DACAs") and the Debtors became unable to utilize the funds received into their Customer Deposit Accounts without explicit approval from the Lender.  In addition, the Lender began to accrue interest on the outstanding principal balance of the Prepetition Loan at the default rate starting November 1, 2022.

36.    On November 14, 2022, Borrowers, Lender, and Mr. Berman executed an agreement (the "Pre-Negotiation Agreement"), pursuant to which the parties thereto made certain acknowledgements, including that as of such date the outstanding principal amount of the Prepetition Loan, including all accrued and unpaid interest, was $164,977,611.06 and that certain events of default under the Loan Documents had occurred and were continuing, and to set forth certain procedures for on-going negotiations.

37.    On November 23, 2022, Lender sent Borrowers a letter attaching a proposal dated November 17, 2022, laying out a list of requirements that it sought in exchange for entering into a modification of the Prepetition Loan.  The Lender offered a short term forbearance through January 31, 2023 provided that the Borrowers (a) immediately retain Fulcrum Hospitality, a third-party hotel asset management firm, (b) fund $15,000,000 to the Prepetition Loan's IR Account on or

9

before January 31, 2023, (c) purchase an interest rate cap no later than December 15, 2022, and (d) agree to a "deed-in-a-box" structure by December 15, 2022 whereby the deeds to the Properties (the "Deeds") would be transferred to a title company selected by Lender and placed in escrow. In the event that the Borrowers failed to perform any of the foregoing before January 31, 2023, the Deeds would immediately transfer to Lender (collectively, the "Forbearance Proposal").

38.     The Forbearance Proposal was later modified by that certain Modification Letter, dated December 15, 2022 (the "Modification Letter"), between Lender, Borrowers and Mr. Berman.  The Modification Letter extended the timeline for certain of the requirements of the Forbearance Proposal until January 9, 2023.

39.     On and after January 16, 2023, the Lender failed to provide the Borrowers any access to Lender-controlled cash to fund operating expenses or otherwise despite Borrowers request that, among other things, funds were needed to pay sales and use taxes and labor-related expenses and provided no meaningful response as to whether they would ultimately release the needed funds.

40.     The Debtors sought to work consensually with the Lender in good faith, including providing a $1,500,000 payment on short notice to the IR Account during their negotiations.

41.      However, the Lender's requirements were unreasonable, their deadlines unrealistic, and the Lender was uncooperative when Robert Douglas and the Borrowers identified a potential source of new equity that would have addressed the Lender's issues.

42.     All the while, the Debtors' limited access to their cash assets put a significant strain on the operation of the Properties and the Debtors' business.  The Lender's delays, refusals, and non-responsiveness to the Debtors' requests to release the Debtors' funds resulted in "slow-pays"

US.355199894.08

and "no-pays" of certain of the Debtors' vendors, including those vendors that provide staff for the Properties.

43.     Despite having significant funds in their Bank Accounts, the Debtors' inability to access their cash to fund operations, including payment of staff and contract labor, left them with no other option than filing for chapter 11 protection on the Petition Date.  Any further delay could have resulted in significant disruption to their day-to-day operations and destruction of the going-concern value of the Debtors' portfolio of Properties.

## THE PURPOSE/OBJECTIVES OF THESE CHAPTER 11 CASES

44.      In November 2022, the Borrowers engaged RobertDouglas, an investment banking firm specializing in hotel properties, to investigate the Borrowers' options to raise equity capital, refinance, or sell the Properties in a manner that maximized value for all stakeholders.

45.     The Borrowers have engaged in a diligence process with at least one potential equity investor and believe that it has the ability to complete a process, during the pendency of the Chapter 11 Cases, to raise significant capital in an equity recapitalization which will allow Borrowers to cure all monetary defaults, if any, to post sufficient reserves to guarantee future performance of all loan obligations and to reinstate its Prepetition Loans.

46.     With the benefit of the automatic stay and an exclusive period to propose a restructuring or reorganization, Borrowers also intend to investigate their options to refinance the current loans with terms that may provide more value to existing stakeholders compared to an equity recapitalization that will dilute the interests of current stakeholders.

47.     Borrowers are confident that the Properties will provide sufficient cash flows to pay all operating costs and administrative expenses during the pendency of these Chapter 11 Cases

US.355199894.08

and that through an equity capital raise, refinancing and/or sale of the Properties, they will be able to satisfy creditors in full and maximize the interests of all stakeholders.

## FIRST DAY MOTIONS[2]

48.    In furtherance of their restructuring efforts, the Debtors will file First Day Motions substantially contemporaneously with this Declaration, and respectfully request that the Court enter the proposed orders granting relief requested in the First Day Motions.  I believe that the relief sought in each of the First Day Motions (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their businesses or loss of productivity or value, and (b) constitutes a critical element in maximizing value during these Chapter 11 Cases. In particular, in light of the Debtors' asset-light model, any disruption to the workforce or interruption to the outsourced manufacturing and services would immediately and severely disrupt the Debtors' business.  Such a disruption would in turn have an equally negative impact on retailer confidence. It is therefore imperative to maintain the manufacturing and retailing network that underlies the Debtors' business model, and the relief sought in the First Day Motions will play a critical role in achieving that goal.

49.    The First Day Motions that are sought to be heard at the first hearing in these Chapter 11 Cases are:

- ***Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only***

- ***Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent***

- ***Debtors' Motion for Interim and Final Orders Granting (I) Authority to (A) Continue Using Existing Bank Accounts, Business Forms, Cash***

---

[2] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions, as applicable.

US.355199894.08

> *Management System, and Credit Card Programs and Pay All Fees Related Thereto, (B) Implement Ordinary Course Changes to Cash Management System Including Open and Close Bank Accounts, (C) Continue Intercompany Transactions, and (D) Provide Administrative Priority for Intercompany Claims, (II) a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code, and (III) Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers, (B) Shippers and Warehousemen, (C) Certain Vendors Entitled to Administrative Expense Status Under Section 503(B)(9) of the Bankruptcy Code, and (D) Foreign Vendors; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling Final Hearing; and IV) Granting Related Relief*

50.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

51.     Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management and from my colleagues that perform services for the Debtors, from my review of relevant documents, and upon my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy and to avoid irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

US.355199894.08

## <u>CONCLUSION</u>

In furtherance of their chapter 11 efforts, for the reasons stated herein and in each of the First Day Motions, the Debtors respectfully request that the relief sought in the First Day Motions be granted.

Dated: January 25, 2023

*/s/ Alex Fridzon*

Alex Fridzon

US.355199894.08