**EXHIBIT A**

Sale Procedures Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AD1 Urban Palm Bay, LLC,[1] | Case No. 23-10074 (KBO) |
| Debtors. | (Jointly Administered) |
| | Docket Ref. Nos. _ & ___ |

**ORDER (I) APPROVING THE FORM OF TRANSACTION AGREEMENTS, AUTHORIZING DEBTORS TO DESIGNATE STALKING HORSE BIDDERS AND APPROVING BREAK-UP FEE; (II) APPROVING (A) SALE PROCEDURES, (B) THE FORM AND MANNER OF NOTICE(S) OF SALE PROCEDURES AND AUCTIONS, CURE AMOUNTS, DESIGNATION OF STALKING HORSE BIDDER, AND SUCCESSFUL BIDDER(S) AND BACK-UP BIDDER(S), (C) CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion"),[2] dated March 14, 2023, of the Debtors in the above-captioned Chapter 11 Cases for the entry of an order (this "Order") (i) approving (a) the form of certain transaction agreements (a "Transaction Agreement" and a "Stalking Horse Transaction Agreement," and collectively, the "Transaction Agreements"), substantially in the form attached hereto as **Exhibits 2 and 3**, authorizing Debtors to designate stalking horse bidders and approving the Break-Up Fee; (b) the Sale Procedures, substantially in the form attached hereto as **Exhibit 1,** (c) the form and manner of notice(s) of Sale Procedures and Auctions, Cure amounts, Designation of Stalking Horse Bidder, and Successful Bidder(s) and Back-Up Bidder(s),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AD1 Celebration Hotels, LLC (7980); AD1 Daytona Hotels, LLC (7940); AD1 LBV1, LLC (1125); AD1 PB Airport Hotels, LLC (6855); AD1 SW Property Holdings, LLC (2507); AD1 Urban Palm Bay, LLC (3713); AD1 Urban Palm Bay Place, LLC (2385); AD1 Celebration Holdings, LLC (3363); AD1 Daytona Holdings, LLC (2761); AD1 LBV Hotels, LLC (7709); AD1 Palm Beach Airport Hotels, LLC (2187); AD1 Urban Strategy Palm Bay, LLC (9412); and AD1 Urban SW, LLC (6934). The mailing address for each of the Debtors is 1955 Harrison Street, Suite 200, Hollywood, FL 33020.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion and the Sale Procedures.

substantially in the forms attached hereto as **Exhibit 4, 5, 6 and 7,** and (d) the Assumption and

Assignment Procedures, and (ii) granting related relief; and due and proper notice of the Motion

having been given as provided in the Motion; and it appearing that no other or further notice need

be provided; and the Sale Procedures Hearing (as defined below) having been held; and all of the

proceedings had before the Court; and the Court having reviewed the Motion and the Hercher

Declaration; and the Court having found and determined that the relief sought in the Motion and

set forth herein is in the best interests of the Debtors, their estates and creditors, and all parties in

interest and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:

A.      This Court has jurisdiction to consider the Motion in accordance with 28

U.S.C. §§ 157 and 1334 and the Amended Standing Order.

B.      Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§

1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory and legal predicates for the relief requested in the Motion and

provided for herein are sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District

of Delaware (the "Local Rules").

D.      In the Motion and at the hearing on the Motion (the "Sale Procedures

Hearing"), the Debtors demonstrated that good and sufficient notice of the relief granted by this

Order has been given and no further notice is required. A reasonable opportunity to object or be

heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

E.    The Debtors' proposed notices of the Sale Procedures and Auctions, Cure Amounts, Designation of Stalking Horse Bidder, and Successful Bidder(s) and Back-Up Bidder(s), attached hereto as Exhibits 4, 5, 6 and 7 respectively, are appropriate and reasonably calculated to provide the interested parties with timely and proper notice, and no other or further notice is required.

F.    The Sale Procedures are fair, reasonable, and appropriate and are designed to maximize the recovery for the Debtors' estates.

G.    The Assumption and Assignment Procedures provided for in the Motion and herein and the Assumption Notice attached hereto as **Exhibit 5** are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures and the Assumption Notice have been tailored to provide an adequate opportunity for all Counterparties (as defined below) to assert any Contract Objections (as defined herein).

H.    Entry of this Order is in the best interests of the Debtors, their estates and creditors and all other interested parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    The Sale Procedures are hereby approved and shall apply with respect to, and shall govern all proceedings related to, (i) the Transaction Agreements, (ii) the Auction(s), and the Sale(s), if any.

2.    Any objections to the Motion or the relief granted by this Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

**Approval of the form of Transaction Agreement and Stalking Horse Transaction Agreement**

3.      The form of Transaction Agreement and Stalking Horse Agreement attached hereto as **Exhibits 2** and **3** respectively are hereby approved.

4.      The Debtors are authorized to enter into the Transaction Agreements, as applicable, subject to the confirmation of a plan or entry of a Sale Order or multiple Sale Orders, as applicable, and take any and all actions reasonably necessary or appropriate to implement the Sale Procedures.

**Approval of Designation of Stalking Horse Bidder and Stalking Horse Break-Up Fee**

5.      The Break-Up Fee in the amount of $100,000.00, as set forth in the Stalking Horse Transaction Agreement, is approved.

**Approval of Sale Procedures; Auction**

6.      The Sale Procedures are hereby approved. The failure to specifically include or reference any particular provision of the Sale Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Sale Procedures are approved in their entirety, as if fully set forth in this Order. The Debtors are hereby authorized to conduct the Auctions of the Hotel Assets pursuant to the terms of the Sale Procedures and this Order. The Sale Procedures shall apply to the Acceptable Bidders and the Qualified Bidders (each as defined in the Sale Procedures), as well as the conduct of the Auctions.

7.      The Debtors shall have the right, with the consent of their Secured Lender, to alter the Sale Procedures based upon the exigencies of a given situation without further order of this Court.

8.      The Debtors shall have the right, in their sole discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or

otherwise not appropriate for disclosure to a Qualified Bidder (as defined in the Sale Procedures). Notwithstanding any limitations provided for in such information, including, without limitation, any non-disclosure, confidentiality or similar provisions, the Debtors and their estates shall be authorized to provide due diligence information to Qualified Bidders, *provided* that such Qualified Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualified Bidders in connection with the Sale Procedures and any Sale, if applicable, *provided* that the information was provided in accordance with this Order.

9.     Any potential bidder that desires to make a Bid shall deliver, among other things, and in accordance with the Sale Procedures, a written and binding offer in the form of the Transaction Agreements attached hereto as **Exhibit 2** or **3**, as applicable, to the Notice Parties so as to be received on or before the applicable Bid Deadline with respect to the applicable Hotel Asset as set forth in more detail in the Sale Procedures; *provided* that the Debtors, with the consent of their Secured Lender, may extend the Bid Deadline without further order of the Court, subject to providing notice to the Notice Parties. Any party that does not submit a bid by the applicable Bid Deadlines will not be allowed to: (a) submit any bids after the Bid Deadlines or (b) participate in the Auction(s). The term "Notice Parties" shall mean, with respect to the Hotel Assets: (i) the Debtors, AD1 Urban Palm Bay, LLC, 1955 Harrison Street, Suite 200, Hollywood, Florida 33020 (Attn. Alex Fridzon) and Email: alex@ad1global.com; (ii) counsel to the Debtors, Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Katharina Earle, Esq.) and Email: Katharina.earle@faegredrinker.com, (Attn: Ian J. Bambrick; Esq.) and Email: Ian.Bambrick@faegredrinker.com, and (Attn:  Scott F. Gautier, Esq.) and Email:

Scott.Gautier@faegredrinker.com; (iii) counsel to Secured Lender, Paul Hastings LLP, 200 Park

Avenue, New York, New York 10166 (Attn: Daniel Ginsberg, Esq.) and Email:

danielginsberg@paulhastings.com; and (iv) counsel to any Stalking Horse Bidder, if any.

10.     All Qualified Bidders submitting a Qualified Bid are deemed to have

submitted to the exclusive jurisdiction of this Court with respect to all matters related to the

Auction and the terms and conditions of the sale or transfer of the assets identified under the

applicable Transaction Agreement.

11.     In the event that the Debtors timely receive by the respective Bid Deadlines

more than one Qualified Bid for a Hotel Asset, the Debtors shall conduct Auctions with respect to

the applicable Hotel Assets. If a Stalking Horse Transaction Agreement is the only Qualified Bid

submitted for a Hotel Asset on or before the applicable Bid Deadline, the Debtors may request at

the Sale Hearing (or through confirmation of a plan, if applicable) that this Court approve the

Stalking Horse Transaction Agreement applicable to such Hotel Asset and the transactions

contemplated thereunder. If there are no Hotel Assets for which at least two Qualified Bids

(inclusive of any Stalking Horse Transaction Agreement) have been timely submitted, an Auction

will not be held.

12.     The Auctions, if necessary, shall be held at the offices of Faegre Drinker

Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware, 19801, or such

other location that the Debtors, in consultation with the Secured Lender and advisors, determine

will enhance the prospects for higher and better bidding on the Hotel Assets, at the following dates

and times: Group Properties (May 9, 2023 at [TBD]), Crowne Plaza (July 12, 2023 at [TBD]), and

Daytona (August 4, 2023 at [TBD]).

13.     The Debtors, in consultation with the Secured Lender, shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Sale Procedures, including, without limitation, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) permit Qualified Bidders to bid on less than all of the Hotel Assets that were included in their Qualified Bid, if applicable; (d) subject to the terms of the Sale Procedures, determine which bids are the Successful Bid and Back-Up Bid, each as it relates to the Auction(s), if necessary; (e) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Sale Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (f) adjourn or cancel an Auction and/or the Sale Hearing in open court without further notice or as provided in this Order and in the Sale Procedures; and (g) modify the Sale Procedures consistent with their fiduciary duties and bankruptcy law.

**Assumption and Assignment Procedures; Contract Objections**

14.     The following "Assumption and Assignment Procedures" are hereby approved:

(a)     On or before [*]**, 2023** (the "Assumption Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assumed Contract an Assumption Notice substantially in the form attached hereto as **Exhibit 5**. If after the Assumption Notice Deadline, the Debtors identify (i) any additional Assumed Contract that was not included in the Assumption Notice and that a potential purchaser may potentially seek to acquire by assumption and assignment or (ii) modify the Cure Amount (as defined herein) for an Assumed Contract, the Debtors shall, as soon as practicable thereafter and in no event less than one (1) business day before the commencement of the Auction(s), file with the Court and serve, by overnight delivery, on the affected Counterparties a supplemental Assumption Notice (a "Supplemental Assumption Notice").

(b)     The Assumption Notice (or Supplemental Assumption Notice, if applicable) shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed

Contracts. If a Counterparty objects to (i) the Debtors ability to assume and assign the Assumed Contract or (ii) the Cure Amount for its Assumed Contract, the Counterparty must file with the Court and serve on the Notice Parties a written objection (a "Contract Objection"). The term "Notice Parties" shall mean, with respect to the Hotel Assets: (i) the Debtors, AD1 Urban Palm Bay, LLC, 1955 Harrison Street, Suite 200, Hollywood, Florida 33020 (Attn. Alex Fridzon) and Email: alex@ad1global.com; (ii) counsel to the Debtors, Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn. Katharina Earle, Esq.) and Email: Katharina.Earle@faegredrinker.com, (Attn:. Ian J. Bambrick, Esq.) and Email: Ian.Bambrick@faegredrinker.com, and (Attn: Scott F. Gautier, Esq.) and Email: Scott.Gautier@faegredrinker.com; (iii) counsel to Secured Lender, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166, (Attn. Daniel Ginsberg, Esq.) and Email: danielginsberg@paulhastings.com; and (iii) counsel to any Stalking Horse Bidder, if any.

(c)    Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (ET) on [TBD], 2023** (the "Contract Objection Deadline"), *provided* that if the Debtors file and serve any Supplemental Assumption Notice, such notice shall provide that the Contract Objection Deadline shall be at least 14 days after service of such notice; (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. Any objections to adequate assurance of future performance by a Successful Bidder shall be filed in accordance the instructions set forth below.

(d)    No later than one (1) business day after the conclusion or cancellation of an Auction, if any, the Debtors shall file with the Court one or more notices identifying the Successful Bidder for each Hotel Asset (a "Notice of Successful Bidder"), substantially in the form attached hereto as **Exhibit 7** which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (as defined in the Sale Procedures), if any, (ii) the Assumed Contracts included in the Successful Bid or Back-Up Bid (as defined in the Sale Procedures); (iii) the proposed assignee(s) of such Assumed Contracts; and (iv) instructions for contacting the Successful Bidder to obtain Adequate Assurance Information, which shall be provided to each affected Counterparty on a confidential basis; provided that if the Auction is cancelled and the Debtors choose to proceed with a transaction with one or more Stalking Horse Bidders, the Notice of Successful Bidder shall set forth such information for the Stalking Horse Bidder(s) that would be provided for the Successful Bidder.

(e)     No later than one (1) business day after the conclusion or cancellation of the Auction, if any, the Debtors will cause to be served by overnight mail upon each affected Counterparty the Notice of Successful Bidder. To the extent a Counterparty objects <u>solely</u> on the basis of adequate assurance of future performance by a Successful Bidder for a Hotel Asset (the "<u>Adequate Assurance Objection</u>**"),** such Adequate Assurance Objection shall be filed no later than seven (7) business days after the filing of the Notice of Successful Bidder.

(f)     If no Contract Objection is timely received with respect to an Assumed Contract: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtors and (if applicable) assignment of such Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance); (ii) any and all defaults under such Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount included in the Assumption Notice or Supplemental Assumption Notice, if applicable, for such Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors and (if applicable) the Debtors' assignee, or the property of any of them, that existed prior to the entry of the Sale Order.

(g)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the Cure Amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "<u>Cure Dispute</u>"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be mutually agreed to by the Debtors and the objecting Counterparty or scheduled by the Court; <u>provided, however,</u> that if the Contract Objection relates solely to a Cure Dispute, such Assumed Contract may be assumed by the Debtors and assigned, *provided* that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the proposed assignee pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

15.     As part of its bid, each Qualified Bidder (including any Stalking Horse Bidder) must make available, for review by the Notice Parties and Counterparties to Assumed Contracts of which such Qualified Bidder may seek to take assignment, information supporting the Qualified Bidder's ability to comply with the requirements of adequate assurance of future

performance under section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information"), including (a) the Qualified Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such Qualified Bidder; (b) a contact person for the proposed assignee that the applicable Counterparty may directly contact in connection with the adequate assurance of future performance; and (c) the actual assignee's identity. To the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; and (y) financial statements and annual reports. Adequate Assurance Information shall be provided on a confidential basis and must be kept confidential and shall only be used and disclosed as agreed to by the Qualified Bidder that provided such Adequate Assurance Information or ordered by the Court. This Order authorizes the filing of any Adequate Assurance Information under seal, and on the docket with such non-public information redacted, without further order of the Court; *provided* that unredacted versions of such pleadings shall be served upon the Debtors, with a copy to the Court's chambers. Any representative receiving Adequate Assurance Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

16.     The Assumption and Assignment Procedures are appropriate and fair to all Counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

17.     The inclusion of a contract, lease or other agreement on an Assumption Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease or other agreement is, in fact, an

executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved.

**Approval of Proposed Schedule and Deadlines**

18.     The Debtors' proposed dates and deadlines set forth on **Exhibit B** to the Motion (the "Sale Process Timeline") are hereby approved. The Sale Process Timeline appropriately tracks the dates the Court has already established in connection with the entry of the Final Cash Collateral Order. The Sale Process Timeline will foster a fulsome Sale Process and comports with due process in these Chapter 11 Cases.

**Form and Manner of Notice(s) of Sale Procedures, Auctions, Cure Amounts, and Successful Bidder(s) and Back-Up Bidder(s) (collectively, the "Notices")**

19.     The Notices, substantially in the forms attached to this Order as **Exhibits 4, 5, 6,** and **7** are hereby approved.

20.     The Notices and the objection periods associated with each of the foregoing are reasonably calculated to provide sufficient and effective notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as it relates to the Sale Procedures and Auction, the designation of Stalking Horse Bidder(s), Successful and Back-Up Bidder(s), and the Assumption and Assignment Procedures pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such Notices and objection periods are hereby approved.

21.     Within five (5) days of the entry of this Order, the Debtors will serve the Sale Procedures Notice by first class mail on: (1) the U.S. Trustee; (2) counsel to the Secured Lender; (3) all parties known by the Debtors to assert a lien on any of the Hotel Assets; (4) all persons known or reasonably believed to have asserted an interest in any of the Hotel Assets; (5) all non-Debtor parties to any of the Assumed Contracts; (6) all persons known or reasonably believed to have expressed an interest in acquiring all or any portion of the Hotel Assets or making

an equity or other investment in the Debtors within the twelve (12) months prior to the Petition Date; (7) the Office of the United States Attorney for the District of Delaware; (8) the Office of the Attorney General in each state in which the Debtors operate; (9) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (10) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (11) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (12) the Securities and Exchange Commission; (13) the United States Attorney General/Antitrust Division of Department of Justice; and (14) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the date of service (collectively, the "Sale Procedures Notice Parties"). In addition, the Debtors will serve the Sale Procedures Notice on all of the Debtors' known creditors, investors, and equity holders (for whom identifying information and addresses are available to the Debtors).[3]

22.    The Debtors shall also post the Sale Procedures Notice and this Order on the website of the Debtors' claims and noticing agent, at AD1 Urban Palm Bay, LLC, et al. (stretto.com).

**Miscellaneous**

23.    The Debtors' right to designate, with the consent of the Secured Lender, one or more Qualified Bidders as Stalking Horse Bidders pursuant to the Sale Procedures is approved.

24.    The Debtors will be authorized to conduct any sales resulting from the Sale Procedures and the Auctions without the necessity of complying with any state or local bulk transfer laws or requirements.

---

25.     In the event that there is a conflict between this Order or the Sale Procedures, on the one hand, and the Motion, a Transaction Agreement, or a Stalking Horse Transaction Agreement, on the other hand, this Order and the Sale Procedures shall control and govern.

26.     Prior to mailing and publishing the Notices, as applicable, the Debtors may fill in, or cause to be filled in, any missing dates and other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors with the consent of the Secured Lender deem necessary or appropriate.

27.     All persons or entities that participate in the Sale Process shall be deemed to have knowingly and voluntarily: (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the Sale Process, the Auction and/or, if applicable, any Sale) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

28.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in these Chapter 11 Cases, any subsequent chapter 7 or chapter 11 case of the Debtors, or any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of this Order. This Order shall be binding on any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases.

29.    This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules is expressly waived. The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

30.    The requirements set forth in Local Bankruptcy Rules 6004-1, 9006-1 and 9013-1 are hereby satisfied or waived.

31.    This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Order.

**<u>Exhibit 1</u>**

Bidding Procedures

US.356291489.01

**<u>Exhibit 2</u>**

Transaction Agreement

US.356291489.01

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

**THE ENTITIES LISTED ON EXHIBIT A ATTACHED HERETO**

AS SELLER

AND

[_____]
a _____

AS PURCHASER

DATED AS OF _____

FOR THE

**THE HOTELS ON EXHIBIT B ATTACHED HERETO**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ........................................................................................ **1**
    **1.1**    Definitions ....................................................................................... 1

**ARTICLE II THE PROPERTIES AND LIABILITIES** ........................................... **9**
    **2.1**    Description of the Properties ........................................................... 9
    **2.2**    Executory Contracts ...................................................................... 11
    **2.3**    Cure Costs ...................................................................................... 12
    **2.4**    Assumed Liabilities ....................................................................... 13
    **2.5**    Retained Liabilities ........................................................................ 13

**ARTICLE III PURCHASE PRICE** ...................................................................... **13**
    **3.1**    Purchase Price ................................................................................ 13
    **3.2**    Earnest Money ................................................................................ 13
    **3.3**    Payment of Purchase Price ............................................................ 14
    **3.4**    Allocation of Purchase Price ......................................................... 14
    **3.5**    Like-Kind Exchange ...................................................................... 14

**ARTICLE IV CONTINGENCIES** ........................................................................ **14**

**ARTICLE V TITLE TO THE PROPERTY** ......................................................... **14**
    **5.1**    Title Commitments ........................................................................ 14
    **5.2**    Surveys .......................................................................................... 15
    **5.3**    Exceptions to Title ........................................................................ 15
    **5.4**    Conveyance of the Real Properties ................................................ 16

**ARTICLE VI CONDITION OF THE PROPERTY** ............................................ **16**
    **6.1**    PROPERTIES SOLD "AS IS" ..................................................... 16

**ARTICLE VII REPRESENTATIONS AND WARRANTIES** ............................ **18**
    **7.1**    Seller's Representations and Warranties ...................................... 18
    **7.2**    Purchaser's Representations and Warranties ............................... 21

**ARTICLE VIII COVENANTS** ............................................................................. **22**
    **8.1**    Confidentiality ............................................................................... 22
    **8.2**    Conduct of the Business ................................................................ 23
    **8.3**    Licenses and Permits .................................................................... 23
    **8.4**    Employees ...................................................................................... 23
    **8.5**    Tax Contests .................................................................................. 24
    **8.6**    Notices and Filings ........................................................................ 24
    **8.7**    Further Assurances ........................................................................ 24
    **8.8**    Assignment and Assumption of the Franchise Agreements ........... 24

**ARTICLE IX CLOSING CONDITIONS** ............................................................ **24**
    **9.1**    Mutual Closing Condition ............................................................ 24
    **9.2**    Purchaser Closing Conditions ...................................................... 25
    **9.3**    Sellers Closing Conditions ........................................................... 25

**ARTICLE X CLOSING** .................................................................................................. **26**
    **10.1**    Closing Date ......................................................................................... 26
    **10.2**    Closing Escrow ..................................................................................... 26
    **10.3**    Closing Deliveries ................................................................................ 26
    **10.4**    Possession ............................................................................................ 29
    **10.5**    Break-Up Fee ...............................................**Error! Bookmark not defined.**

**ARTICLE XI PRORATIONS AND EXPENSES** ........................................................... **29**
    **11.1**    Closing Statement ................................................................................ 29
    **11.2**    Prorations ............................................................................................. 29
    **11.3**    Accounts Receivable ........................................................................... 31
    **11.4**    Transaction Costs ................................................................................ 31

**ARTICLE XII TRANSITION PROCEDURES** ............................................................ **32**
    **12.1**    Safe Deposit Boxes ............................................................................. 32
    **12.2**    Baggage ............................................................................................... 33

**ARTICLE XIII DEFAULT AND REMEDIES** ............................................................. **33**
    **13.1**    Sellers Default ..................................................................................... 33
    **13.2**    Purchaser's Default ............................................................................. 33
    **13.3**    LIQUIDATED DAMAGES ................................................................. 34

**ARTICLE XIV RISK OF LOSS** .................................................................................. **34**
    **14.1**    Casualty ............................................................................................... 34
    **14.2**    Condemnation ...................................................................................... 35

**ARTICLE XV SURVIVAL, INDEMNIFICATION AND RELEASE** ......................... **35**
    **15.1**    Survival ................................................................................................ 35
    **15.2**    Indemnification by Sellers .................................................................. 36
    **15.3**    Indemnification by Purchaser .............................................................. 36
    **15.4**    Limitations on Indemnification Obligations ....................................... 36

**ARTICLE XVI MISCELLANEOUS PROVISIONS** .................................................. **37**
    **16.1**    Notices ................................................................................................. 37
    **16.2**    No Recordation .................................................................................... 38
    **16.3**    Time is of the Essence ......................................................................... 38
    **16.4**    Assignment .......................................................................................... 38
    **16.5**    Successors and Assigns ....................................................................... 38
    **16.6**    Third Party Beneficiaries .................................................................... 39
    **16.7**    GOVERNING LAW ........................................................................... 39
    **16.8**    Rules of Construction .......................................................................... 39
    **16.9**    Severability .......................................................................................... 39
    **16.10**    JURISDICTION AND VENUE ......................................................... 40
    **16.11**    WAIVER OF TRIAL BY JURY ........................................................ 40
    **16.12**    Survival. ............................................................................................... 40
    **16.13**    Incorporation of Recitals, Exhibits and Schedules ............................. 40
    **16.14**    Entire Agreement ................................................................................ 40

**16.15**   Amendments, Waivers and Termination of Agreement.....................................40
**16.16**   Not an Offer ..........................................................................................................40
**16.17**   Execution of Agreement.......................................................................................40

### LIST OF EXHIBITS

Exhibit A      Seller Entities
Exhibit B      List of Hotels
Exhibit C      Debtor Entities and Case Numbers
Exhibit D      Form of Earnest Money Escrow Agreement
Exhibit E      _____
Exhibit F      _____
Exhibit G      _____
Exhibit H      _____
Exhibit I      _____

### LIST OF SCHEDULES

Schedule ____   _____
Schedule ____   _____
Schedule ____   _____
Schedule ____   _____

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of this ____ day of _____, 2023 (the "<u>Effective Date</u>") by and between THE ENTITIES IDENTIFIED ON <u>EXHIBIT A</u> ATTACHED HERETO (each, a "<u>Seller</u>", and collectively, the "<u>Sellers</u>"), and _____, a _____ ("<u>Purchaser</u>"). Sellers and Purchaser are sometimes referred to herein individually as a "<u>Party</u>", and collectively as the "<u>Parties</u>".

**WHEREAS**, Sellers are the owners of the hotels referred to on <u>Exhibit B</u> attached hereto (collectively, the "<u>Hotels</u>"), and the Properties (as defined below), as more specifically described in this Agreement.

**WHEREAS**, Sellers, as debtors, have filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") bearing the case numbers referenced in <u>Exhibit C</u> attached hereto (collectively, the "<u>Bankruptcy Cases</u>").

**WHEREAS**, Purchaser is the "Successful Bidder" (as such term is defined in the Sale Motion, as hereinafter defined), and accordingly, Sellers desire to sell the Properties to Purchaser, and Purchaser desires to purchase the Properties from Sellers, on the terms set forth in this Agreement, in accordance with and pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1** <u>Definitions</u>. In addition to the terms defined above in the introduction and recitals to this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"<u>Accounts Receivable</u>" means all amounts which Sellers are entitled to receive from the Business which are not paid as of the Closing, but expressly excluding all (i) credit card charges, checks and other instruments which Sellers have submitted for payment as of the Closing, and (ii) items of income otherwise prorated pursuant to Sections 11.2 or 11.3 hereof.

"<u>Accrued Vacation Pay</u>" means, with respect to any Rehired Employee, the salary and wages which such Rehired Employee is entitled to receive for any sick or vacation days or other paid time off accrued but unused by such Rehired Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law.

"<u>Affiliate</u>" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the

Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Assigned Operating Agreements" has the meaning set forth in Section 2.1.10 hereof.

"Assignment and Assumption of Tenant Leases" has the meaning set forth in Section 2.1.8 hereof.

"Assignment and Assumption of Franchise Agreements" has the meaning set forth in Section 8.8 hereof.

"Assumed Liabilities" has the meaning set forth in Section 2.4 hereof.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bookings" has the meaning set forth in Section 2.1.16 hereof.

"Books and Records" has the meaning set forth in Section 2.1.13 hereof.

"Broker" means Robert Douglas.

"Business" means the lodging business and all business and activities related or ancillary thereto conducted at the Hotels.

"Business Day(s)" shall mean every day other than (i) Saturdays, (ii) Sundays, (iii) all days observed by the Federal Government of the United States as legal holidays and (iv) all days on which commercial banks in New York State are required by law to be closed.

"Casualty" has the meaning set forth in Section 14.1 hereof.

"Closing" has the meaning set forth in Section 10.1 hereof.

"Closing Date" has the meaning set forth in Section 10.1 hereof.

"Closing Escrow" has the meaning set forth in Section 10.2 hereof.

"Closing Escrow Agreement" has the meaning set forth in Section 10.2 hereof.

US.356247233.03

"<u>Closing Statement</u>" has the meaning set forth in Section 11.1 hereof.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings and guidance issued by the Internal Revenue Service.

"<u>Condemnation</u>" has the meaning set forth in Section 14.2 hereof.

"<u>Condition of the Property</u>" has the meaning set forth in Section 6.1 hereof.

"<u>Confidential Information</u>" has the meaning set forth in Section 8.1.1 hereof.

"<u>Contracts</u>" means, collectively, the Tenant Leases, the Equipment Leases and the Assigned Operating Agreements.

"<u>Cure Costs</u>" means the aggregate monetary sum required to be paid to the counterparties under the Operating Agreements to be assigned by the applicable Sellers and assumed by Purchaser in accordance with Section 2.2(c) hereof.

"<u>Cut-Off Time</u>" has the meaning set forth in Section 11.2 hereof.

"<u>Deeds</u>" has the meaning set forth in Section 10.3.1(b) hereof.

"<u>Earnest Money</u>" means, at the time in question, the amounts then deposited with Escrow Agent (and any additional amounts as may be deposited with Escrow Agent pursuant to Section 10.1 hereof), together with all interest and any other amounts earned thereon.

"<u>Earnest Money Escrow Agreement</u>" has the meaning set forth in Section 3.2.1 hereof.

"<u>Employee Compensation</u>" means, with respect to any Employee, all salary and wages which such Employee is entitled to receive at the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding all other compensation accrued or payable to such Employee, including, without limitation, any (i) bonus or incentive compensation; (ii) PTO/Accrued Vacation Pay, sick days and personal days; and (iii) health, welfare and other benefits provided to such Employee, and employer contributions to, and amounts paid or accrued under, any benefit plans for the benefit of such Employee.

"<u>Employees</u>" means, at the time in question, all persons employed full time or part time at the Hotels by Sellers or any of their Affiliates.

"<u>Employer</u>" means the employer of the Employees.

"<u>Employment Agreements</u>" has the meaning set forth in Section 7.1.7 hereof.

"<u>Environmental Claims</u>" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous

Substances over, on, in, under or from any one or more of the Properties, or (ii) violation of any Environmental Laws with respect to any one or more of the Properties.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (i) the Comprehensive Environmental Response, Compensation and Liability Act, (ii) the Resource Conservation and Recovery Act, (iii) the Federal Water Pollution Control Act, (iv) the Toxic Substances Control Act, (v) the Clean Water Act, (vi) the Clean Air Act, and (vii) the Hazardous Materials Transportation Act, and similar state and local laws, as amended as of the time in question.

"Environmental Liabilities" means all liabilities and obligations under any Environmental Laws arising from or in connection with any one or more of the Properties, including, without limitation, any obligations to manage, control, contain, remove, remedy, respond to, clean up or abate any actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media.

"Environmental Reports" has the meaning set forth in Section 7.1.15 hereof.

"Equipment Leases" has the meaning set forth in Section 2.1.9 hereof.

"Escrow Agent" means Commonwealth Land Title Insurance Company.

"Exception Notice" has the meaning set forth in Section 5.3.1 hereof.

"Executory Contract Order" has the meaning set forth in Section 2.2. hereof.

"Existing Surveys" means those certain Surveys entitled "_____", last updated on _____ by _____, entitled "_____", last updated on _____ by _____.

"F&B" has the meaning set forth in Section 2.1.6 hereof.

"FF&E" has the meaning set forth in Section 2.1.3 hereof.

Franchise Agreements" means those certain Franchise Agreements between Sellers and the respective Franchisors which are referenced on Schedule ___ attached hereto.

"Franchisors" means the franchisors under the Franchise Agreements.

"Governmental Authority" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

4

"<u>Guest Ledger</u>" means all charges accrued to the open accounts of any guests or customers at the Hotels as of the Cut-Off Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotels, any restaurants, bars or banquet services, or any other goods or services provided by or on behalf of Sellers at the Hotels.

"<u>Hazardous Substances</u>" means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by products and polychlorinated biphenyls to the extent that some are governed by or subject to any restrictions pursuant to Environmental Laws or which give rise to Environmental Liabilities.

"<u>Hotel Guest Data and Information</u>" means, with respect to the Hotels, all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences and any other guest or customer information.[1]

"<u>Improvements</u>" has the meaning set forth in Section 2.1.2 hereof.

"<u>Indemnification Deductible</u>" has the meaning set forth in Section 15.4.2 hereof.

"<u>Indemnification Loss</u>" means, with respect to any Indemnitee, any liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by such Indemnitee as a result of the act, breach, default, omission or occurrence in question.

"<u>Indemnitee</u>" means a Seller Indemnitee or a Purchaser Indemnitee as the case may be.

"<u>Indemnitor</u>" means the Party required to provide defense or indemnification to an Indemnitee.

"<u>Intellectual Property</u>" has the meaning set forth in Section 2.1.13 hereof.

"<u>Inventoried Baggage</u>" has the meaning set forth in Section 12.2 hereof.

"<u>Inventoried Safe Deposit Box</u>" has the meaning set forth in Section 12.1 hereof.

"<u>IT Systems</u>" has the meaning set forth in Section 2.1.5 hereof.

"<u>Land</u>" has the meaning set forth in Section 2.1.1 hereof.

"<u>Letter of Intent</u>" means that certain letter of intent, dated _____ between Sellers and Purchaser or their respective Affiliates outlining the general terms of the transaction described in this Agreement.[2]

---

[1] **[Note: Parties to consider data privacy issues / whether to modify or qualify this accordingly]**
[2] **[Note: To be deleted if not applicable]**

"Liability" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Licenses and Permits" has the meaning set forth in Section 2.1.11 hereof.

"Liquor Licenses" has the meaning set forth in Section 8.3 hereof and as referenced in Schedule ___ attached hereto.

"Lis Pendens" means that certain Notice of Pendency dated _____ filed against the Properties as Index No.: _____ by _____, directly and derivatively on behalf of _____, and any amendments, modifications or replacements thereof or additions thereto.[3]

"Material Casualty" has the meaning set forth in Section 14.1.1 hereof.

"Material Condemnation" has the meaning set forth in Section 14.2.1 hereof.

"Material Contract" means any Contract which cannot be cancelled without penalty on no more than thirty (30) days' notice and which has a remaining payment obligation of at least $25,000.00.

"Mutual Closing Condition" has the meaning set forth in Section 9.1.1 hereof.

"Non-Union Employees" means those Employees that are not Union Employees.

"Notice" has the meaning set forth in Section 16.1.1 hereof.

"OFAC" has the meaning set forth in Section 7.1.17 hereof.

"Operating Agreements" means all maintenance, service and supply contracts, booking and reservation agreements, credit card service agreements, and all other agreements for goods or services in connection with the Business, other than the Equipment Leases and Licenses and Permits, together with all deposits made or held by the applicable Sellers thereunder.

"Ordinary Course of Business" means the ordinary course of business consistent with Sellers' past custom and practice for the Business; provided, however, that with respect to maintenance and/or repair items, in no event shall Sellers be obligated to make any repairs and/ or replacements with respect to the FF&E, the Improvements, the Land and/ or the Personal Property, as applicable, which cost in excess of $25,000.00 in the aggregate.

"Permitted Exceptions" has the meaning set forth in Section 5.3.1 hereof.

---

[3] **[Note: To be deleted if not applicable]**

6

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Personal Property" means the Properties other than the Real Properties.

"Plans and Specifications" has the meaning set forth in Section 2.1.14 hereof.

"Properties" has the meaning set forth in Section 2.1 hereof.

"Prorations" has the meaning set forth in Section 11.2 hereof.

"Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Purchaser Closing Conditions" has the meaning set forth in Section 9.2 hereof.

"Purchaser Closing Deliveries" has the meaning set forth in Section 10.3.2 hereof.

"Purchaser Default" has the meaning set forth in Section 13.2 hereof.

"Purchaser Documents" has the meaning set forth in Section 7.2.2 hereof.

"Purchaser Indemnitees" means Purchaser and its Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Purchaser Party" has the meaning set forth in Section 7.2.5 hereof.

"Real Properties" has the meaning set forth in Section 2.1.2 hereof.

"Rehired Employees" has the meaning set forth in Section 8.4 hereof.

"Retail Merchandise" has the meaning set forth in Section 2.1.7 hereof.

"Retained Liabilities" has the meaning set forth in Section 2.5 hereof.

"Sale Motion" means that certain motion filed by the Sellers (through their counsel) with the Bankruptcy Court on March 14, 2023 [Docket No. __], seeking approval of the "Sale Procedures Order".

"Sale Order" shall mean the order of the Bankruptcy Court, in the form and substance acceptable to Purchaser and Sellers and reasonably acceptable to the Sellers' secured lender, approving the sale of the Properties free and clear of all liens, encumbrances and claims other than the Permitted Exceptions, which order has not been stayed by the Bankruptcy Court. Unless a separate order is sought by the Sellers, the order confirming the Plan of Reorganization filed in the Bankruptcy Case shall be the Sale Order.

"Sale Procedures Order" shall mean the order of the Bankruptcy Court, in the form attached to the Sale Motion, approving, among other things, certain marketing and bid procedures with

US.356247233.03

respect to the Properties, which shall not be subject to any modifications thereafter unless otherwise ordered by the Bankruptcy Court.

"Sellers' Breach Termination Event" has the meaning set forth in Section 13.1 hereof.

"Sellers Closing Conditions" has the meaning set forth in Section 9.3 hereof.

"Sellers Closing Deliveries" has the meaning set forth in Section 10.3.1 hereof.

"Sellers Default" has the meaning set forth in Section 13.1 hereof.

"Sellers Documents" has the meaning set forth in Section 7.1.2 hereof.

"Seller Indemnitees" means Sellers, Manager, Employer and their respective Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Seller Litigation" shall mean those certain civil actions identified on Schedule ____ attached hereto, as same may be modified, amended, replaced, expanded, appealed or supplemented, and including any additional actions or claims or counterclaim brought by or on behalf of or against any one or more of the Sellers or any of their Affiliates, members, directors or officers, successors or assigns in any jurisdiction.

"Sellers' Knowledge" means the actual knowledge of Alex Fridzon, Arie Fridzon and Jose Berman.

"Seller Party" has the meaning set forth in Section 7.1.17 hereof.

"Successful Bidder" has the meaning set forth in the Sale Motion.

"Supplies" has the meaning set forth in Section 2.1.4 hereof.

"Surveys" has the meaning set forth in Section 5.2 hereof.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Sellers with respect to the Properties or the Business, including any assessment, interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Tenant Leases" has the meaning set forth in Section 2.1.8 hereof.

"Title Commitments" has the meaning set forth in Section 5.1 hereof.

"Title Company" means Commonwealth Land Title Insurance Company.

8

"Title Exceptions" has the meaning set forth in Section 5.3.1 hereof.

"Title Policies" has the meaning set forth in Section 5.4 hereof.

"Trade Payables" has the meaning set forth in Section 11.2.12 hereof.

"Unpermitted Exceptions" has the meaning set forth in Section 5.3.1 hereof.

"Updated Surveys" means updates to the Existing Surveys (or any new surveys) obtained by Purchaser, at its own expense.

"UST Guidelines" means the "Operating Guidelines and Reporting Requirements for Debtor's In Possession and Trustees (Revised 11/27/13)" promulgated by the Office of the United States Trustee for the _____ District of Delaware and applicable in the Bankruptcy Case.

"Warranties" has the meaning set forth in Section 2.1.15 hereof.

## ARTICLE II
## THE PROPERTIES AND LIABILITIES

**2.1**    Description of the Properties. Subject to the terms set forth in this Agreement, at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all right, title and interest of Sellers in and to the properties and assets set forth in this Section 2.1 (collectively, the "Properties"):

2.1.1.    Land. The parcels of land described in Schedule ___ attached hereto, together with all appurtenant easements and any other rights and interests appurtenant thereto (collectively, the "Land");

2.1.2.    Improvements. All buildings, structures and other improvements located on or affixed to the Land and all fixtures on the Land which constitute real property under Applicable Law (collectively, the "Improvements"; the Land and the Improvements are referred to collectively herein as the "Real Properties");

2.1.3.    FF&E. All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work, apparatus, finishes, trade fixtures, televisions, video and antennae equipment, carpets, window treatments, telephones and other communications equipment, safety equipment, intercom equipment and systems, advertising booklets and materials, brochures, signs and other items of tangible personal property which are located at the Hotels, or ordered for future use at the Hotels as of the Closing, other than the Supplies, IT Systems, F&B, Retail Merchandise, Books and Records and Plans and Specifications (the "FF&E");

2.1.4.    Supplies. All china, glassware and silverware, bedding, towels, linens, uniforms, operating stock, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed

materials, and all other similar supplies and materials, which are located at the Hotels or ordered for future use at the Hotels as of the Closing (the "Supplies");

2.1.5.    IT Systems. All computer hardware, telecommunications and information technology systems located at the Hotels, and all computer software used at the Hotels (subject to the terms of the applicable license agreement(s)), to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "IT Systems");

2.1.6.    Food and Beverage. All food and beverages (alcoholic and non alcoholic) which are located at the Hotels (whether opened or unopened), or ordered or stored for future use at the Hotels as of the Closing, including, without limitation, all food and beverages in the guest rooms; provided, however, notwithstanding anything to the contrary contained herein, expressly excluding any alcoholic beverages to the extent the sale or transfer of the same is not permitted under Applicable Law (collectively, the "F&B");

2.1.7.    Retail Merchandise. All merchandise located at the Hotels and held for sale to guests and customers of the Hotels, or ordered or stored for future sale at the Hotels as of the Closing, including, without limitation, the inventory held for sale in any gift shop, pro shop or newsstand at the Hotels, but expressly excluding the F&B (collectively, the "Retail Merchandise");

2.1.8.    Tenant Leases. All of the leases referenced on Schedule __ attached hereto (collectively, the "Tenant Leases"); to the extent the Tenant Leases and the deposits held thereunder are assignable or the Parties obtain any consent necessary to effectuate such an assignment, then said assignment will be subject to an assignment and assumption thereof executed by the Parties (collectively, the "Assignment and Assumption of Tenant Leases");

2.1.9.    Equipment Leases. Subject to the provisions of Section 2.2 hereof, all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Hotels, together with all deposits made thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "Equipment Leases") each if which are referenced on Schedule __ attached hereto;

2.1.10.    Assigned Operating Agreements. Subject to the provisions of Section 2.2 hereof, all Operating Agreements, to the extent the same and the deposits held thereunder are assignable or the Parties obtain any consent necessary to effectuate such an assignment (collectively, the "Assigned Operating Agreements");

2.1.11.    Licenses and Permits. Subject to the provisions of Section 2.2 hereof, all licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by Sellers or their Affiliates with respect to the Hotels, including, without limitation, the construction, use or occupancy of the Hotels or the Business, together with any deposits made by Sellers or their Affiliates thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "Licenses and Permits");

10

2.1.12.    <u>Intellectual Property</u>. All trademarks, trade names, goodwill, trade dress, service marks and other intellectual property rights set forth in <u>Schedule __</u> attached hereto (collectively, the "<u>Intellectual Property</u>");[4]

2.1.13.    <u>Books and Records</u>. All books and records located at the Hotels which relate to the Hotels or the Business, including, without limitation, all Hotel Guest Data and Information, but excluding Employee personnel files (collectively, the "<u>Books and Records</u>");

2.1.14.    <u>Plans and Specifications</u>. All plans and specifications, blue prints, architectural plans, engineering diagrams and similar items which relate to the Hotels (collectively, the "<u>Plans and Specifications</u>");

2.1.15.    <u>Warranties</u>. The right, title and interest of Sellers in and to all unexpired warranties and guarantees furnished by contractors, subcontractors and other third parties, whether presently outstanding or hereafter arising, including, without limitation, contractors' and manufacturers' warranties or guarantees, to the extent they relate to the Hotels, the Improvements or the Personal Property (collectively, the "<u>Warranties</u>");

2.1.16.    <u>Bookings</u>. All bookings and reservations for guest, conference and banquet rooms or other facilities at the Hotels as of the Closing, together with all guest deposits with respect thereto (collectively, the "<u>Bookings</u>");

2.1.17.    <u>Accounts Receivable</u>. Such Accounts Receivable (including the Guest Ledger) as set forth in Section 11.3 hereof; and

2.1.18.    <u>Miscellaneous Hotel Assets</u>. All telephone and facsimile numbers and all keys, locks and safe combinations and codes for the Hotels.

**2.2**    <u>Executory Contracts.</u>

(a)    On the Bid Submission Deadline (as defined in the Sale Procedures Order), Purchaser shall have the right to designate by written notice to Sellers any of the Operating Agreements as a Purchased Contract or an Excluded Contract (other than any bookings, reservations or other agreements which Purchaser is required to assume pursuant to the Sale Order of pursuant to terms hereof). Any of the Operating Agreements which are so designated as a Purchased Contract shall be assigned by Sellers and assumed by Purchaser at the Closing pursuant to Section 10.3.1(d) hereof and shall be deemed a Purchased Asset. Any Operating Agreements so designated as an Excluded Contract may be assumed or rejected by Sellers in their sole discretion and shall be deemed an Excluded Asset. Any such designation may be made by Purchaser by giving notice on or prior to the Bid Submission Deadline; failing which, each of the Operating Agreements which is not duly and timely designated as a Purchased Contract or an Excluded Contract shall be deemed to be Excluded Contracts. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, in no event shall Purchaser have the right to designate any of the Operating Agreements as an Excluded Contract if Seller does not have the express unilateral right to terminate such Operating Agreements without cause as of the Closing Date, and in such event, each of such Operating Agreements so designated by Purchaser as an Excluded Contract, shall, for

---

[4] **[Note: RUSHHH may be excluded as to Daytona Beach]**

the avoidance of doubt, be a Purchased Contract.  By no later than 5:00 p.m. **[Eastern]** time on the Bid Submission Deadline, all such designations (and deemed designations) made by Purchaser shall be become final and binding upon Purchaser and, except as otherwise set forth below, all of the Operating Agreements as to which Purchaser has made no such designation shall be deemed Excluded Contracts. The entry of an order by the Bankruptcy Court authorizing the assumption or rejection of executory contracts in accordance with the terms and conditions of this Agreement ("Executory Contract Order"), which may be included in the Sale Order, shall at Closing be deemed to be part of the Sellers Closing Deliveries under this Agreement.

(b)     Notwithstanding the foregoing,

(i)     so long as an Excluded Contract has not been rejected by the Sellers pursuant to Section 365 of the Bankruptcy Code, Sellers shall, upon written request by Purchaser, assign such Excluded Contract to Purchaser and Purchaser shall assume the same in accordance with Section 10.3.1(d) hereof; and

(ii)     if Sellers become aware, on or before the Closing Date, of any of the Operating Agreements that have not been included on the Schedules, Sellers shall promptly thereafter advise Purchaser of the existence, and provide Purchaser with a copy, of such Operating Agreement and Purchaser thereupon shall have the right to request, by written notice to said Sellers within five (5) days, that Sellers assign such Operating Agreements to Purchaser, in which case Sellers shall use commercially reasonable efforts to assign such Operating Agreements to Purchaser, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Purchased Contracts.

(c)     As part of the Sale Motion, Sellers shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all of the Operating Agreements identified on Schedule ____ attached hereto. Sellers shall serve the Sale Motion on all counterparties to all such Operating Agreements along with a notice stating that Sellers are or may be seeking the sale, assumption and assignment of such Operating Agreements and shall notify such parties of the deadline for objecting to the Cure Costs, which deadline shall be as set forth in the Sales Procedure Order. As part of the Sale Motion, Sellers shall seek authority to file with the Bankruptcy Court the list identifying such Operating Agreements and the amounts necessary to cure defaults under each of such Operating Agreements, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. In cases in which Sellers are unable to establish that a default exists as to any such Operating Agreements, the relevant Cure Cost shall be set at $0.00. The process governing the assignment and assumption of Operating Agreements shall be subject to the provisions set forth in the Sale Procedures Order.

(d)     Payment of Cure Amounts. The Cure Costs shall be the responsibility of Purchaser.

**2.3**     Cure Costs. Cure Costs shall be paid (or in the case of a dispute, the disputed amount escrowed with the Escrow Agent pursuant to an escrow arrangement reasonably acceptable to Sellers and Purchaser) at the Closing.

12

**2.4**     Assumed Liabilities. At Closing, Purchaser shall assume all Liabilities arising or occurring from and after the Closing with respect to the Properties, the Hotels, the Assigned Contracts, the Purchased Contracts, the Business, or the Rehired Employees, but expressly excluding the Retained Liabilities (all Liabilities, except for the Retained Liabilities, shall be referred to herein as "Assumed Liabilities"). The preceding sentence shall not be deemed to modify or otherwise limit any representation or warranty of Sellers set forth in this Agreement or in any document delivered by Sellers at Closing.

**2.5**     Retained Liabilities. At Closing, Sellers shall retain all Liabilities arising or occurring prior to the Closing Date with respect to the Properties, the Hotels, the Assigned Contracts, the Purchased Contracts or the Business (the "Retained Liabilities"). The Parties rights and obligations under this Section shall survive the Closing.

### ARTICLE III
### PURCHASE PRICE

**3.1**     Purchase     Price.     The     purchase     price     for     the     Properties     is _____ and 00/100 Dollars ($_____) (the "Purchase Price"), which shall be allocated in accordance with Section 3.4 hereof and shall be adjusted at Closing for the Prorations pursuant to Section 11.2 hereof, the Accounts Receivable pursuant to Section 11.3 hereof, and as otherwise expressly provided in this Agreement.

**3.2**     Earnest Money.

3.2.1.     Prior to the Effective Date, Purchaser has deposited with Escrow Agent the sum which is equal to five percent (5%) of the Purchase Price in accordance with the "Sale Procedures Order". The Earnest Money has been and shall be held by Escrow Agent in escrow as earnest money pursuant to the escrow agreement in the form attached hereto as Exhibit C, entered into among Sellers, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"). The Earnest Money shall be maintained by the Escrow Agent as to comply with the requirements of the Bankruptcy Court and the Sale Procedures Order.

3.2.2.     Disbursement of Earnest Money to Sellers. At Closing, Escrow Agent is authorized and directed to disburse and Purchaser shall otherwise cause Escrow Agent to disburse the Earnest Money to Sellers or in such manner as Sellers shall instruct Escrow Agent, and Purchaser shall receive a credit against the Purchase Price in the amount of the Earnest Money disbursed to Sellers. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Earnest Money pursuant to the express provisions of this Agreement, the Earnest Money shall be disbursed to Sellers. This Section 3.2.2 shall survive the termination of this Agreement.

3.2.3.     Refund of Earnest Money to Purchaser. In the event: (i) the Sale Procedure Order is not entered on or before _____ days from the filing of the Sellers' Chapter 11 petition or _____, 2023, whichever is earlier; or (ii) the Sale Order is not entered on or before _____, 2023, then at Purchaser's option, this Agreement shall terminate, the Parties shall have no further recourse, obligations or liabilities under this Agreement, except for those obligations and/or liabilities which expressly survive termination.

**3.3**     Payment of Purchase Price.

     3.3.1.     Payment at Closing. At Closing, Purchaser shall pay to Sellers an amount equal to the Purchase Price (as adjusted pursuant to the provisions referenced in Section 3.1 hereof), less the Earnest Money.

**3.4**     Allocation of Purchase Price.

     The Parties hereby agree that the Purchase Price shall be allocated among the Land, the Improvements and the Personal Property in accordance with Schedule __ attached hereto. The Parties shall file all federal, state and local tax returns and related tax documents consistent with such allocation.

**3.5**     Like-Kind Exchange.

     Notwithstanding anything to the contrary in this Agreement, each Party acknowledge and agree that the other Party or Parties (as the case may be) has the right to designate this transaction to qualify as a tax-free exchange under Section 1031 of the Code, and that Purchaser shall have the right to assign this Agreement to a "qualified intermediary" (as defined in Treas. Reg. § 1.1031(k)-1(g)(4) of the Code) or such other entity or entities as is necessary to carry out a 1031 Exchange. Each Party shall execute and deliver such documents as may reasonably and customarily be required to complete the transactions contemplated by any such tax-free exchange, which are in form and substance reasonably acceptable to the other applicable Parties, and otherwise cooperate in all reasonable respects with respect to such tax-free exchange, provided that (i) Sellers shall not be required to take title to any property, and (ii) neither such tax-free exchange nor Sellers' cooperation therewith shall result in any delay to the Closing, nor the imposition of any cost or liability upon Sellers or Purchaser, as the case may be.

### ARTICLE IV
### CONTINGENCIES

**4.1**     No Contingencies. Purchaser acknowledges and agrees that Purchaser has completed all of its due diligence investigations with respect to the Properties and is satisfied with the same. For the avoidance of doubt, it is expressly understood and agreed to by Purchaser that there is no due diligence or financing contingency, or other contingency under this Agreement, which gives Sellers a right of termination. Purchaser's only termination rights are set forth in Sections 5.3.1, 13.1, 14.1, and 14.2 hereof.

### ARTICLE V
### TITLE TO THE PROPERTY

**5.1**     Title Commitments. Purchaser shall obtain, subject to the entry of the Sale Order, at Purchaser's sole cost and expense, a commitment (or commitments separately as to the Real Properties) for an owner's title insurance policy (or policies, as the case may be) from the Title Company for the Real Properties (the "Title Commitments"), which shall include a copy of all documents referenced in Schedule B thereof as recorded title exceptions and all departmental and UCC searches reasonably requested by Purchaser.

**5.2**     Surveys. Purchaser acknowledges its receipt of the Existing Surveys. Purchaser shall have the right to obtain updates to the Existing Surveys, at its sole cost and expense.

**5.3**     Exceptions to Title. Except as provided in this Agreement or otherwise accepted by Purchaser in writing, the sale of the Real Properties to Purchaser hereunder shall be subject to the Permitted Exceptions but otherwise free and clear of any interest or liens in accordance with the Sale Order.

5.3.1.     Permitted Exceptions and Unpermitted Exceptions. Purchaser hereby acknowledges and agrees that it accepts, and that it shall take title to the Properties subject to (i) all matters set forth on Schedule ___ attached hereto and made a part hereof and (ii) all matters approved by Purchaser in writing (or deemed approved pursuant to this Section 5.3.1) (collectively, the "Permitted Exceptions").  Within ten (10) day following the Effective Date, Purchaser shall give written notice to Sellers (the "Exception Notice") of any matters set forth in the Title Commitments and/ or disclosed in the Surveys which are not Permitted Exceptions and which Purchaser is unwilling to take title subject to (the "Unpermitted Exceptions"); failing which all of such matters shall be deemed Permitted Exceptions for all purposes under this Agreement. Seller agrees that regardless of whether Purchaser shall make such objection, the following shall constitute Unpermitted Exceptions: (i) any mortgages, deeds of trust or other security interests (except to the extent Purchaser agrees to assume same); and (ii) Taxes and water and sewage charges which are due and payable as of Closing.  On or before the Closing, Sellers shall discharge and cause to be released of record all mortgages which were caused or created by Sellers and all other monetary liens on the Properties but only to the extent such monetary liens (x) were caused, created or voluntarily assumed by Sellers or (z) cost less than $100,000.00 in the aggregate to cure. In addition to the foregoing, other than Permitted Exceptions, Sellers shall notify Purchaser within seven (7) Business Days after receipt of the Exception Notice whether it will cure the matters set forth therein which Purchaser has indicated it is unwilling to accept title subject to.  If Sellers notify Purchaser that Sellers will not cure all such other matters, then, within five (5) Business Days thereafter, Purchaser shall, by notice to Sellers either, elect to terminate this Agreement or accept such matters as Permitted Exceptions; and, if Purchaser does not notify Sellers that it has elected to accept such matters, Purchaser shall be deemed to have elected to accept title subject to such matters without any reduction to the Purchase Price.  If Purchaser learns of any new matters affecting title to the Properties prior to the Closing which are not Permitted Exceptions and which are not set forth in the Title Commitments, Purchaser shall, at any time prior to the Closing, have the same rights set forth above in this paragraph with respect to such new matters as it has with respect to matters appearing in the Title Commitments (in which event, the Exception Notice shall be given within five (5) Business Days after Purchaser or its attorneys learn of such matter(s), and Sellers shall in turn have the same rights as above to elect to cure or not cure such matters). Purchaser shall cause copies of all updates and/or continuations of the Title Commitments to concurrently be delivered to Sellers' attorneys.  If on the Closing Date, the Properties shall be affected by any lien which, pursuant to the provisions of this Agreement, is required to be discharged or satisfied by Sellers, Sellers shall not be required to discharge or satisfy the same of record provided (i) proper instruments of bonding, satisfaction or discharge therefor are delivered to Purchaser or the Title Company on the Closing Date and proper allowance made to Purchaser for recording charges thereon or (ii) Sellers deposits with the Title Company such amount as it requires in order to omit the same as an exception to title and in either case the same are omitted from the Title Policies as exceptions to title.  Purchaser agrees, upon two (2) Business Days' prior

15

notice from Seller, to advance on the Closing Date, by bank check payable to the applicable lienholder(s) or by wire transfer to the Title Company, as applicable, any amount not exceeding the Purchase Price as shall be required to discharge (or omit as a title exception, as the case may be) any such lien or liens, and the amount so advanced shall be credited against the Purchase Price. Purchaser acknowledges and agrees that Purchaser shall be obligated to take title to the Property and complete the Closing subject to all Permitted Exceptions.

5.3.2.    Failure to Cure. Subject to the provisions of Section 5.3.1 hereof,  Sellers shall have until the Closing Date (as the same may be adjourned, extended, or postponed by Sellers or Purchaser pursuant to the terms hereof) to cure any Unpermitted Exceptions. In the event that Sellers shall be unable to deliver title as required under this Article V, including without limitation, the curing of any Unpermitted Exceptions, Purchaser's sole and exclusive right shall be either to (I) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.3 hereof, and the Parties shall have no further recourse, rights or obligations under this Agreement, except those which expressly survive such termination, or (II) proceed to Closing pursuant to this Agreement and accept title to the Real Properties subject to the Unpermitted Exceptions, which thereafter shall be deemed to constitute Permitted Exceptions without offset or deduction from the Purchase Price. Notwithstanding anything to the contrary set forth in this Agreement, Sellers shall have the right extend the Closing Date for a period of up to sixty (60) days in order to effect cure of any Unpermitted Exceptions.

**5.4**    Conveyance of the Real Properties. At Closing, Sellers shall convey insurable fee simple title (as determined by the Title Company) to the Real Properties, subject to all Permitted Exceptions and otherwise in accordance with the terms of the Sale Order, except for the Equipment Leases which shall be subject only to the ownership interest of the lessor thereunder.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1**    PROPERTIES SOLD "AS IS". Purchaser represents and warrants to Sellers that Purchaser knows, has examined and has investigated to Purchaser's satisfaction the physical nature and condition of the Properties.  Purchaser acknowledges that neither Sellers nor any real estate broker, agent, officer, employee, member, shareholder, attorney, servant or representative of Sellers has made any representations whatsoever regarding the subject matter of this transaction or any fact thereof including, without limitation, representations as to the physical nature or condition of the Properties, the existence or absence of any hazardous materials at the Properties, the existing leases or tenancies, the existing or projected rents, rates, profits, existing or future expenses or any other matter or thing affecting or related to the Properties or the operation thereof, except only as herein specifically set forth; and Purchaser further agrees to take title to the Properties "AS IS" and in their present condition, subject to the express provisions of this Agreement and the Permitted Exceptions and to reasonable use, wear, tear and natural deterioration of the Properties between the Effective Date and the Closing.  In executing, delivering and performing this Agreement, Purchaser has not relied upon and does not rely upon and Sellers are not liable for or bound in any manner by, express or implied warranties, guaranties, promises, statements, representations, "set ups", proposals or information pertaining to the Properties, the rents, rates, profits, expenses and operations thereof made or furnished by Sellers or by any real estate broker, agent, officer, employee, member, shareholder, attorney, servant or other person representing or purporting to

16

represent Sellers, to whomsoever made or given, directly or indirectly, verbally or in writing, unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in this Agreement. In addition to the foregoing, and except as set forth herein, Sellers make no representations or warranties whatsoever, whether express or implied or arising by operation of law, with respect to the Properties and "Condition of the Property"; nor shall any adverse change in the Condition of the Properties before the Closing give rise to any obligation on the part of Sellers or remedy on the part of Purchaser except only as expressly set forth in this Agreement. Sellers are selling and conveying the Properties at the Closing in their then existing condition, AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, other than the representations and warranties of Sellers, if any, expressly set forth in this Agreement. Without limiting the generality of the foregoing, except for any representations of Sellers expressly contained in this Agreement, the transactions described in this Agreement are without statutory, express or implied warranty, representation, agreement, statement or expression of any opinion regarding the Condition of the Properties or any aspect thereof, including any and all statutory, express or implied representations or warranties related to the suitability for habitation, merchantability or fitness for a particular purpose or created by any affirmation of fact or promise, by any description of the Properties or by operation of any legal requirements. For purposes of this Agreement, the term "Condition of the Property" means the following: (a) the quality, nature and adequacy of the physical condition of the Properties, including the quality of the design, labor and materials used to construct the improvements included in the Properties; the construction of the facilities, condition of structural elements, foundations, roofs, glass, mechanical, plumbing, electrical, HVAC, sewage and utility components and systems; the capacity or availability of sewer, water or other utilities; the geology, soils, subsurface conditions, groundwater, landscaping and irrigation of or with respect to the Properties; the location of the Properties in or near any special taxing district, flood hazard zone, wetlands area, protected habitat, geological fault or subsidence zone, hazardous waste disposal or clean-up site or other special area; the existence, location or condition of ingress, egress, access and parking; the condition of any fixtures; the presence of any asbestos or other hazardous materials, dangerous or toxic substance, material or waste in, on, under or about the Properties and the improvements located thereon; and any environmental, botanical, hydrological, geological, meteorological, structural or other condition or hazard or the absence thereof heretofore, now or hereafter affecting in any manner the Properties; (b) the habitability, merchantability, fitness, suitability and adequacy of the Properties for any use and purpose and any conditions at or which affect the Properties with respect to a particular use, purpose, development, potential or otherwise; (c) the compliance or non-compliance of the Properties or any part thereof in accordance with, and the context of, (A) all legal requirements, including, without limitation, Environmental Laws and/or those legal requirements, laws, codes, rules, regulations and/or decrees relating to zoning, building, public works, parking, fire and police access, handicap access, life safety, subdivision and subdivision sales; (B) all agreements, covenants, conditions, restrictions (public or private), plans, development agreements, site plans, building permits, building rules and other instruments and documents governing or affecting the use, management and operation of the Property; and (d) the availability, cost, terms and coverage of liability, hazard, comprehensive and any other insurance of or with respect to the Properties. Purchaser acknowledges and agrees that its obligations under this Agreement shall not be subject to the availability of financing, nor any financing contingency

or other contingencies or satisfaction of conditions and Purchaser shall have no right to terminate this Agreement or receive a return of the Earnest Money, except only as expressly provided for in this Agreement. The acceptance of a deed or deeds by Purchaser shall be deemed to be the full and complete performance and discharge of every agreement and obligation on the part of Sellers hereunder and no representation, warranty, covenant or agreement, express or implied, of Sellers shall survive the Closing except those, if any, which are herein specifically stated to survive the Closing.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**7.1**    Seller's Representations and Warranties. Sellers hereby make the following representations and warranties in this Section 7.1:

7.1.1.    Organization and Power. Each party comprising Seller is duly incorporated, organized or formed (as the case may be), validly existing, in good standing in the jurisdiction of its incorporation, organization or formation, and is qualified to do business in the jurisdiction in which the Properties are located, and has all requisite power and authority to own the Properties and conduct the Business as currently owned and conducted.

7.1.2.    Authority and Binding Obligation. Subject to approval of the Bankruptcy Court and entry of the Sale Order, (i) Sellers have full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Sellers pursuant to this Agreement (collectively, the "Sellers Documents"), and to perform the respective obligations of Sellers under each of the Sellers Documents, (ii) the execution and delivery by the signer on behalf of each party comprising Seller of each of the Sellers Documents, and the performance by each party comprising Seller of its obligations under each of the Sellers Documents, has been (or as of Closing will be) duly and validly authorized by all necessary action by each party comprising Seller, and (iii) each of the Sellers Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller enforceable against the Parties comprising Seller in accordance with their terms, except to the extent Purchaser is in default thereunder.

7.1.3.    Consents and Approvals; No Conflicts. Except for the entry of the Sale Procedures Order and the Sale Order, or as disclosed in Schedule ___ attached hereto, (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for execution or delivery by Sellers of any of the Sellers Documents, or the performance by Sellers of any of their respective obligations under any of the Sellers Documents or the consummation by Sellers of the transaction described in this Agreement, and (ii) neither the execution and delivery by each party comprising Seller of any of the Sellers Documents, nor the performance by Sellers of any of their obligations under any of the Sellers Documents, nor the consummation by Sellers of the transactions described in this Agreement, will: (A) violate any provision of any of Sellers' organizational or governing documents; or (B) violate any Applicable Law to which each party comprising Sellers is subject.

7.1.4.    Title to Personal Property. Except as set forth in Schedule ___ attached hereto, Sellers have good title to all tangible Personal Property, except for the Equipment Leases and/or

18

IT Systems which shall be subject only to the ownership interest of the lessor and/or licensee thereunder, as applicable.

7.1.5.    <u>Condemnation</u>. Sellers have not received any written notice of any pending condemnation proceeding or other proceeding in eminent domain, and to Sellers' Knowledge, no such condemnation proceeding or eminent domain proceeding is threatened affecting the Properties or any portion thereof.

7.1.6.    <u>Litigation</u>. Except as set forth in <u>Schedule ___</u> attached hereto and the Seller Litigation, Sellers have not (i) been served with any court or administrative filing in any litigation or other legal proceeding with respect to the Properties or the Business in which Sellers are named a party which has not been resolved, settled or dismissed, or (ii) received written notice of any claim, charge or complaint from any Governmental Authority or other Person pursuant to any administrative, arbitration or similar adjudicatory proceeding with respect to the Properties or the Business which has not been resolved, settled or dismissed, and Sellers have not received any written notice threatening any such litigation or administrative, arbitration or other adjudicatory proceeding.

7.1.7.    <u>Employees</u>.  Sellers are not a party to any collective bargaining agreement with any labor union with respect to the Employees. Except for the employment agreements set forth in <u>Schedule ___</u> attached hereto (collectively, the "<u>Employment Agreements</u>"), Sellers are not a party to any written employment or compensation agreements (other than general employee benefit plans) with any of the Employees, other than offer letters for at-will employment. <u>Schedule ___</u> attached hereto sets forth a correct and complete list of the positions and compensation of each Employee at the Hotels as of the Effective Date.

7.1.8.    <u>Licenses and Permits</u>. <u>Schedule ___</u> attached hereto sets forth a correct and complete list of the Licenses and Permits, and Sellers have delivered to Purchaser or made available to Purchaser a true and complete copy of the Licenses and Permits.

7.1.9.    <u>Tenant Leases</u>. Except as set forth in <u>Schedule ___</u> attached hereto, there are no leases, subleases, licenses, concessions or similar agreements granting to any other Person the right to use or occupy any portion of the Real Properties, other than the Bookings.

7.1.10.    <u>Material Contracts</u>. <u>Schedule ___</u> attached hereto sets forth a correct and complete list of the Material Contracts, and Sellers have made available to Purchaser a true and complete copy of the Material Contracts.

7.1.11.    <u>Management Agreements</u>. Except for the management agreements referred to in <u>Schedule ___</u> attached hereto, Sellers are not a party to any management agreements with respect to the Hotels.

7.1.12.    <u>Finders and Investment Brokers</u>. Except for the Broker, Sellers have not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Sellers in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement. Subject to the Sale Procedures

Order or any applicable order of the Bankruptcy Court, Sellers shall pay at Closing all fees and commissions payable to the Broker.

7.1.13.    <u>Foreign Person</u>. Sellers are a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

7.1.14.    <u>Bookings</u>. <u>Schedule ____</u> attached hereto sets forth a correct report of all Bookings for the ninety (90) days following the Effective Date, which report shall be updated at Closing and delivered to Purchaser.

7.1.15.    <u>Environmental Matters</u>. <u>Schedule ___</u> attached hereto sets forth a correct and complete list of all environmental assessments, reports and studies relating to the Properties in Sellers' possession (collectively, the "<u>Environmental Reports</u>"), and Sellers have made available to Purchaser a true and complete copy of the Environmental Reports. Except as set forth in <u>Schedule ____</u> attached hereto, Sellers have not received any written notice from any Governmental Authority or other Person of any Environmental Claims which have not been resolved, settled or dismissed, and Sellers have not received any written notice threatening any such Environmental Claim.

7.1.16.    <u>Bankruptcy</u>. Sellers will file and serve the Sale Motion, and seek to obtain approval of the Sale Procedures Order and Sale Order. Purchaser acknowledges and is aware that Sellers shall continue to market the Properties for sale and solicit higher and better offers until the Properties are sold.

7.1.17.    <u>Anti-Terrorism</u>. None of Sellers' property or interests is subject to being "blocked" under any Anti-Terrorism Laws and neither Sellers nor any Person holding any direct or indirect interest in Sellers is in violation of any Anti-Terrorism Laws. Neither Sellers nor any of their affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "<u>Seller Party</u>") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Purchaser from conducting the business activities contemplated by this Agreement with Sellers. Sellers, including their Seller Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31

20

U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

**7.2**    Purchaser's Representations and Warranties. To induce Sellers to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 7.2, upon which Purchaser acknowledges and agrees that Sellers are entitled to rely.

7.2.1.    Organization and Power. Purchaser is duly incorporated or formed (as the case may be), validly existing and in good standing under the laws of the State of _____ and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

7.2.2.    Authority and Binding Obligation. (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "Purchaser Documents"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Sellers is in default thereunder.

7.2.3.    Consents and Approvals; No Conflicts. (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and (ii) neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will: (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

7.2.4.    Finders and Investment Brokers. Except for Broker, Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.2.5.    No Violation of Anti-Terrorism Laws. None of Purchaser's property or interests is subject to being "blocked" under any Anti-Terrorism Laws, and neither Purchaser nor any

US.356247233.03

Person holding any direct or indirect interest in Purchaser is in violation of any Anti-Terrorism Laws. Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "<u>Purchaser Party</u>") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the OFAC of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Sellers from conducting the business activities contemplated by this Agreement with Purchaser.

7.2.6.    <u>Patriot Act</u>. Purchaser, including its Purchaser Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

## ARTICLE VIII
## COVENANTS

**8.1**    <u>Confidentiality</u>.

8.1.1.    <u>Disclosure of Confidential Information</u>. Except as required by the Bankruptcy Court and /or in connection with any motion or other applications filed with the Bankruptcy Court, including, without limitation, any motion or application to approve or reject this Agreement, and regarding any dispute under this Agreement and/or otherwise in connection with the Sales Procedure Order and/or the Sale Order, Sellers and Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any documents, materials, data or other information with respect to the Properties or the Business which is not generally known or available to the public (the "<u>Confidential Information</u>"). Notwithstanding the foregoing, Sellers and Purchaser shall be permitted to (i) disclose any Confidential Information to the extent required under Applicable Law (after giving the other Party prior notice and an opportunity to obtain relief from the disclosure requirement), and (ii) disclose any Confidential Information to any Person on a "need to know" basis, such as their respective shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, engineers, surveyors, lenders, investors, managers, franchisors and such other Persons whose assistance is required to consummate the transactions described in this Agreement;

22

provided, however, that Sellers or Purchaser (as the case may be) shall (A) advise such Person of the confidential nature of such Confidential Information, and (B) use commercially reasonable efforts to cause such Person to maintain the confidentiality of such Confidential Information.

8.1.2.    Public Announcements. Notwithstanding the provisions of Section 8.1.1 hereof, a Party shall have the right to make a public announcement regarding the transaction described in this Agreement after the Closing, provided that Sellers and Purchaser shall approve the form and substance of any such public announcement, which approval shall not be unreasonably withheld, conditioned or delayed.

8.1.3.    Communication with Employees. Purchaser shall have the right to interview the Employees for consideration of employment with Purchaser, and Sellers or any Affiliates of Sellers have the right to coordinate the same and attend such interviews.

**8.2**    Conduct of the Business.

8.2.1.    Operation in Ordinary Course of Business. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers will conduct the Business in the Ordinary Course of Business, including: (i) maintaining the inventories of FF&E, Supplies, F&B and Retail Merchandise at levels maintained in the Ordinary Course of Business, (ii) performing maintenance and repairs for the Real Properties and tangible Personal Property in the Ordinary Course of Business; and (iii) maintaining its current insurance coverages.

8.2.2.    Contracts. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers shall not, without Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), (i) amend, extend, renew or terminate any Material Contracts or Licenses and Permits, except in the Ordinary Course of Business or (ii) enter into any new Material Contracts.

**8.3**    Licenses and Permits. Subject to the express terms of this Section 8.3, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things reasonably necessary, to consummate the transfer of all Licenses and Permits. At Purchaser's sole cost and expense, Purchaser shall be responsible for obtaining the transfer of all Licenses and Permits (to the extent transferable) or the issuance of new licenses and permits, including, without limitation, the licenses and permits required for the sale and service of alcoholic beverages at the Hotels (the "Liquor Licenses"). Purchaser, at its cost and expense, shall submit all necessary applications and other materials to the appropriate Governmental Authority and take such other actions to effect the transfer of Licenses and Permits or issuance of new licenses and permits, including, without limitation, the Liquor License, as of the Closing, and Sellers shall reasonably cooperate (at Purchaser's expense) with Purchaser to cause the Licenses and Permits to be transferred or new licenses and permits to be issued to Purchaser.

**8.4**    Employees. Sellers shall terminate (or cause the termination by its manager of) the employment of all Employees effective as of the Closing, and Purchaser shall offer employment to such terminated Employees on the same terms. (The terminated Employees who accept such offers of employment are referred to herein as the "Rehired Employees").

23

**8.5**    Tax Contests.

8.5.1.    Taxable Period Terminating Prior to Closing Date. Sellers shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. Sellers represent that they have not initiated any tax contest for a taxable period which includes the Closing Date and any periods thereafter.

**8.6**    Notices and Filings. Sellers and Purchaser shall use commercially reasonable efforts to cooperate with each other (at no cost or expense to the Party whose cooperation is requested, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to provide written notice to any Person under any Contracts, Licenses and Permits, and to effect any registrations or filings with any Governmental Authority or other Person, regarding the change in ownership of the Properties or the Business.

**8.7**    Further Assurances. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Sellers and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement.

**8.8**    Assignment and Assumption of Franchise Agreements. Subject to the express terms of this Section 8.8, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, or cause to be done, all reasonable things necessary to consummate the assignment and assumption of the Franchise Agreements. At Purchaser's sole cost and expense, Purchaser shall be responsible for taking all necessary actions that the Franchisor may reasonably require related to Sellers' assignment of the Franchise Agreement to Purchaser ("Assignment and Assumption of Franchise Agreements"). Purchaser, at its cost and expense, shall submit all necessary applications and other materials to the Franchisor and take such other actions to effect the Assignment and Assumption of the Franchise Agreements as of the Closing, but the failure of any one or more of the Franchisors to accept, consent to or otherwise allow such assignment shall not be a condition to the Closing.

**ARTICLE IX**
**CLOSING CONDITIONS**

**9.1**    Mutual Closing Condition.

9.1.1.    Satisfaction of Mutual Closing Condition. The respective obligations of Sellers and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following condition precedent (the "Mutual Closing

24

Condition"): The Bankruptcy Court shall have entered the Sale Order and there shall be no applicable stay ordered by the Bankruptcy Court which is in effect.

9.1.2.    Failure of Mutual Closing Condition. If the Mutual Closing Condition is not satisfied at Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination.

**9.2**    Purchaser Closing Conditions.

9.2.1.    Satisfaction of Purchaser Closing Conditions. In addition to the Mutual Closing Condition, Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Purchaser Closing Conditions"):

(a)    Seller's Deliveries. All of the Sellers Closing Deliveries shall have been delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser upon the consummation of the Closing.

(b)    Representations and Warranties. The representations or warranties of Sellers in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(c)    Covenants and Obligations. The material covenants and material obligations of Sellers in this Agreement shall have been performed in all material respects.

9.2.2. Failure of Purchaser Closing Condition. If any of the Purchaser Closing Conditions are not satisfied on the Closing Date (as the same may be extended, adjourned, or postponed by Sellers or Purchasers to the extent they have the express right to do so under this Agreement), then Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Sellers, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) to waive any of the Purchaser Closing Conditions at or prior to Closing, without offset or deduction from the Purchase Price; provided, however, that any such waiver shall be made in writing by Purchaser.  Nothing contained herein shall be deemed or construed to limit Purchaser's rights under Section 13.1 hereof.

**9.3**    Sellers Closing Conditions.

9.3.1.    Satisfaction of Sellers Closing Conditions. In addition to the Mutual Closing Condition, Sellers' obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Sellers Closing Conditions"):

(a)    Receipt of the Purchase Price. Purchaser shall have (A) paid to Sellers or deposited with Escrow Agent with written direction to disburse the same to Sellers, the Purchase Price (as adjusted

US.356247233.03

pursuant to Section 3.1 hereof), and (B) delivered written direction to Escrow Agent to disburse the Earnest Money to Sellers.

(b)    Purchaser's Deliveries. All of the Purchaser Closing Deliveries shall have been delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers at Closing.

(c)    Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(d)    Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

9.3.2.    Failure of Sellers Closing Condition. If any of the Sellers Closing Conditions is not satisfied on the Closing Date, then Sellers shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Sellers in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Sellers Closing Conditions at or prior to Closing; provided, however, that any such waiver shall be made in writing executed by Sellers.  Nothing contained herein shall be deemed or construed to limit Sellers' rights under Section 13.2 and/or 13.3 hereof.

# ARTICLE X
# CLOSING

**10.1**    Closing Date. The closing of the transaction described in this Agreement (the "Closing") shall occur on the date which is _____ (__) days following the entry of the Sale Order, or such other date as agreed to in writing between Sellers and Purchaser (the date on which the Closing occurs is referred to herein as the "Closing Date"). The Closing shall be effected through the Closing Escrow pursuant to the Closing Escrow Agreement as provided in Section 10.2 hereof.

**10.2**    Closing Escrow. The Closing shall take place by means of an escrow (the "Closing Escrow"), and, at or prior to the Closing, the Parties shall enter into a closing escrow agreement with the Escrow Agent with respect to the Closing Escrow in form and substance reasonably acceptable to Sellers, Purchaser and the Escrow Agent (the "Closing Escrow Agreement") pursuant to which (i) the Purchase Price to be paid by Purchaser pursuant to Section 3.3 hereof shall be deposited with Escrow Agent, (ii) all of the documents required to be delivered by Sellers and Purchaser at Closing pursuant to this Agreement shall be deposited with Escrow Agent, and (iii) at Closing, the Purchase Price (as adjusted pursuant to this Agreement) and the Earnest Money shall be disbursed to Sellers and the documents deposited into the Closing Escrow shall be delivered to Sellers and Purchaser (as the case may be) pursuant to the Closing Escrow Agreement.

**10.3**    Closing Deliveries.

10.3.1.    Seller's Deliveries. At the Closing, Sellers shall deliver or cause to be delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser

at Closing, all of the (i) documents set forth in this Section 10.3.1, each of which shall have been duly executed by Sellers and acknowledged (if required) and (ii) other items set forth in this Section 10.3.1 (the "Sellers Closing Deliveries"), as follows:

(a)     A closing certificate in the form of Exhibit D, together with all exhibits thereto;

(b)     Deeds in the form of Exhibit E, conveying the Real Properties to Purchaser, subject to the Permitted Exceptions, to the extent applicable, respectively, to the Real Properties (collectively, the "Deeds");

(c)     A Bill of Sale in the form of Exhibit F, transferring the FF&E, Supplies, IT Systems, F&B, Retail Merchandise, Intellectual Property, Books and Records, Plans and Specifications, Warranties, Bookings and Accounts Receivable to Purchaser on the terms set forth therein;

(d)     An Assignment and Assumption of Contracts and Licenses and Permits in the form of Exhibit G, assigning the Contracts and Licenses and Permits to Purchaser on the terms set forth therein;

(e)     A certificate or registration of title for any owned vehicle[5] or other Personal Property included in the Properties which requires such certification or registration, duly executed, conveying such vehicle or such other Personal Property to Purchaser, or in the event that such certificate or registration is lost, such documentation as is required to convey title to such vehicle;

(f)     Such agreements, affidavits or other documents as may be reasonably and customarily required by the Title Company from Sellers;

(g)     Any real estate transfer tax declaration, tax returns or similar documents required under Applicable Law in connection with the conveyance of the Real Property;

(h)     A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(i)     A certificate from the applicable state or local Governmental Authority stating that all sales and use taxes with respect to the Properties or Business have been paid through the date of the issuance of such certificate, and, if any such taxes have not been paid, the amount due and payable as of the date of issuance of the certificate, which shall be paid by Sellers at Closing; provided that if despite Sellers' commercially reasonable efforts such certificate setting forth the amount due and payable is not obtained on or before the Closing Date, then Sellers may postpone the Closing for a period of up to thirty (30) days from the originally scheduled Closing Date upon Sellers' delivery of notice thereof to Purchaser given not less than Five (5) Business Days prior to the Closing Date;[6]

---

[5] **[Note: To determine if there are any vehicles owned by and to be transferred by Sellers.]**
[6] **[Note: Query, is this necessary? Are the taxing authorities part of the Bankruptcy Case and setting paid taxes as a matter of course?]**

US.356247233.03

(j)      A resolution of each party comprising Seller, signed by each party comprising Seller's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(k)      The Sale Order;

(l)      A Certificate of Good Standing from _____ evidencing that each Seller is in good standing under the laws of _____;

(m)     To the extent not previously delivered to Purchaser, all originals (or copies if originals are not available) of the Assigned Operating Agreements, Licenses and Permits, Books and Records, keys and lock combinations, which shall be located at the Hotels on the Closing Date;

(n)      An Assignment and Assumption of the Franchise Agreements;

(o)      The Closing Statement prepared pursuant to Section 11.1 hereof;

(p)      Such other documents and instruments as may be reasonably requested by Purchaser in order to consummate the transaction described in this Agreement;

(q)      The Executory Contract Order; and

(r)      An Assignment and Assumption of Tenant Leases.

        10.3.2.   _Purchaser's Deliveries_. At the Closing, Purchaser shall deliver or cause to be delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers all of the (i) documents set forth in this Section 10.3.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.3.2 (the "Purchaser Closing Deliveries"), as follows:

(a)      The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser;

(b)      A letter of direction to Escrow Agent authorizing and  directing Escrow Agent to disburse the Earnest Money to Sellers or to such party or parties as Sellers shall designate;

(c)      A closing certificate in the form of Exhibit H, together with all exhibits thereto;

(d)      A resolution of Purchaser, signed by Purchaser's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(e)      A Certificate of Good Standing from _____ evidencing that Purchaser is in good standing under the laws of _____;

(f)      A counterpart of each of the documents and instruments to be delivered by Sellers under Section 10.3.1 hereof which require execution by Purchaser;

(g)      Such other documents and instruments as may be reasonably requested by Sellers or the Title Company in order to consummate the transaction described in this Agreement;

28

(h)     An Assignment and Assumption of the Franchise Agreements; and

(i)     An Assignment and Assumption of Tenant Leases.

**10.4**    Possession. Sellers shall deliver possession of the Real Properties and tangible Personal Property to Purchaser upon completion of the Closing, subject to transient hotel guest occupancy and use.


# ARTICLE XI
# PRORATIONS AND EXPENSES

**11.1**    Closing Statement. No later than the day prior to Closing, the Parties, through their respective employees, agents or representatives, jointly shall make such examinations, audits and inventories of the Hotels as may be necessary to make the adjustments and prorations to the Purchase Price as set forth in Sections 11.2 and 11.3 hereof or any other provisions of this Agreement. Based upon such examinations, audits and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "Closing Statement"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement, except to the extent any such items shall be reprorated after the Closing as expressly set forth in Section 11.2 hereof.

**11.2**    Prorations. The items of revenue and expense set forth in this Section 11.2 shall be prorated between the Parties (the "Prorations") as of 11:59 p.m. on the day preceding the Closing Date (the "Cut-Off Time"), or such other time expressly provided in this Section 11.2, so that the Closing Date is a day of income and expense for Purchaser.

11.2.1.    Taxes. All real property, personal property, and similar Taxes shall be prorated as of the Cut-Off Time between Sellers and Purchaser. If the amount of any such Taxes is not ascertainable on the Closing Date, the proration for such Taxes shall be based on the most recent available bill; provided, however, that after the Closing, Sellers and Purchaser shall reprorate the Taxes and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant taxable period. This Section 11.2.1 shall survive the Closing.

11.2.2.    Contracts. Any amounts prepaid, accrued or due and payable under the Contracts (other than for utilities which proration is addressed separately in Section 11.2.4 hereof) shall be prorated as of the Cut-Off Time between Sellers and Purchaser, with Sellers being credited for amounts prepaid, and Purchaser being credited for amounts accrued and unpaid. Purchaser shall receive a credit for all deposits held by Sellers under the Contracts (together with any interest thereon if interest is required to be paid to the counterparty) which are not transferred to Purchaser, and Purchaser thereafter shall be obligated to refund or apply such deposits in accordance with the terms of such Contracts. Sellers shall receive a credit for all deposits made by Sellers under the Contracts (together with any interest thereon) which are transferred to Purchaser or remain on deposit for the benefit of Purchaser.

29

11.2.3.    Licenses and Permits. All amounts prepaid, accrued or due and payable under any Licenses and Permits transferred to Purchaser shall be prorated as of the Cut-Off Time between Sellers and Purchaser. Sellers shall receive a credit for all deposits made by Sellers under the Licenses and Permits (together with any interest thereon) which are transferred to Purchaser or which remain on deposit for the benefit of Purchaser. For all Excluded Contracts, Purchaser shall be responsible to pay all termination fees and other costs thereunder which are due by reason of the Sellers' termination thereof.

11.2.4.    Utilities. All utility services shall be prorated as of the Cut-Off Time between Sellers and Purchaser. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings are not obtained as of the Closing Date, the cost of such utilities shall be prorated between Sellers and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, the Parties shall reprorate the amount for such utilities and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant billing period, which obligation shall survive the Closing. Sellers shall receive a credit for all fuel stored at the Hotels based on Sellers' cost for such fuel. Sellers shall receive a credit for all deposits transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts.

11.2.5.    Compensation. Sellers shall pay directly to the Rehired Employees all Employee Compensation due to such Rehired Employees through the date immediately prior to the Closing Date on or before Sellers' first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Employee Compensation; provided, however, that any portion of Employee Compensation consisting of tax withholdings, employer taxes, and the like shall be paid to the appropriate collecting entity.

11.2.6.    Accrued Vacation Pay. Sellers shall pay directly to the Rehired Employees all Accrued Vacation Pay due to such Rehired Employees through the date immediately prior to the Closing Date on or before each of Seller's first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Accrued Vacation Pay.

11.2.7.    Bookings. Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Purchaser.

11.2.8.    Retail Merchandise and F&B. Sellers shall receive a credit at Closing from Purchaser for all Retail Merchandise and unopened items of F&B (including, without limitation, all F&B in any "mini bars" in the guest rooms) based on Sellers' cost for such items.

11.2.9.    Restaurants and Bars. Sellers shall close out the transactions in the restaurants and bars in the Hotels as of the regular closing time for such restaurants and bars during the night in which the Cut-Off Time occurs and retain all monies collected and receivables arising from such transactions as of such closing, and Purchaser shall be entitled to any monies collected from the restaurants and bars thereafter.

11.2.10.    Vending Machines. Sellers shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and

30

shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

11.2.11.   Trade Payables. Except to the extent an adjustment or proration is made under another subsection of this Section 11.2, (i) Sellers shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Business (the "Trade Payables") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotels prior to Closing, and (ii) Purchaser shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Sellers and Purchaser shall reprorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for such goods or services. Sellers shall receive a credit for all advance payments or deposits made with respect to FF&E, Supplies, F&B and Retail Merchandise ordered, but not delivered to the Hotels prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, Supplies, F&B and Retail Merchandise which were ordered prior to Closing. This Section 11.2.11 shall survive the Closing.

11.2.12.   Cash. Sellers shall receive a credit for all cash on hand or on deposit in any house bank at the Hotels which shall remain on deposit for the benefit of Purchaser.

11.2.13.   All Adjustments and Prorations. All of the foregoing adjustments and prorations as well as all other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a hotel property similar to the Properties shall be adjusted and prorated between Sellers and Purchaser in accordance with the prevailing Uniform System of Accounts for the Lodging Industry.

**11.3**   Accounts Receivable.

11.3.1.   Guest Ledger. At Closing, Sellers shall receive a credit from Purchaser in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs, and (ii) one half ($^{1}/_{2}$) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger which shall be prorated in accordance with Section 11.2.9 hereof), and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

11.3.2.   Accounts Receivable (Other than Guest Ledger). Sellers shall retain the right to collect all Accounts Receivable (other than the Guest Ledger which is addressed in Section 11.3.1 hereof), and Purchaser shall not receive a credit for the Accounts Receivable. Purchaser shall cooperate with Sellers in collecting the Accounts Receivable, at no cost or expense to Purchaser other than any de minimis cost and expense or any cost or expense which Sellers agree in writing to reimburse. If any Accounts Receivable are paid to Purchaser after the Closing, Purchaser shall pay to Sellers the amounts received by Purchaser within five (5) days after receipt of such amounts, without any commission or deduction for Purchaser.

**11.4**   Transaction Costs.

31

11.4.1.    <u>Seller's Transaction Costs</u>. In addition to the other costs and expenses to be paid by Sellers set forth elsewhere in this Agreement, Sellers shall pay for the following items in connection with this transaction: (i) the fees and expenses of removing or curing any Unpermitted Exceptions which Sellers elect to cure or remove pursuant to this Agreement; (ii) the commission due to Broker; (iii) one half ($^1/_2$) of the fees and expenses for the Escrow Agent; (iv) any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Properties, except as may otherwise be set forth in an order of the Bankruptcy Case; and (v) the fees and expenses of its own attorneys, accountants and consultants.

11.4.2.    <u>Purchaser's Transaction Costs</u>. In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction: (i) the fees and expenses incurred by Purchaser for Purchaser's Inspectors or otherwise in connection with the Inspections; (ii) all of the fees, costs, and expenses for the Title Commitments and Title Policies; (iii) all of the fees, costs, and expenses for any Updated Surveys; (iv) any mortgage tax, title insurance fees and expenses for any loan title insurance policies, recording charges or other amounts payable in connection with any financing obtained by Purchaser; (v) one half ($^1/_2$) of the fees and expenses for the Escrow Agent; (vi) the fees and expenses of its own attorneys, accountants and consultants; and (vii) any fees or expenses payable for the assignment, transfer or conveyance of any Assigned Operating Agreements, Licenses and Permits, IT Systems, Intellectual Property, Plans and Specifications and Warranties and

11.4.3.    <u>Other Transaction Costs</u>. All other fees, costs and expenses not expressly addressed in this Section 11.4 or elsewhere in this Agreement shall be allocated between Sellers and Purchaser or paid by the applicable Party, as the case may be, in accordance with the prevailing Uniform System of Accounts for the Lodging Industry, and to the extent not covered thereby in accordance with the prevailing applicable custom and practice for similar transactions.

## ARTICLE XII
## TRANSITION PROCEDURES

**12.1**    <u>Safe Deposit Boxes</u>. Prior to the Closing, Sellers shall notify all guests or customers who are then using a safe deposit box at the Hotels advising them of the pending change in ownership of the Hotels and requesting them to conduct an inventory and verify the contents of such safe deposit box. All inventories by such guests or customers shall be conducted under the joint supervision of employees, agents or representatives of the Parties. Upon such inventory and verification and upon the completion of the Closing, Sellers shall deliver to Purchaser all keys, receipts and agreements for such safe deposit box (and thereafter such safe deposit box shall be deemed an "<u>Inventoried Safe Deposit Box</u>"). Upon Closing, Sellers shall deliver to Purchaser a list of all safe deposit boxes which are then in use, with the name and room number of such depositor. After the Closing, the Parties shall make appropriate arrangements for guests and customers at the Hotels to inventory and verify the contents of the non Inventoried Safe Deposit Boxes, and upon such inventory and verification, Sellers shall deliver to Purchaser all keys, receipt and agreements for such safe deposit box (and such safe deposit box thereafter shall constitute an Inventoried Safe Deposit Box). Purchaser shall be responsible for, and shall indemnify, defend, save and hold harmless the Seller Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to, any theft, loss or

damage to the contents of any safe deposit box from and after the time such safe deposit box is deemed an Inventoried Safe Deposit Box pursuant to this Section 12.1. Sellers shall be responsible for, and shall indemnify, defend, save and hold harmless the Purchaser Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Purchaser Indemnitees with respect to, any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is deemed an Inventoried Safe Deposit Box.

**12.2**    <u>Baggage</u>. On the Closing Date, employees, agents or representatives of the Parties jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Sellers at the Hotels, and Sellers shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "<u>Inventoried Baggage</u>"). Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage, boxes or similar items left in the care of Purchaser which was not inventoried by the Parties. Sellers shall be responsible for, and shall indemnify and hold harmless the Purchaser Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Purchaser Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage, boxes or similar items left in the care of Sellers which was not inventoried by the Parties.

**ARTICLE XIII**
**DEFAULT AND REMEDIES**

**13.1**    <u>Sellers Default</u>. If, at the time of Closing, Sellers fail to perform their material covenants or material obligations under this Agreement and no Purchaser Default has occurred (a "<u>Seller Default</u>") that has prevented the satisfaction of the conditions to the obligations of Purchaser to close the transactions set forth in Sections 9.2.1(b) or 9.2.1(c) hereof, then Purchaser, as its sole and exclusive remedy, may elect upon written notice to Sellers to (a) terminate this Agreement, and if Sellers fail to remedy the Seller Default within thirty (30) days thereafter, this Agreement shall terminate (a "<u>Sellers' Breach Termination Event</u>") and the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without offset or deduction to the Purchase Price; or (c) obtain a court order for specific performance. Purchaser hereby waives any and all other rights and/or remedies it may otherwise have at law and/or in equity.

**13.2**    <u>Purchaser's Default</u>. If Purchaser fails to perform any of its material covenants or material obligations under this Agreement and no Seller Default has occurred which remains uncured (a "<u>Purchaser Default</u>"), then Sellers, as their sole and exclusive remedy, may elect to (A) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Sellers in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing pursuant to this Agreement.

33

**13.3**  LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 13.2 HEREOF, THE DAMAGES THAT SELLERS WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLERS SHALL RETAIN THE EARNEST MONEY AS A FAIR AND REASONABLE SUM AND AS FAIR MEASURE OF DAMAGES, AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLERS' SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION. NOTWITHSTANDING THE FOREGOING, THE REMEDY OF LIQUIDATED DAMAGES SHALL NOT LIMIT, AND SHALL NOT BE DEEMED TO LIMIT, IN ANY WAY THE RIGHTS AND REMEDIES AVAILABLE TO SELLERS WHICH SURVIVE TERMINATION OF THIS AGREEMENT.

**ARTICLE XIV**
**RISK OF LOSS**

**14.1**  Casualty. If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Properties or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Sellers shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

14.1.1.    Material Casualty. If the amount of the repair restoration of the Properties required by a Casualty equals or exceeds ten percent (10%) of the Purchase Price, as estimated by Sellers' architect (a "Material Casualty") then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of the estimate from Sellers' architect, to (a) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.3 hereof, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Sellers shall (i) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (A) the applicable insurance deductible, and (B) and the reasonable estimated costs for the repair or restoration of the Properties required by such Material Casualty, and (ii) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Sellers with respect to the Properties or the Business. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

14.1.2.    Non Material Casualty. In the event of any Casualty which is not a Material Casualty, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall (A) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (1) the applicable insurance deductible under Sellers' applicable insurance policy, and (2) the reasonable estimated costs for the repair or restoration required by such Casualty, and (B) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty insurance policies maintained by Sellers with respect to the Hotels.

34

**14.2**    <u>Condemnation</u>. If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Real Properties (a "<u>Condemnation</u>"), Sellers shall give written notice of such Condemnation to Purchaser promptly after Sellers receive notice of such Condemnation.

14.2.1.    <u>Material Condemnation</u>. If the Condemnation would (i) result in the permanent loss of more than five percent (5%) of the fair market value of the Land or Improvements, (ii) result in any permanent material reduction or restriction in access to the Land or Improvements, or (iii) have a permanent materially adverse effect on the Business as conducted prior to such Condemnation (a "<u>Material Condemnation</u>"), then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of Sellers' written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.3 hereof, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Material Condemnation. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

14.2.2.    <u>Non-Material Condemnation</u>. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Condemnation.

## ARTICLE XV
## SURVIVAL, INDEMNIFICATION AND RELEASE

**15.1**    <u>Survival</u>. Except only as expressly set forth in this Section 15.1, all representations, warranties, covenants, liabilities and obligations shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

15.1.1.    <u>Survival of Representations and Warranties</u>. The payment of the Purchase Price and the delivery of the deed(s) by Sellers to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

15.1.2.    <u>Survival of Covenants and Obligations</u>. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

35

15.1.3.    Survival of Indemnification. This ARTICLE XV and all other rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

**15.2**    Indemnification by Sellers. Subject to the limitations set forth in any express provision of in this Agreement, Sellers shall indemnify, defend, save and hold harmless the Purchaser Indemnitees from and against any Indemnification Loss incurred by any Purchaser Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Sellers in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) the breach by Sellers of any of their covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Retained Liabilities.

**15.3**    Indemnification by Purchaser. Subject to the limitations set forth in any express provision of this Agreement, Purchaser shall indemnify, defend, save and hold harmless the Seller Indemnitees from and against any Indemnification Loss incurred by any Seller Indemnitee to the extent resulting from (i) any breach of any express representations or warranties of Purchaser in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) any breach by Purchaser of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Assumed Liabilities.

**15.4**    Limitations on Indemnification Obligations.

15.4.1.    Indemnification Deductible and Cap. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide indemnification to the Purchaser Indemnitees pursuant to clause (i) of Section 15.2 hereof to the extent that (a) the aggregate of all Indemnification Losses under clause (i) of Section 15.2 hereof does not exceed $150,000.00, (b) with respect to any individual Indemnification Loss, such Indemnification Loss does not exceed $25,000.00, or (c) such Indemnifications Losses exceed 25% of the Purchase Price, in the aggregate.

15.4.2.    Negligence or Willful Misconduct of Indemnitee. Notwithstanding anything to the contrary in this Agreement, (i) a Purchaser Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Purchaser Indemnitee, and (ii) a Seller Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Seller Indemnitee.

15.4.3.    WAIVER OF CERTAIN DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, SELLERS (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ALL RIGHTS TO CLAIM OR SEEK ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES.

US.356247233.03

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

**16.1**    Notices

16.1.1.    <u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address, facsimile number or e-mail address:

If to Seller:

        c/o AD1 Management, Inc.
        1955 Harrison Street, Suite 200
        Hollywood, Florida  33020
        Attn: Alex Fridzon
        E-mail address: alex@ad1global.com

        With a copy to:

        Faegre Drinker Biddle & Reath LLP
        1800 Century Park East, Suite 1500
        Los Angeles, California 90067
        Attn: Scott Gautier
        E-mail address: scott.gautier@faegredrinker.com

        With a copy to:

        Faegre Drinker Biddle & Reath LLP
        1177 Avenue of the Americas
        41st Floor
        New York, New York 10036
        Attn: Joe Brasile
        E-mail address: joe.brasile@faegredrinker.com

If to Purchaser:

        _____
        _____
        _____
        Attn: _____
        E-mail address: _____

With a copy to:

_____

_____

_____

Attn: _____

E-mail address:_____

16.1.2.    <u>Receipt of Notices</u>. All Notices sent by a Party (or its counsel pursuant to Section 16.1.4 hereof) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. **[Eastern]** on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 16.1.3 hereof.

16.1.3.    <u>Change of Address</u>. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 16.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 16.1.

16.1.4.    <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**16.2** <u>No Recordation</u>. No Party shall record this Agreement, or any memorandum of this Agreement, in any public records.

**16.3** <u>Time is of the Essence</u>. Time is of the essence as to all dates and/ or times, as applicable, set forth in this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**16.4** <u>Assignment</u>. Purchaser shall not assign this Agreement or any interest therein to any Person, without the prior written consent of Sellers, which consent may be withheld in Sellers' sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to designate any affiliate(s) (which is intended to be broader than the defined term "Affiliate") as its nominee to receive title to the Properties, or assign all of its right, title and interest in this Agreement to any affiliate(s) of Purchaser by providing written notice to Sellers no later than five (5) days prior to the Closing, provided that in any such event the originally named Purchaser shall remain liable for all Purchaser obligations hereunder.

**16.5** <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

US.356247233.03

**16.6**    Third Party Beneficiaries. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**16.7**    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF FLORIDA, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**16.8**    Rules of Construction. The following rules shall apply to the construction and interpretation of this Agreement:

16.8.1.    Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

16.8.2.    All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

16.8.3.    The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

16.8.4.    Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

16.8.5.    The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

16.8.6.    The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

16.8.7.    The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**16.9**    Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

US.356247233.03

**16.10**  JURISDICTION AND VENUE. ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE BANKRUPTCY COURT AND SELLERS (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURT AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**16.11**  WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY WAIVE ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

**16.12**  Survival. The payment of the Purchase Price and the delivery of the deed(s) by Sellers to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement excepting only that the provisions of Sections 2.2(b)(ii), 2.4, 2.5, 6.1, 8.1, 8.1.2, 8.5, 8.6, 11.2.1 and 11.4 hereof and Articles XV and XVI hereof shall survive the Closing.  Notwithstanding anything to the contrary contained herein, Sections 8.1, 8.1.2 and Articles XIII, XV and XVI hereof shall survive the termination of this Agreement.

**16.13**  Incorporation of Recitals, Exhibits and Schedules. The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 16.15 hereof) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**16.14**  Entire Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede the Letter of Intent and any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**16.15**  Amendments, Waivers and Termination of Agreement. No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**16.16**  Not an Offer. The delivery by Sellers of this Agreement executed by Sellers shall not constitute an offer to sell the Properties, and Sellers shall have no obligation to sell the Properties to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

**16.17**  Execution of Agreement. A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts

US.356247233.03

together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**[Remainder of page intentionally left blank;
Signatures on following pages]**

US.356247233.03

**IN WITNESS WHEREOF,** each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER:**

[_____]

By: _____,
Its _____

   By: _____,
   Its _____

      By:_____
         Name:
         Title:

**PURCHASER:**

[_____]

By: _____,
Its _____

   By: _____,
   Its _____

      By:_____
         Name:
         Title:

42

## Exhibit A

## SELLERS ENTITIES

1. AD1 LBV1, LLC, a Delaware limited liability company ("**Crowne Plaza Orlando Seller**")

2. AD1 CELEBRATION HOTELS, LLC, a Florida limited liability company ("**Staybridge Seller**")

3. AD1 DAYTONA HOTELS, LLC, a Florida limited liability company ("**Rushhh Seller**")

4. AD1 PB AIRPORT HOTELS, LLC, a Delaware limited liability company ("**Holiday Inn Seller**")

5. AD1 URBAN PALM BAY PLACE, LLC, a Delaware limited liability company ("**Hyatt Seller**")

6. AD1 URBAN PALM BAY, LLC, a Delaware limited liability company ("**Home2 Suites Seller**")

7. AD1 SW PROPERTY HOLDINGS, LLC, a Delaware limited liability company ("**Aloft/Element Seller**")

**Exhibit B**

**DEBTOR ENTITIES AND CASE NUMBERS**

1. IN RE: AD1 URBAN PALM BAY, LLC, Case No. 23-10074

2. IN RE: AD1 URBAN PALM BAY PLACE, LLC, Case No. 23-10075

3. IN RE: AD1 URBAN STRATEGY PALM BAY, LLC, Case No. 23-10076

4. IN RE: AD1 LBV1, LLC, Case No. 23-10077

5. IN RE: AD1 LBV HOTELS, LLC, Case No. 23-10078

6. IN RE: AD1 SW PROPERTY HOLDINGS, LLC, Case No. 23-10079

7. IN RE: AD1 URBAN SW, LLC, Case No. 23-10080

8. IN RE: AD1 PALM BEACH AIRPORT HOTELS, LLC, Case No. 23-10081

9. IN RE: AD1 PB AIRPORT HOTELS, LLC, Case No. 23-10082

10. IN RE: AD1 CELEBRATION HOLDINGS, LLC, Case No. 23-10084

11. IN RE: AD1 CELEBRATION HOTELS, LLC, Case No. 23-10085

12. IN RE: AD1 DAYTONA HOLDINGS, LLC, Case No. 23-10086

13. IN RE: AD1 DAYTONA HOTELS, LLC, Case No. 23-10087

## Exhibit C

## FORM OF EARNEST MONEY ESCROW AGREEMENT

This escrow agreement (the "Escrow Agreement") is made as of this ___ day of _____, 20__ by and between _____ ("Seller"), _____ ("Purchaser"), and COMMONWEALTH LAND TITLE INSURANCE COMPANY, having an address at 685 Third Avenue, 20th Floor, New York, New York 10017 ("Escrow Agent").

## WITNESSETH:

WHEREAS, and Purchaser have entered into a Purchase and Sale Agreement with an effective date of _____, 20__ (the "Agreement") for the sale of that certain premises which is commonly known as _____ and is located in _____ (the "Transaction").  A copy of the Agreement has been received by Escrow Agent.

WHEREAS, Purchaser is obligated to deposit certain monies into escrow with Escrow Agent to be held as earnest money for the benefit of Sellers pursuant to the Agreement in connection with the Transaction (the "Earnest Money").

WHEREAS, in furtherance of the Transaction, the parties desire and Escrow Agent is willing to hold the Earnest Money in escrow on the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable considerations, the receipt of and sufficiency thereof, is duly acknowledged, the parties hereto agree as follows:

1.      The terms of the Agreement are incorporated herein by reference, and Escrow Agent agrees to abide by such terms as they may be applicable to Escrow Agent.  All capitalized items not otherwise defined therein shall have the meanings ascribed to them in the Agreement.

2.      Upon receipt of a fully executed Internal Revenue Service Form W-9, Escrow Agent shall be authorized to invest any Earnest Money funds in an interest bearing money market account at **[Citibank, N.A.]**

3.      When the closing of the Transaction takes place, Escrow Agent shall deliver the Earnest Money to or upon Sellers, provided Purchaser has executed and delivered to Escrow Agent a letter certifying that all of the conditions precedent to be performed by Sellers set forth in the Agreement between Sellers and Purchaser have been duly satisfied or have been expressly waived by Purchaser, which letter shall be delivered by email to Escrow Agent.

4.      Pursuant to Paragraph ___ of the Agreement, Purchaser may, prior to _____, 20__, elect to terminate the Agreement by giving written notice thereof to Sellers and to Escrow Agent, and, in such event, the Earnest Money shall be returned to Purchaser by Escrow Agent, whereupon the Agreement and this Escrow Agreement shall be cancelled and none of the parties hereto shall have any further rights and obligations hereunder, except as provided in the Agreement.

5.      If Purchaser does not terminate the Agreement in the manner described in Section ___ of the Agreement, but the closing of the sale does not take place, Escrow Agent shall pay the Earnest Money to, or upon the instruction of, the party entitled thereto in accordance with the provisions of the Agreement; provided, however, that Escrow Agent shall not pay the Earnest Money in such event unless and until (a) it delivers written notice to the other party notifying such other party of its intention to deliver the Earnest Money, and (b) such other party or its attorney as designated below shall not deliver to Escrow Agent a written notice objecting to such delivery of the Earnest Money within ten (10) days after delivery of Escrow Agent's notice.

6.      With respect to delivering the Earnest Money in accordance with Paragraphs 3 or 5, in the event that Escrow Agent receives conflicting instructions from the parties or determines in good faith that a bona fide dispute exists as to whether Escrow Agent is obligated to deliver the Earnest Money, or as to whom said Earnest Money is to be delivered, Escrow Agent, at its option, may: (a) refuse to comply with any claims or demands on it and continue to hold the Earnest Money until (i) Escrow Agent receives written notice signed by Sellers and Purchaser directing the release and delivery of the Earnest Money, in which event Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (ii) Escrow Agent receives a certified copy of a final non-appealable judgment of a court of competent jurisdiction directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction; (b) deliver the Earnest Money to the Clerk of the Supreme Court of the State of Florida, for the County of _____; or (c) take such affirmative steps as Escrow Agent may elect in order to substitute another impartial party reasonably satisfactory to Sellers and Purchaser (whose consents to such substitution shall not be unreasonably withheld), to hold the Earnest Money, including, without limitation, the deposit thereof in a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be the joint and several obligation of Sellers and Purchaser (but, as between Sellers and Purchaser, such costs shall be borne by whichever of Sellers or Purchaser is the losing party, or in accordance with any mutual agreement of Sellers and Purchaser if neither party is the losing party).

7.      Escrow Agent is acting as a stakeholder only with respect to the Earnest Money.  It is agreed that the duties of the Escrow Agent are only as herein specifically provided, and are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or gross negligence.  Sellers and Purchaser each release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder.

8.      Sellers and Purchaser acknowledge that Escrow Agent's duties are solely limited to holding and disbursement of the Earnest Money as set forth herein and that Escrow Agent shall have no obligations, responsibilities or duties, fiduciary or otherwise, under this Escrow Agreement and shall incur no liability to either Sellers or Purchaser pursuant to the terms hereof, unless and until the first deposit of funds is made by or on behalf of Purchaser pursuant to the terms of the Agreement.

9.      Sellers and Purchaser shall jointly and severally indemnify, defend (with counsel acceptable to Escrow Agent) and save harmless Escrow Agent from and against all loss, cost, claim, liability, damage and expense, including reasonable attorneys' fees and disbursements incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this Escrow Agreement, or involving gross negligence on the part of Escrow Agent (the "Indemnified Matters") (but, as between Sellers and Purchaser, the cost of such Indemnified Matters shall be shared equally, except to the extent that such Indemnified Matters are attributable to the breach by Sellers or Purchaser of the Agreement or this Escrow Agreement, in which event the cost shall be borne by whichever of Sellers or Purchaser is the breaching party).

10.     The parties agree and acknowledge that Escrow Agent has no liability in connection with the Earnest Money in the event of the failure or insolvency of the financial institution in which the Earnest Money is deposited.

11.     All notices, demands, offers, elections or other communications required or permitted by this Escrow Agreement shall be in writing and shall be personally delivered by (a) express mail or by reputable overnight courier which delivers only upon receipt of addresses, and addressed to the party at its address set forth below by either of the aforesaid methods; (b) electronic mail (i.e., email) to the address set forth below; or (c) by registered or certified mail, postage prepaid, with a return receipt requested, with copies as follows:

To Seller:

       c/o AD1 Management, Inc.
       1955 Harrison Street, Suite 200
       Hollywood, Florida  33020
       Attn: Alex Fridzon
       E-mail address: alex@ad1global.com

       With a copy to:

       Faegre Drinker Biddle & Reath LLP
       1800 Century Park East, Suite 1500
       Los Angeles, California 90067
       Attn: Scott Gautier
       E-mail address: scott.gautier@faegredrinker.com

       With a copy to:

       Faegre Drinker Biddle & Reath LLP
       1177 Avenue of the Americas
       41st Floor
       New York, New York 10036
       Attn: Joe Brasile
       E-mail address: joe.brasile@faegredrinker.com

To Purchaser:


With a copy to:


To Escrow Agent:    Commonwealth Land Title Insurance Company
685 Third Avenue, 20th Floor
New York, NY 10017
Attention:
Email:

or at such other address as, from time to time, shall be supplied by a party to the others by like notice, and shall be deemed to have been given or sent, (i) if sent by express mail or by registered or by certified mail, when properly deposited with the United States Postal Services with the proper address and postage paid therewith, and shall be deemed to have been received when actually delivered to or refused receipt at the specified address; (ii) if sent by email, when sent to the recipient; or (iii) if sent by overnight courier, when delivered to said courier service with the proper address and delivery charges either prepaid or charged to a proper account, and deemed to have been received when actually delivered to the specified address.

Notwithstanding the foregoing paragraph to the contrary, in the event any notice, demand, offer, election or other communication is sent by email, then (i) a copy shall also be sent by one of the other methods set forth in this Section 11, and (ii) if any notice, demand, offer, election or other communications is delivered on a non-business day or after 5:00 p.m. (local time of the recipient) on a business day, then, in either event, it shall not be deemed given and received until 9:00 a.m. (local time of the recipient) on the following business day.

Notwithstanding preceding paragraphs in this Section 11 to the contrary, and solely with respect to Escrow Agent, notice shall be deemed to have been given or delivered to Escrow Agent on the date of Escrow Agent's actual receipt or refusal of such notice.  Each party shall be entitled to rely on all communications which purport to be on behalf of the party and purport to be signed by an authorized party or the above-indicated attorneys or such other attorney as may be designated from time to time by any of the parties hereto.

12.    Escrow Agent hereunder may resign at any time giving ten (10) business days prior written notice to that effect to each of the Sellers and Purchaser.  In such event, the successor Escrow Agent shall be selected by the Purchaser and approved by Sellers, such approval not to be unreasonably withheld or delayed.  Escrow Agent shall then deliver to successor Escrow Agent

the Earnest Money, to be held by successor Escrow Agent pursuant to the terms of this Escrow Agreement and the Agreement.

13.     In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained herein, and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and believed by Escrow Agent to have been signed by the proper person.  Escrow Agent may assume that any person purporting to give any notice hereunder and representing that they have authority to do so has been duly authorized to do so.

14.     Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein.  Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery or to enforce any obligation of any person to perform any other act. Escrow Agent shall be under no liability to the other parties hereto or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document.

15.     Escrow Agent shall be entitled to approve (not to be unreasonably withheld or delayed) any and all counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Escrow Agreement.

16.     It is expressly agreed that this Escrow Agreement is for the sole benefit of the parties hereto and shall not be construed or deemed to be made for the benefit of any third party or parties.

17.     This Escrow Agreement and the obligations of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Florida.

18.     If any provision of this Escrow Agreement or the application thereof to any entity, person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Escrow Agreement and the application of such provisions to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

19.     This Escrow Agreement contains the entire understanding between the parties hereto.  No variations, modifications or changes hereof shall be binding upon any party hereto unless set forth in a document duly executed by all parties hereto.

20.     Whenever used herein, the singular number shall include the plural, and the use of any gender shall include all genders.  Obligations under this Escrow Agreement shall be binding upon Sellers and Purchaser, jointly and severally.  This Escrow Agreement shall be binding upon and enforceable between Sellers and Purchaser, their heirs, executors, administrators, legal representatives, successors, assigns or trustees.

21.    This Escrow Agreement may be executed in multiple original counterparts, all of which shall be deemed originals and with the same effect as if all parties hereto had signed the same document.  All such counterparts shall be construed together and shall constitute one and the same instrument. Further, for purposes of executing this Escrow Agreement, a document signed and transmitted by email in pdf format shall be treated as an original document, the signature of any party thereon shall be considered an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document. At the request of any party, any document transmitted by email shall be re-executed by the parties in original form.  No party may raise the fact that any signature was transmitted through the use of email as a defense to the enforcement of this Escrow Agreement or any amendment executed in compliance with this Section 21.

22.    Each party waives the right to a jury trial of any dispute relating to this Escrow Agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the date first above-written.

**Seller:**

By: _____

Printed Name: _____

Title: _____

**Purchaser:**

By: _____

Printed Name: _____

Title: _____

**Escrow Agent:**    **COMMONWEALTH LAND TITLE INSURANCE COMPANY**

By: _____

Printed Name: _____

Title: _____

## **LIST OF SCHEDULES**

Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____

## **Exhibit 3**

Stalking Horse Transaction Agreement

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

**THE ENTITIES LISTED ON EXHIBIT A ATTACHED HERETO**

AS SELLER

AND

[_____]
a _____

AS PURCHASER

DATED AS OF _____

FOR THE

**THE HOTELS ON EXHIBIT B ATTACHED HERETO**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ................................................................................................ **1**
    **1.1**    Definitions ................................................................................................ 1

**ARTICLE II THE PROPERTIES AND LIABILITIES** .............................................. **9**
    **2.1**    Description of the Properties ................................................................ 9
    **2.2**    Executory Contracts .............................................................................. 11
    **2.3**    Cure Costs .............................................................................................. 13
    **2.4**    Assumed Liabilities ............................................................................... 13
    **2.5**    Retained Liabilities ............................................................................... 13

**ARTICLE III PURCHASE PRICE** ............................................................................. **13**
    **3.1**    Purchase Price ...................................................................................... 13
    **3.2**    Earnest Money....................................................................................... 13
    **3.3**    Payment of Purchase Price .................................................................. 14
    **3.4**    Allocation of Purchase Price ............................................................... 14
    **3.5**    Like-Kind Exchange ............................................................................. 14

**ARTICLE IV CONTINGENCIES** ............................................................................... **14**

**ARTICLE V TITLE TO THE PROPERTY** ............................................................... **15**
    **5.1**    Title Commitments................................................................................ 15
    **5.2**    Surveys ................................................................................................... 15
    **5.3**    Exceptions to Title ............................................................................... 15
    **5.4**    Conveyance of the Real Properties ..................................................... 16

**ARTICLE VI CONDITION OF THE PROPERTY** ................................................. **16**
    **6.1**    PROPERTIES SOLD "AS IS" .......................................................... 16

**ARTICLE VII REPRESENTATIONS AND WARRANTIES**................................ **18**
    **7.1**    Seller's Representations and Warranties............................................. 18
    **7.2**    Purchaser's Representations and Warranties ..................................... 21

**ARTICLE VIII COVENANTS**..................................................................................... **22**
    **8.1**    Confidentiality........................................................................................ 22
    **8.2**    Conduct of the Business ....................................................................... 23
    **8.3**    Licenses and Permits ........................................................................... 23
    **8.4**    Employees .............................................................................................. 24
    **8.5**    Tax Contests .......................................................................................... 24
    **8.6**    Notices and Filings ............................................................................... 24
    **8.7**    Further Assurances ............................................................................... 24
    **8.8**    Assignment and Assumption of the Franchise Agreements............... 24

**ARTICLE IX CLOSING CONDITIONS**.................................................................... **25**
    **9.1**    Mutual Closing Condition .................................................................... 25
    **9.2**    Purchaser Closing Conditions ............................................................ 25
    **9.3**    Sellers Closing Conditions .................................................................. 26

**ARTICLE X CLOSING** ........................................................................................... **26**
    **10.1**    Closing Date ..................................................................................... 26
    **10.2**    Closing Escrow .................................................................................. 27
    **10.3**    Closing Deliveries ............................................................................. 27
    **10.4**    Possession ......................................................................................... 29
    **10.5**    Break-Up Fee .................................................................................... 29

**ARTICLE XI PRORATIONS AND EXPENSES** ................................................... **30**
    **11.1**    Closing Statement ............................................................................. 30
    **11.2**    Prorations ......................................................................................... 30
    **11.3**    Accounts Receivable ........................................................................ 32
    **11.4**    Transaction Costs ............................................................................. 33

**ARTICLE XII TRANSITION PROCEDURES** ...................................................... **34**
    **12.1**    Safe Deposit Boxes .......................................................................... 34
    **12.2**    Baggage ............................................................................................ 34

**ARTICLE XIII DEFAULT AND REMEDIES** ....................................................... **34**
    **13.1**    Sellers Default .................................................................................. 34
    **13.2**    Purchaser's Default ........................................................................... 35
    **13.3**    LIQUIDATED DAMAGES .............................................................. 35

**ARTICLE XIV RISK OF LOSS** ........................................................................... **35**
    **14.1**    Casualty ............................................................................................ 35
    **14.2**    Condemnation ................................................................................... 36

**ARTICLE XV SURVIVAL, INDEMNIFICATION AND RELEASE** ................... **37**
    **15.1**    Survival ............................................................................................ 37
    **15.2**    Indemnification by Sellers ............................................................... 37
    **15.3**    Indemnification by Purchaser .......................................................... 37
    **15.4**    Limitations on Indemnification Obligations .................................... 37

**ARTICLE XVI MISCELLANEOUS PROVISIONS** .............................................. **38**
    **16.1**    Notices .............................................................................................. 38
    **16.2**    No Recordation ................................................................................. 39
    **16.3**    Time is of the Essence ...................................................................... 40
    **16.4**    Assignment ....................................................................................... 40
    **16.5**    Successors and Assigns .................................................................... 40
    **16.6**    Third Party Beneficiaries ................................................................. 40
    **16.7**    GOVERNING LAW ........................................................................ 40
    **16.8**    Rules of Construction ....................................................................... 40
    **16.9**    Severability ....................................................................................... 41
    **16.10**    JURISDICTION AND VENUE ...................................................... 41
    **16.11**    WAIVER OF TRIAL BY JURY ..................................................... 41
    **16.12**    Survival. ............................................................................................ 41
    **16.13**    Incorporation of Recitals, Exhibits and Schedules ......................... 41
    **16.14**    Entire Agreement ............................................................................. 41

**16.15**   Amendments, Waivers and Termination of Agreement.................................... 42
**16.16**   Not an Offer ............................................................................................... 42
**16.17**   Execution of Agreement .............................................................................. 42

## **LIST OF EXHIBITS**

Exhibit A      Seller Entities
Exhibit B      List of Hotels
Exhibit C      Debtor Entities and Case Numbers
Exhibit D      Form of Earnest Money Escrow Agreement
Exhibit E      _____
Exhibit F      _____
Exhibit G      _____
Exhibit H      _____
Exhibit I       _____


## **LIST OF SCHEDULES**


Schedule ____   _____
Schedule ____   _____
Schedule ____   _____
Schedule ____   _____

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of this _____ day of _____, 2023 (the "<u>Effective Date</u>") by and between THE ENTITIES IDENTIFIED ON <u>EXHIBIT A</u> ATTACHED HERETO (each, a "<u>Seller</u>", and collectively, the "<u>Sellers</u>"), and _____, a _____ ("<u>Purchaser</u>"). Sellers and Purchaser are sometimes referred to herein individually as a "<u>Party</u>", and collectively as the "<u>Parties</u>".

**WHEREAS**, Sellers are the owners of the hotels referred to on <u>Exhibit B</u> attached hereto (collectively, the "<u>Hotels</u>"), and the Properties (as defined below), as more specifically described in this Agreement.

**WHEREAS**, Sellers, as debtors, have filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") bearing the case numbers referenced in <u>Exhibit C</u> attached hereto (collectively, the "<u>Bankruptcy Cases</u>").

**WHEREAS**, Sellers desire to sell the Properties to Purchaser, and Purchaser desires to purchase the Properties from Sellers, on the terms set forth in this Agreement, in accordance with and pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1**    <u>Definitions</u>. In addition to the terms defined above in the introduction and recitals to this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"<u>Accounts Receivable</u>" means all amounts which Sellers are entitled to receive from the Business which are not paid as of the Closing, but expressly excluding all (i) credit card charges, checks and other instruments which Sellers have submitted for payment as of the Closing, and (ii) items of income otherwise prorated pursuant to Sections 11.2 or 11.3 hereof.

"<u>Accrued Vacation Pay</u>" means, with respect to any Rehired Employee, the salary and wages which such Rehired Employee is entitled to receive for any sick or vacation days or other paid time off accrued but unused by such Rehired Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law.

"<u>Affiliate</u>" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means

having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Assigned Operating Agreements" has the meaning set forth in Section 2.1.10 hereof.

"Assignment and Assumption of Tenant Leases" has the meaning set forth in Section 2.1.8 hereof.

"Assignment and Assumption of Franchise Agreements" has the meaning set forth in Section 8.8 hereof.

"Assumed Liabilities" has the meaning set forth in Section 2.4 hereof.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bookings" has the meaning set forth in Section 2.1.16 hereof.

"Books and Records" has the meaning set forth in Section 2.1.13 hereof.

"Breakup Fee" means the amount of $100,000.00 payable to Purchaser on the terms set forth in this Agreement. The Breakup Fee shall be earned and payable to Purchaser, to the extent applicable, in accordance with the terms of Sections 10.5 and 13.1 hereof.

"Broker" means Robert Douglas.

"Business" means the lodging business and all business and activities related or ancillary thereto conducted at the Hotels.

"Business Day(s)" shall mean every day other than (i) Saturdays, (ii) Sundays, (iii) all days observed by the Federal Government of the United States as legal holidays and (iv) all days on which commercial banks in New York State are required by law to be closed.

"Casualty" has the meaning set forth in Section 14.1 hereof.

"Closing" has the meaning set forth in Section 10.1 hereof.

"Closing Date" has the meaning set forth in Section 10.1 hereof.

"Closing Escrow" has the meaning set forth in Section 10.2 hereof.

"Closing Escrow Agreement" has the meaning set forth in Section 10.2 hereof.

"Closing Statement" has the meaning set forth in Section 11.1 hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings and guidance issued by the Internal Revenue Service.

"Condemnation" has the meaning set forth in Section 14.2 hereof.

"Condition of the Property" has the meaning set forth in Section 6.1 hereof.

"Confidential Information" has the meaning set forth in Section 8.1.1 hereof.

"Contracts" means, collectively, the Tenant Leases, the Equipment Leases and the Assigned Operating Agreements.

"Cure Costs" means the aggregate monetary sum required to be paid to the counterparties under the Operating Agreements to be assigned by the applicable Sellers and assumed by Purchaser in accordance with Section 2.2(c) hereof.

"Cut-Off Time" has the meaning set forth in Section 11.2 hereof.

"Deeds" has the meaning set forth in Section 10.3.1(b) hereof.

"Earnest Money" means, at the time in question, the amounts then deposited with Escrow Agent (and any additional amounts as may be deposited with Escrow Agent pursuant to Sections 10.1 and/or 10.6 hereof), together with all interest and any other amounts earned thereon.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1 hereof.

"Employee Compensation" means, with respect to any Employee, all salary and wages which such Employee is entitled to receive at the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding all other compensation accrued or payable to such Employee, including, without limitation, any (i) bonus or incentive compensation; (ii) PTO/Accrued Vacation Pay, sick days and personal days; and (iii) health, welfare and other benefits provided to such Employee, and employer contributions to, and amounts paid or accrued under, any benefit plans for the benefit of such Employee.

"Employees" means, at the time in question, all persons employed full time or part time at the Hotels by Sellers or any of their Affiliates.

"Employer" means the employer of the Employees.

"Employment Agreements" has the meaning set forth in Section 7.1.7 hereof.

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from any one or more of the Properties, or (ii) violation of any Environmental Laws with respect to any one or more of the Properties.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (i) the Comprehensive Environmental Response, Compensation and Liability Act, (ii) the Resource Conservation and Recovery Act, (iii) the Federal Water Pollution Control Act, (iv) the Toxic Substances Control Act, (v) the Clean Water Act, (vi) the Clean Air Act, and (vii) the Hazardous Materials Transportation Act, and similar state and local laws, as amended as of the time in question.

"Environmental Liabilities" means all liabilities and obligations under any Environmental Laws arising from or in connection with any one or more of the Properties, including, without limitation, any obligations to manage, control, contain, remove, remedy, respond to, clean up or abate any actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media.

"Environmental Reports" has the meaning set forth in Section 7.1.15 hereof.

"Equipment Leases" has the meaning set forth in Section 2.1.9 hereof.

"Escrow Agent" means Commonwealth Land Title Insurance Company.

"Exception Notice" has the meaning set forth in Section 5.3.1 hereof.

"Executory Contract Order" has the meaning set forth in Section 2.2. hereof.

"Existing Surveys" means those certain Surveys entitled "_____", last updated on _____ by _____, entitled "_____", last updated on _____ by _____.

"F&B" has the meaning set forth in Section 2.1.6 hereof.

"FF&E" has the meaning set forth in Section 2.1.3 hereof.

"Franchise Agreements" means those certain Franchise Agreements between Sellers and the respective Franchisors which are referenced on Schedule ___ attached hereto.

"Franchisors" means the franchisors under the Franchise Agreements.

4

"<u>Governmental Authority</u>" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"<u>Guest Ledger</u>" means all charges accrued to the open accounts of any guests or customers at the Hotels as of the Cut-Off Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotels, any restaurants, bars or banquet services, or any other goods or services provided by or on behalf of Sellers at the Hotels.

"<u>Hazardous Substances</u>" means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by products and polychlorinated biphenyls to the extent that some are governed by or subject to any restrictions pursuant to Environmental Laws or which give rise to Environmental Liabilities.

"<u>Hotel Guest Data and Information</u>" means, with respect to the Hotels, all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences and any other guest or customer information.[1]

"<u>Improvements</u>" has the meaning set forth in Section 2.1.2 hereof.

"<u>Indemnification Deductible</u>" has the meaning set forth in Section 15.4.2 hereof.

"<u>Indemnification Loss</u>" means, with respect to any Indemnitee, any liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by such Indemnitee as a result of the act, breach, default, omission or occurrence in question.

"<u>Indemnitee</u>" means a Seller Indemnitee or a Purchaser Indemnitee as the case may be.

"<u>Indemnitor</u>" means the Party required to provide defense or indemnification to an Indemnitee.

"<u>Intellectual Property</u>" has the meaning set forth in Section 2.1.13 hereof.

"<u>Inventoried Baggage</u>" has the meaning set forth in Section 12.2 hereof.

"<u>Inventoried Safe Deposit Boxes</u>" has the meaning set forth in Section 12.1 hereof.

"<u>IT Systems</u>" has the meaning set forth in Section 2.1.5 hereof.

"<u>Land</u>" has the meaning set forth in Section 2.1.1 hereof.

---

[1] **[Note: Parties to consider data privacy issues / whether to modify or qualify this accordingly]**

"<u>Letter of Intent</u>" means that certain letter of intent, dated _____ between Sellers and Purchaser or their respective Affiliates outlining the general terms of the transaction described in this Agreement.[2]

"<u>Liability</u>" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"<u>Licenses and Permits</u>" has the meaning set forth in Section 2.1.11 hereof.

"<u>Liquor Licenses</u>" has the meaning set forth in Section 8.3 hereof and as referenced in <u>Schedule ___</u> attached hereto.

"<u>Lis Pendens</u>" means that certain Notice of Pendency dated _____ filed against the Properties as Index No.: _____ by _____, directly and derivatively on behalf of _____, and any amendments, modifications or replacements thereof or additions thereto. [3]

"<u>Material Casualty</u>" has the meaning set forth in Section 14.1.1 hereof.

"<u>Material Condemnation</u>" has the meaning set forth in Section 14.2.1 hereof.

"<u>Material Contract</u>" means any Contract which cannot be cancelled without penalty on no more than thirty (30) days' notice and which has a remaining payment obligation of at least $25,000.00.

"<u>Mutual Closing Condition</u>" has the meaning set forth in Section 9.1.1 hereof.

"<u>Non-Union Employees</u>" means those Employees that are not Union Employees.

"<u>Notice</u>" has the meaning set forth in Section 16.1.1 hereof.

"<u>OFAC</u>" has the meaning set forth in Section 7.1.17 hereof.

"<u>Operating Agreements</u>" means all maintenance, service and supply contracts, booking and reservation agreements, credit card service agreements, and all other agreements for goods or services in connection with the Business, other than the Equipment Leases and Licenses and Permits, together with all deposits made or held by the applicable Sellers thereunder.

"<u>Ordinary Course of Business</u>" means the ordinary course of business consistent with Sellers' past custom and practice for the Business; provided, however, that with respect to maintenance and/or repair items, in no event shall Sellers be obligated to make any repairs and/ or replacements with respect to the FF&E, the Improvements, the Land and/ or the Personal Property, as applicable, which cost in excess of $25,000.00 in the aggregate.

---

[2] **[Note: To be deleted if not applicable]**
[3] **[Note: To be deleted if not applicable]**

US.356163480.09

"Permitted Exceptions" has the meaning set forth in Section 5.3.1 hereof.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Personal Property" means the Properties other than the Real Properties.

"Plans and Specifications" has the meaning set forth in Section 2.1.14 hereof.

"Properties" has the meaning set forth in Section 2.1 hereof.

"Prorations" has the meaning set forth in Section 11.2 hereof.

"Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Purchaser Closing Conditions" has the meaning set forth in Section 9.2 hereof.

"Purchaser Closing Deliveries" has the meaning set forth in Section 10.3.2 hereof.

"Purchaser Default" has the meaning set forth in Section 13.2 hereof.

"Purchaser Documents" has the meaning set forth in Section 7.2.2 hereof.

"Purchaser Indemnitees" means Purchaser and its Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Purchaser Party" has the meaning set forth in Section 7.2.5 hereof.

"Real Properties" has the meaning set forth in Section 2.1.2 hereof.

"Rehired Employees" has the meaning set forth in Section 8.4 hereof.

"Reinstatement Notice" has the meaning set forth in Section 10.6 hereof.

"Retail Merchandise" has the meaning set forth in Section 2.1.7 hereof.

"Retained Liabilities" has the meaning set forth in Section 2.5 hereof.

"Sale Motion" means that certain motion filed by the Sellers (through their counsel) with the Bankruptcy Court on March 14, 2023 [Docket No. __], seeking approval of the "Sale Procedures Order".

"Sale Order" shall mean the order of the Bankruptcy Court, in the form and substance acceptable to Purchaser and Sellers and reasonably acceptable to the Sellers' secured lender, approving the sale of the Properties free and clear of all liens, encumbrances and claims other than the Permitted Exceptions, which order has not been stayed by the Bankruptcy Court. Unless a

separate order is sought by the Sellers, the order confirming the Plan of Reorganization filed in the Bankruptcy Case shall be the Sale Order.

"Sale Procedures Order" shall mean the order of the Bankruptcy Court, in the form attached to the Sale Motion, approving, among other things, certain marketing and bid procedures with respect to the Properties, which shall not be subject to any modifications thereafter unless otherwise ordered by the Bankruptcy Court.

"Sellers' Breach Termination Event" has the meaning set forth in Section 13.1 hereof.

"Sellers Closing Conditions" has the meaning set forth in Section 9.3 hereof.

"Sellers Closing Deliveries" has the meaning set forth in Section 10.3.1 hereof.

"Sellers Default" has the meaning set forth in Section 13.1 hereof.

"Sellers Documents" has the meaning set forth in Section 7.1.2 hereof.

"Seller Indemnitees" means Sellers, Manager, Employer and their respective Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Seller Litigation" shall mean those certain civil actions identified on Schedule ____ attached hereto, as same may be modified, amended, replaced, expanded, appealed or supplemented, and including any additional actions or claims or counterclaim brought by or on behalf of or against any one or more of the Sellers or any of their Affiliates, members, directors or officers, successors or assigns in any jurisdiction.

"Sellers' Knowledge" means the actual knowledge of Alex Fridzon, Arie Fridzon and Jose Berman.

"Seller Party" has the meaning set forth in Section 7.1.17 hereof.

"Successful Bidder" has the meaning set forth in the Sale Motion.

"Supplies" has the meaning set forth in Section 2.1.4 hereof.

"Surveys" has the meaning set forth in Section 5.2 hereof.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Sellers with respect to the Properties or the Business, including any assessment, interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Title Commitments" has the meaning set forth in Section 5.1 hereof.

"Title Company" means Commonwealth Land Title Insurance Company.

"Title Exceptions" has the meaning set forth in Section 5.3.1 hereof.

"Title Policies" has the meaning set forth in Section 5.4 hereof.

"Trade Payables" has the meaning set forth in Section 11.2.12 hereof.

"Unpermitted Exceptions" has the meaning set forth in Section 5.3.1 hereof.

"Updated Surveys" means updates to the Existing Surveys (or any new surveys) obtained by Purchaser, at its own expense.

"UST Guidelines" means the "Operating Guidelines and Reporting Requirements for Debtor's In Possession and Trustees (Revised 11/27/13)" promulgated by the Office of the United States Trustee for the District of Delaware and applicable in the Bankruptcy Case.

"Warranties" has the meaning set forth in Section 2.1.15 hereof.

## ARTICLE II
## THE PROPERTIES AND LIABILITIES

**2.1**    Description of the Properties. Subject to the terms set forth in this Agreement, at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all right, title and interest of Sellers in and to the properties and assets set forth in this Section 2.1 (collectively, the "Properties"):

2.1.1.    Land. The parcels of land described in Schedule ___ attached hereto, together with all appurtenant easements and any other rights and interests appurtenant thereto (collectively, the "Land");

2.1.2.    Improvements. All buildings, structures and other improvements located on or affixed to the Land and all fixtures on the Land which constitute real property under Applicable Law (collectively, the "Improvements"; the Land and the Improvements are referred to collectively herein as the "Real Properties");

2.1.3.    FF&E. All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work, apparatus, finishes, trade fixtures, televisions, video and antennae equipment, carpets, window treatments, telephones and other communications equipment, safety equipment, intercom equipment and systems, advertising booklets and materials, brochures, signs and other items of tangible personal property which are located at the Hotels, or ordered for future use at the Hotels as of the Closing, other than the Supplies, IT Systems, F&B, Retail Merchandise, Books and Records and Plans and Specifications (the "FF&E");

9

2.1.4.    <u>Supplies</u>. All china, glassware and silverware, bedding, towels, linens, uniforms, operating stock, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are located at the Hotels or ordered for future use at the Hotels as of the Closing (the "<u>Supplies</u>");

2.1.5.    <u>IT Systems</u>. All computer hardware, telecommunications and information technology systems located at the Hotels, and all computer software used at the Hotels (subject to the terms of the applicable license agreement(s)), to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "<u>IT Systems</u>");

2.1.6.    <u>Food and Beverage</u>. All food and beverages (alcoholic and non alcoholic) which are located at the Hotels (whether opened or unopened), or ordered or stored for future use at the Hotels as of the Closing, including, without limitation, all food and beverages in the guest rooms; provided, however, notwithstanding anything to the contrary contained herein, expressly excluding any alcoholic beverages to the extent the sale or transfer of the same is not permitted under Applicable Law (collectively, the "<u>F&B</u>");

2.1.7.    <u>Retail Merchandise</u>. All merchandise located at the Hotels and held for sale to guests and customers of the Hotels, or ordered or stored for future sale at the Hotels as of the Closing, including, without limitation, the inventory held for sale in any gift shop, pro shop or newsstand at the Hotels, but expressly excluding the F&B (collectively, the "<u>Retail Merchandise</u>");

2.1.8.    <u>Tenant Leases</u>. All of the leases referenced on <u>Schedule __</u> attached hereto (collectively, the "<u>Tenant Leases</u>"); to the extent the Tenant Leases and the deposits held thereunder are assignable or the Parties obtain any consent necessary to effectuate such an assignment, then said assignment will be subject to an assignment and assumption thereof executed by the Parties (collectively, the "<u>Assignment and Assumption of Tenant Leases</u>").

2.1.9.    <u>Equipment Leases</u>. Subject to the provisions of Section 2.2 hereof, all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Hotels, together with all deposits made thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "<u>Equipment Leases</u>") each if which are referenced on <u>Schedule __</u> attached hereto;

2.1.10.    <u>Assigned Operating Agreements</u>. Subject to the provisions of Section 2.2 hereof, all Operating Agreements, to the extent the same and the deposits held thereunder are assignable or the Parties obtain any consent necessary to effectuate such an assignment (collectively, the "<u>Assigned Operating Agreements</u>");

2.1.11.    <u>Licenses and Permits</u>. Subject to the provisions of Section 2.2 hereof, all licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by Sellers or their Affiliates with respect to the Hotels, including, without limitation, the construction, use or occupancy of the Hotels or the Business, together with any deposits made by Sellers or their Affiliates thereunder, to the extent the same

10

and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "Licenses and Permits");

2.1.12.    Intellectual Property. All trademarks, trade names, goodwill, trade dress, service marks and other intellectual property rights set forth in Schedule ___ attached hereto (collectively, the "Intellectual Property");[4]

2.1.13.    Books and Records. All books and records located at the Hotels which relate to the Hotels or the Business, including, without limitation, all Hotel Guest Data and Information, but excluding Employee personnel files (collectively, the "Books and Records");

2.1.14.    Plans and Specifications. All plans and specifications, blue prints, architectural plans, engineering diagrams and similar items which relate to the Hotels (collectively, the "Plans and Specifications");

2.1.15.    Warranties. The right, title and interest of Sellers in and to all unexpired warranties and guarantees furnished by contractors, subcontractors and other third parties, whether presently outstanding or hereafter arising, including, without limitation, contractors' and manufacturers' warranties or guarantees, to the extent they relate to the Hotels, the Improvements or the Personal Property (collectively, the "Warranties");

2.1.16.    Bookings. All bookings and reservations for guest, conference and banquet rooms or other facilities at the Hotels as of the Closing, together with all guest deposits with respect thereto (collectively, the "Bookings");

2.1.17.    Accounts Receivable. Such Accounts Receivable (including the Guest Ledger) as set forth in Section 11.3 hereof; and

2.1.18.    Miscellaneous Hotel Assets. All telephone and facsimile numbers and all keys, locks and safe combinations and codes for the Hotels.

**2.2    Executory Contracts.**

(a)    On the Bid Submission Deadline (as defined in the Sale Procedures Order), Purchaser shall have the right to designate by written notice to Sellers any of the Operating Agreements as a Purchased Contract or an Excluded Contract (other than any bookings, reservations or other agreements which Purchaser is required to assume pursuant to the Sale Order of pursuant to terms hereof).  Any of the Operating Agreements which are so designated as a Purchased Contract shall be assigned by Sellers and assumed by Purchaser at the Closing pursuant to Section 10.3.1(d) hereof and shall be deemed a Purchased Asset. Any Operating Agreements so designated as an Excluded Contract may be assumed or rejected by Sellers in their sole discretion and shall be deemed an Excluded Asset. Any such designation may be made by Purchaser by giving notice on or prior to the Bid Submission Deadline; failing which, each of the Operating Agreements which is not duly and timely designated as a Purchased Contract or an Excluded Contract shall be deemed to be Excluded Contracts. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, in no event shall Purchaser have the right to designate any of the Operating

---

[4] **[Note: RUSHHH may be excluded as to Daytona Beach]**

Agreements as an Excluded Contract if Seller does not have the express unilateral right to terminate such Operating Agreements without cause as of the Closing Date, and in such event, each of such Operating Agreements so designated by Purchaser as an Excluded Contract, shall, for the avoidance of doubt, be a Purchased Contract.  By no later than 5:00 p.m. **[Eastern]** time on the Bid Submission Deadline, all such designations (and deemed designations) made by Purchaser shall be become final and binding upon Purchaser and, except as otherwise set forth below, all of the Operating Agreements as to which Purchaser has made no such designation shall be deemed Excluded Contracts. The entry of an order by the Bankruptcy Court authorizing the assumption or rejection of executory contracts in accordance with the terms and conditions of this Agreement ("Executory Contract Order"), which may be included in the Sale Order, shall at Closing be deemed to be part of the Sellers Closing Deliveries under this Agreement.

(b)     Notwithstanding the foregoing,

(i)     so long as an Excluded Contract has not been rejected by the Sellers pursuant to Section 365 of the Bankruptcy Code, Sellers shall, upon written request by Purchaser, assign such Excluded Contract to Purchaser and Purchaser shall assume the same in accordance with Section 10.3.1(d) hereof; and

(ii)     if Sellers become aware, on or before the Closing Date, of any of the Operating Agreements that have not been included on the Schedules, Sellers shall promptly thereafter advise Purchaser of the existence, and provide Purchaser with a copy, of such Operating Agreement and Purchaser thereupon shall have the right to request, by written notice to said Sellers within five (5) days, that Sellers assign such Operating Agreements to Purchaser, in which case Sellers shall use commercially reasonable efforts to assign such Operating Agreements to Purchaser, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Purchased Contracts.

(c)     As part of the Sale Motion, Sellers shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all of the Operating Agreements identified on Schedule ___ attached hereto.  Sellers shall serve the Sale Motion on all counterparties to all such Operating Agreements along with a notice stating that Sellers are or may be seeking the sale, assumption and assignment of such Operating Agreements and shall notify such parties of the deadline for objecting to the Cure Costs, which deadline shall be as set forth in the Sales Procedure Order.  As part of the Sale Motion, Sellers shall seek authority to file with the Bankruptcy Court the list identifying such Operating Agreements and the amounts necessary to cure defaults under each of such Operating Agreements, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. In cases in which Sellers are unable to establish that a default exists as to any such Operating Agreements, the relevant Cure Cost shall be set at $0.00. The process governing the assignment and assumption of Operating Agreements shall be subject to the provisions set forth in the Sale Procedures Order.

(d)     Payment of Cure Amounts. The Cure Costs shall be the responsibility of Purchaser.

**2.3**    Cure Costs. Cure Costs shall be paid (or in the case of a dispute, the disputed amount escrowed with the Escrow Agent pursuant to an escrow arrangement reasonably acceptable to Sellers and Purchaser) at the Closing.

**2.4**    Assumed Liabilities. At Closing, Purchaser shall assume all Liabilities arising or occurring from and after the Closing with respect to the Properties, the Hotels, the Assigned Contracts, the Purchased Contracts, the Business, or the Rehired Employees, but expressly excluding the Retained Liabilities (all Liabilities, except for the Retained Liabilities, shall be referred to herein as "Assumed Liabilities"). The preceding sentence shall not be deemed to modify or otherwise limit any representation or warranty of Sellers set forth in this Agreement or in any document delivered by Sellers at Closing.

**2.5**    Retained Liabilities. At Closing, Sellers shall retain all Liabilities arising or occurring prior to the Closing Date with respect to the Properties, the Hotels, the Assigned Contracts, the Purchased Contracts or the Business (the "Retained Liabilities"). The Parties rights and obligations under this Section shall survive the Closing.

**ARTICLE III**
**PURCHASE PRICE**

**3.1**    Purchase    Price.    The    purchase    price    for    the    Properties    is _____ and 00/100 Dollars ($_____) (the "Purchase Price"), which shall be allocated in accordance with Section 3.4 hereof and shall be adjusted at Closing for the Prorations pursuant to Section 11.2 hereof, the Accounts Receivable pursuant to Section 11.3 hereof, and as otherwise expressly provided in this Agreement.

**3.2**    Earnest Money.

3.2.1.    Prior to the Effective Date, Purchaser has deposited with Escrow Agent the sum which is equal to five percent (5%) of the Purchase Price  in accordance with the "Sale Procedures Order".  The Earnest Money has been and shall be held by Escrow Agent in escrow as earnest money pursuant to the escrow agreement in the form attached hereto as Exhibit C, entered into among Sellers, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"). The Earnest Money shall be maintained by the Escrow Agent as to comply with the requirements of the Bankruptcy Court and the Sale Procedures Order.

3.2.2.    Disbursement of Earnest Money to Sellers. At Closing, Escrow Agent is authorized and directed to disburse and Purchaser shall otherwise cause Escrow Agent to disburse the Earnest Money to Sellers or in such manner as Sellers shall instruct Escrow Agent, and Purchaser shall receive a credit against the Purchase Price in the amount of the Earnest Money disbursed to Sellers. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Earnest Money pursuant to the express provisions of this Agreement, the Earnest Money shall be disbursed to Sellers. This Section 3.2.2 shall survive the termination of this Agreement.

3.2.3.    Refund of Earnest Money to Purchaser. In the event: (i) the Sale Procedure Order is not entered on or before _____ days from the filing of the Sellers' Chapter 11

13

petition or _____, 2023, whichever is earlier; or (ii) the Sale Order is not entered on or before _____, 2023, then at Purchaser's option, this Agreement shall terminate, the Parties shall have no further recourse, obligations or liabilities under this Agreement, except for those obligations and/or liabilities which expressly survive termination.

**3.3**    Payment of Purchase Price.

    3.3.1.    Payment at Closing. At Closing, Purchaser shall pay to Sellers an amount equal to the Purchase Price (as adjusted pursuant to the provisions referenced in Section 3.1 hereof), less the Earnest Money.

**3.4**    Allocation of Purchase Price.

    The Parties hereby agree that the Purchase Price shall be allocated among the Land, the Improvements and the Personal Property in accordance with Schedule __ attached hereto. The Parties shall file all federal, state and local tax returns and related tax documents consistent with such allocation.

**3.5**    Like-Kind Exchange.

    Notwithstanding anything to the contrary in this Agreement, each Party acknowledge and agree that the other Party or Parties (as the case may be) has the right to designate this transaction to qualify as a tax-free exchange under Section 1031 of the Code, and that Purchaser shall have the right to assign this Agreement to a "qualified intermediary" (as defined in Treas. Reg. § 1.1031(k)-1(g)(4) of the Code) or such other entity or entities as is necessary to carry out a 1031 Exchange. Each Party shall execute and deliver such documents as may reasonably and customarily be required to complete the transactions contemplated by any such tax-free exchange, which are in form and substance reasonably acceptable to the other applicable Parties, and otherwise cooperate in all reasonable respects with respect to such tax-free exchange, provided that (i) Sellers shall not be required to take title to any property, and (ii) neither such tax-free exchange nor Sellers' cooperation therewith shall result in any delay to the Closing, nor the imposition of any cost or liability upon Sellers or Purchaser, as the case may be.

**ARTICLE IV**
**CONTINGENCIES**

**4.1**    No Contingencies. Purchaser acknowledges and agrees that Purchaser has completed all of its due diligence investigations with respect to the Properties and is satisfied with the same. For the avoidance of doubt, it is expressly understood and agreed to by Purchaser that there is no due diligence or financing contingency, or other contingency under this Agreement, which gives Sellers a right of termination. Purchaser's only termination rights are set forth in Sections 5.3.1, 13.1, 14.1, and 14.2 hereof.

US.356163480.09

## ARTICLE V
## TITLE TO THE PROPERTY

**5.1**    Title Commitments. Purchaser shall obtain, subject to the entry of the Sale Order, at Purchaser's sole cost and expense, a commitment (or commitments separately as to the Real Properties) for an owner's title insurance policy (or policies, as the case may be) from the Title Company for the Real Properties (the "Title Commitments"), which shall include a copy of all documents referenced in Schedule B thereof as recorded title exceptions and all departmental and UCC searches reasonably requested by Purchaser.

**5.2**    Surveys. Purchaser acknowledges its receipt of the Existing Surveys. Purchaser shall have the right to obtain updates to the Existing Surveys, at its sole cost and expense.

**5.3**    Exceptions to Title. Except as provided in this Agreement or otherwise accepted by Purchaser in writing, the sale of the Real Properties to Purchaser hereunder shall be subject to the Permitted Exceptions but otherwise free and clear of any interest or liens in accordance with the Sale Order.

    5.3.1.    Permitted Exceptions and Unpermitted Exceptions. Purchaser hereby acknowledges and agrees that it accepts, and that it shall take title to the Properties subject to (i) all matters set forth on Schedule ___ attached hereto and made a part hereof and (ii) all matters approved by Purchaser in writing (or deemed approved pursuant to this Section 5.3.1) (collectively, the "Permitted Exceptions"). Within ten (10) day following the Effective Date, Purchaser shall give written notice to Sellers (the "Exception Notice") of any matters set forth in the Title Commitments and/ or disclosed in the Surveys which are not Permitted Exceptions and which Purchaser is unwilling to take title subject to (the "Unpermitted Exceptions"); failing which all of such matters shall be deemed Permitted Exceptions for all purposes under this Agreement. Seller agrees that regardless of whether Purchaser shall make such objection, the following shall constitute Unpermitted Exceptions: (i) any mortgages, deeds of trust or other security interests (except to the extent Purchaser agrees to assume same); and (ii) Taxes and water and sewage charges which are due and payable as of Closing. On or before the Closing, Sellers shall discharge and cause to be released of record all mortgages which were caused or created by Sellers and all other monetary liens on the Properties but only to the extent such monetary liens (x) were caused, created or voluntarily assumed by Sellers or (z) cost less than $100,000.00 in the aggregate to cure. In addition to the foregoing, other than Permitted Exceptions, Sellers shall notify Purchaser within seven (7) Business Days after receipt of the Exception Notice whether it will cure the matters set forth therein which Purchaser has indicated it is unwilling to accept title subject to. If Sellers notify Purchaser that Sellers will not cure all such other matters, then, within five (5) Business Days thereafter, Purchaser shall, by notice to Sellers either, elect to terminate this Agreement or accept such matters as Permitted Exceptions; and, if Purchaser does not notify Sellers that it has elected to accept such matters, Purchaser shall be deemed to have elected to accept title subject to such matters without any reduction to the Purchase Price. If Purchaser learns of any new matters affecting title to the Properties prior to the Closing which are not Permitted Exceptions and which are not set forth in the Title Commitments, Purchaser shall, at any time prior to the Closing, have the same rights set forth above in this paragraph with respect to such new matters as it has with respect to matters appearing in the Title Commitments (in which event, the Exception Notice shall be given within five (5) Business Days after Purchaser or its attorneys learn of such matter(s), and

15

Sellers shall in turn have the same rights as above to elect to cure or not cure such matters). Purchaser shall cause copies of all updates and/or continuations of the Title Commitments to concurrently be delivered to Sellers' attorneys.  If on the Closing Date, the Properties shall be affected by any lien which, pursuant to the provisions of this Agreement, is required to be discharged or satisfied by Sellers, Sellers shall not be required to discharge or satisfy the same of record provided (i) proper instruments of bonding, satisfaction or discharge therefor are delivered to Purchaser or the Title Company on the Closing Date and proper allowance made to Purchaser for recording charges thereon or (ii) Sellers deposits with the Title Company such amount as it requires in order to omit the same as an exception to title and in either case the same are omitted from the Title Policies as exceptions to title.  Purchaser agrees, upon two (2) Business Days' prior notice from Seller, to advance on the Closing Date, by bank check payable to the applicable lienholder(s) or by wire transfer to the Title Company, as applicable, any amount not exceeding the Purchase Price as shall be required to discharge (or omit as a title exception, as the case may be) any such lien or liens, and the amount so advanced shall be credited against the Purchase Price. Purchaser acknowledges and agrees that Purchaser shall be obligated to take title to the Property and complete the Closing subject to all Permitted Exceptions.

5.3.2.     Failure to Cure. Subject to the provisions of Section 5.3.1 hereof,  Sellers shall have until the Closing Date (as the same may be adjourned, extended, or postponed by Sellers or Purchaser pursuant to the terms hereof) to cure any Unpermitted Exceptions. In the event that Sellers shall be unable to deliver title as required under this Article V, including without limitation, the curing of any Unpermitted Exceptions, Purchaser's sole and exclusive right shall be either to (I) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.3 hereof, and the Parties shall have no further recourse, rights or obligations under this Agreement, except those which expressly survive such termination, expressly excluding however, any right to receive the Breakup Fee, or (II) proceed to Closing pursuant to this Agreement and accept title to the Real Properties subject to the Unpermitted Exceptions, which thereafter shall be deemed to constitute Permitted Exceptions without offset or deduction from the Purchase Price. Notwithstanding anything to the contrary set forth in this Agreement, Sellers shall have the right extend the Closing Date for a period of up to sixty (60) days in order to effect cure of any Unpermitted Exceptions.

**5.4**     Conveyance of the Real Properties. At Closing, Sellers shall convey insurable fee simple title (as determined by the Title Company) to the Real Properties, subject to all Permitted Exceptions and otherwise in accordance with the terms of the Sale Order, except for the Equipment Leases which shall be subject only to the ownership interest of the lessor thereunder.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1**     PROPERTIES SOLD "AS IS". Purchaser represents and warrants to Sellers that Purchaser knows, has examined and has investigated to Purchaser's satisfaction the physical nature and condition of the Properties.  Purchaser acknowledges that neither Sellers nor any real estate broker, agent, officer, employee, member, shareholder, attorney, servant or representative of Sellers has made any representations whatsoever regarding the subject matter of this transaction or any fact thereof including, without limitation, representations as to the physical nature or condition of the Properties, the existence or absence of any hazardous materials at the Properties, the existing leases

16

or tenancies, the existing or projected rents, rates, profits, existing or future expenses or any other matter or thing affecting or related to the Properties or the operation thereof, except only as herein specifically set forth; and Purchaser further agrees to take title to the Properties "AS IS" and in their present condition, subject to the express provisions of this Agreement and the Permitted Exceptions and to reasonable use, wear, tear and natural deterioration of the Properties between the Effective Date and the Closing. In executing, delivering and performing this Agreement, Purchaser has not relied upon and does not rely upon and Sellers are not liable for or bound in any manner by, express or implied warranties, guaranties, promises, statements, representations, "set ups", proposals or information pertaining to the Properties, the rents, rates, profits, expenses and operations thereof made or furnished by Sellers or by any real estate broker, agent, officer, employee, member, shareholder, attorney, servant or other person representing or purporting to represent Sellers, to whomsoever made or given, directly or indirectly, verbally or in writing, unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in this Agreement. In addition to the foregoing, and except as set forth herein, Sellers make no representations or warranties whatsoever, whether express or implied or arising by operation of law, with respect to the Properties and "Condition of the Property"; nor shall any adverse change in the Condition of the Properties before the Closing give rise to any obligation on the part of Sellers or remedy on the part of Purchaser except only as expressly set forth in this Agreement. Sellers are selling and conveying the Properties at the Closing in their then existing condition, AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, other than the representations and warranties of Sellers, if any, expressly set forth in this Agreement. Without limiting the generality of the foregoing, except for any representations of Sellers expressly contained in this Agreement, the transactions described in this Agreement are without statutory, express or implied warranty, representation, agreement, statement or expression of any opinion regarding the Condition of the Properties or any aspect thereof, including any and all statutory, express or implied representations or warranties related to the suitability for habitation, merchantability or fitness for a particular purpose or created by any affirmation of fact or promise, by any description of the Properties or by operation of any legal requirements. For purposes of this Agreement, the term "Condition of the Property" means the following: (a) the quality, nature and adequacy of the physical condition of the Properties, including the quality of the design, labor and materials used to construct the improvements included in the Properties; the construction of the facilities, condition of structural elements, foundations, roofs, glass, mechanical, plumbing, electrical, HVAC, sewage and utility components and systems; the capacity or availability of sewer, water or other utilities; the geology, soils, subsurface conditions, groundwater, landscaping and irrigation of or with respect to the Properties; the location of the Properties in or near any special taxing district, flood hazard zone, wetlands area, protected habitat, geological fault or subsidence zone, hazardous waste disposal or clean-up site or other special area; the existence, location or condition of ingress, egress, access and parking; the condition of any fixtures; the presence of any asbestos or other hazardous materials, dangerous or toxic substance, material or waste in, on, under or about the Properties and the improvements located thereon; and any environmental, botanical, hydrological, geological, meteorological, structural or other condition or hazard or the absence thereof heretofore, now or hereafter affecting in any manner the Properties; (b) the habitability, merchantability, fitness, suitability and adequacy of the Properties for any use and purpose and any conditions at or which affect the Properties with respect

17

to a particular use, purpose, development, potential or otherwise; (c) the compliance or non-compliance of the Properties or any part thereof in accordance with, and the context of, (A) all legal requirements, including, without limitation, Environmental Laws and/or those legal requirements, laws, codes, rules, regulations and/or decrees relating to zoning, building, public works, parking, fire and police access, handicap access, life safety, subdivision and subdivision sales; (B) all agreements, covenants, conditions, restrictions (public or private), plans, development agreements, site plans, building permits, building rules and other instruments and documents governing or affecting the use, management and operation of the Property; and (d) the availability, cost, terms and coverage of liability, hazard, comprehensive and any other insurance of or with respect to the Properties.  Purchaser acknowledges and agrees that its obligations under this Agreement shall not be subject to the availability of financing, nor any financing contingency or other contingencies or satisfaction of conditions and Purchaser shall have no right to terminate this Agreement or receive a return of the Earnest Money, except only as expressly provided for in this Agreement. The acceptance of a deed or deeds by Purchaser shall be deemed to be the full and complete performance and discharge of every agreement and obligation on the part of Sellers hereunder and no representation, warranty, covenant or agreement, express or implied, of Sellers shall survive the Closing except those, if any, which are herein specifically stated to survive the Closing.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**7.1**    Seller's Representations and Warranties. Sellers hereby make the following representations and warranties in this Section 7.1:

7.1.1.    Organization and Power. Each party comprising Seller is duly incorporated, organized or formed (as the case may be), validly existing, in good standing in the jurisdiction of its incorporation, organization or formation, and is qualified to do business in the jurisdiction in which the Properties are located, and has all requisite power and authority to own the Properties and conduct the Business as currently owned and conducted.

7.1.2.    Authority and Binding Obligation. Subject to approval of the Bankruptcy Court and entry of the Sale Order, (i) Sellers have full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Sellers pursuant to this Agreement (collectively, the "Sellers Documents"), and to perform the respective obligations of Sellers under each of the Sellers Documents, (ii) the execution and delivery by the signer on behalf of each party comprising Seller of each of the Sellers Documents, and the performance by each party comprising Seller of its obligations under each of the Sellers Documents, has been (or as of Closing will be) duly and validly authorized by all necessary action by each party comprising Seller, and (iii) each of the Sellers Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller enforceable against the Parties comprising Seller in accordance with their terms, except to the extent Purchaser is in default thereunder.

7.1.3.    Consents and Approvals; No Conflicts. Except for the entry of the Sale Procedures Order and the Sale Order, or as disclosed in Schedule ___ attached hereto, (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for execution or delivery by Sellers of any of the Sellers Documents, or the

18

performance by Sellers of any of their respective obligations under any of the Sellers Documents or the consummation by Sellers of the transaction described in this Agreement, and (ii) neither the execution and delivery by each party comprising Seller of any of the Sellers Documents, nor the performance by Sellers of any of their obligations under any of the Sellers Documents, nor the consummation by Sellers of the transactions described in this Agreement, will: (A) violate any provision of any of Sellers' organizational or governing documents; or (B) violate any Applicable Law to which each party comprising Sellers is subject.

7.1.4.    <u>Title to Personal Property</u>. Except as set forth in <u>Schedule ___</u> attached hereto, Sellers have good title to all tangible Personal Property, except for the Equipment Leases and/or IT Systems which shall be subject only to the ownership interest of the lessor and/or licensee thereunder, as applicable.

7.1.5.    <u>Condemnation</u>. Sellers have not received any written notice of any pending condemnation proceeding or other proceeding in eminent domain, and to Sellers' Knowledge, no such condemnation proceeding or eminent domain proceeding is threatened affecting the Properties or any portion thereof.

7.1.6.    <u>Litigation</u>. Except as set forth in <u>Schedule ___</u> attached hereto and the Seller Litigation, Sellers have not (i) been served with any court or administrative filing in any litigation or other legal proceeding with respect to the Properties or the Business in which Sellers are named a party which has not been resolved, settled or dismissed, or (ii) received written notice of any claim, charge or complaint from any Governmental Authority or other Person pursuant to any administrative, arbitration or similar adjudicatory proceeding with respect to the Properties or the Business which has not been resolved, settled or dismissed, and Sellers have not received any written notice threatening any such litigation or administrative, arbitration or other adjudicatory proceeding.

7.1.7.    <u>Employees</u>.  Sellers are not a party to any collective bargaining agreement with any labor union with respect to the Employees. Except for the employment agreements set forth in <u>Schedule ___</u> attached hereto (collectively, the "<u>Employment Agreements</u>"), Sellers are not a party to any written employment or compensation agreements (other than general employee benefit plans) with any of the Employees, other than offer letters for at-will employment. <u>Schedule ___</u> attached hereto sets forth a correct and complete list of the positions and compensation of each Employee at the Hotels as of the Effective Date.

7.1.8.    <u>Licenses and Permits</u>. <u>Schedule ____</u> attached hereto sets forth a correct and complete list of the Licenses and Permits, and Sellers have delivered to Purchaser or made available to Purchaser a true and complete copy of the Licenses and Permits.

7.1.9.    <u>Tenant Leases</u>. Except as set forth in <u>Schedule ___</u> attached hereto, there are no leases, subleases, licenses, concessions or similar agreements granting to any other Person the right to use or occupy any portion of the Real Properties, other than the Bookings.

7.1.10.    <u>Material Contracts</u>. <u>Schedule ____</u> attached hereto sets forth a correct and complete list of the Material Contracts, and Sellers have made available to Purchaser a true and complete copy of the Material Contracts.

19

7.1.11.    <u>Management Agreements</u>. Except for the management agreements referred to in <u>Schedule</u> _____ attached hereto, Sellers are not a party to any management agreements with respect to the Hotels.

7.1.12.    <u>Finders and Investment Brokers</u>. Except for the Broker, Sellers have not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Sellers in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement. Subject to the Sale Procedures Order or any applicable order of the Bankruptcy Court, Sellers shall pay at Closing all fees and commissions payable to the Broker.

7.1.13.    <u>Foreign Person</u>. Sellers are a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

7.1.14.    <u>Bookings</u>. <u>Schedule</u> _____ attached hereto sets forth a correct report of all Bookings for the ninety (90) days following the Effective Date, which report shall be updated at Closing and delivered to Purchaser.

7.1.15.    <u>Environmental Matters</u>. <u>Schedule</u> ___ attached hereto sets forth a correct and complete list of all environmental assessments, reports and studies relating to the Properties in Sellers' possession (collectively, the "<u>Environmental Reports</u>"), and Sellers have made available to Purchaser a true and complete copy of the Environmental Reports. Except as set forth in <u>Schedule</u> _____ attached hereto, Sellers have not received any written notice from any Governmental Authority or other Person of any Environmental Claims which have not been resolved, settled or dismissed, and Sellers have not received any written notice threatening any such Environmental Claim.

7.1.16.    <u>Bankruptcy</u>. Sellers will file and serve the Sale Motion, and seek to obtain approval of the Sale Procedures Order and Sale Order. Purchaser acknowledges and is aware that Sellers shall continue to market the Properties for sale and solicit higher and better offers until the Properties are sold.

7.1.17.    <u>Anti-Terrorism</u>. None of Sellers' property or interests is subject to being "blocked" under any Anti-Terrorism Laws and neither Sellers nor any Person holding any direct or indirect interest in Sellers is in violation of any Anti-Terrorism Laws. Neither Sellers nor any of their affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "<u>Seller Party</u>") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C.

20

§§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Purchaser from conducting the business activities contemplated by this Agreement with Sellers. Sellers, including their Seller Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

**7.2** <u>Purchaser's Representations and Warranties</u>. To induce Sellers to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 7.2, upon which Purchaser acknowledges and agrees that Sellers are entitled to rely.

    7.2.1.    <u>Organization and Power</u>. Purchaser is duly incorporated or formed (as the case may be), validly existing and in good standing under the laws of the State of _____ and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

    7.2.2.    <u>Authority and Binding Obligation</u>. (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "<u>Purchaser Documents</u>"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Sellers is in default thereunder.

    7.2.3.    <u>Consents and Approvals</u>; <u>No Conflicts</u>. (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and (ii) neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will: (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

US.356163480.09

7.2.4.    <u>Finders and Investment Brokers</u>. Except for Broker, Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.2.5.    <u>No Violation of Anti-Terrorism Laws</u>. None of Purchaser's property or interests is subject to being "blocked" under any Anti-Terrorism Laws, and neither Purchaser nor any Person holding any direct or indirect interest in Purchaser is in violation of any Anti-Terrorism Laws. Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "<u>Purchaser Party</u>") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the OFAC of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Sellers from conducting the business activities contemplated by this Agreement with Purchaser.

7.2.6.    <u>Patriot Act</u>. Purchaser, including its Purchaser Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

## ARTICLE VIII
## COVENANTS

**8.1**    <u>Confidentiality</u>.

8.1.1.    <u>Disclosure of Confidential Information</u>. Except as required by the Bankruptcy Court and /or in connection with any motion or other applications filed with the Bankruptcy Court, including, without limitation, any motion or application to approve or reject this Agreement, and regarding any dispute under this Agreement and/or otherwise in connection with the Sales Procedure Order and/or the Sale Order, Sellers and Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any documents, materials, data or other information with respect to the Properties or the

Business which is not generally known or available to the public (the "Confidential Information"). Notwithstanding the foregoing, Sellers and Purchaser shall be permitted to (i) disclose any Confidential Information to the extent required under Applicable Law (after giving the other Party prior notice and an opportunity to obtain relief from the disclosure requirement), and (ii) disclose any Confidential Information to any Person on a "need to know" basis, such as their respective shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, engineers, surveyors, lenders, investors, managers, franchisors and such other Persons whose assistance is required to consummate the transactions described in this Agreement; provided, however, that Sellers or Purchaser (as the case may be) shall (A) advise such Person of the confidential nature of such Confidential Information, and (B) use commercially reasonable efforts to cause such Person to maintain the confidentiality of such Confidential Information.

8.1.2.    Public Announcements. Notwithstanding the provisions of Section 8.1.1 hereof, a Party shall have the right to make a public announcement regarding the transaction described in this Agreement after the Closing, provided that Sellers and Purchaser shall approve the form and substance of any such public announcement, which approval shall not be unreasonably withheld, conditioned or delayed.

8.1.3.    Communication with Employees. Purchaser shall have the right to interview the Employees for consideration of employment with Purchaser, and Sellers or any Affiliates of Sellers have the right to coordinate the same and attend such interviews.

**8.2**    Conduct of the Business.

8.2.1.    Operation in Ordinary Course of Business. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers will conduct the Business in the Ordinary Course of Business, including: (i) maintaining the inventories of FF&E, Supplies, F&B and Retail Merchandise at levels maintained in the Ordinary Course of Business, (ii) performing maintenance and repairs for the Real Properties and tangible Personal Property in the Ordinary Course of Business; and (iii) maintaining its current insurance coverages.

8.2.2.    Contracts. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers shall not, without Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), (i) amend, extend, renew or terminate any Material Contracts or Licenses and Permits, except in the Ordinary Course of Business or (ii) enter into any new Material Contracts.

**8.3**    Licenses and Permits. Subject to the express terms of this Section 8.3, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things reasonably necessary, to consummate the transfer of all Licenses and Permits.  At Purchaser's sole cost and expense, Purchaser shall be responsible for obtaining the transfer of all Licenses and Permits (to the extent transferable) or the issuance of new licenses and permits, including, without limitation, the licenses and permits required for the sale and service of alcoholic beverages at the Hotels (the "Liquor Licenses"). Purchaser, at its cost and expense, shall submit all necessary applications and other materials to the appropriate Governmental Authority and take such other actions to effect the transfer of Licenses and Permits or issuance of new licenses and permits, including, without limitation, the Liquor License, as of

23

the Closing, and Sellers shall reasonably cooperate (at Purchaser's expense) with Purchaser to cause the Licenses and Permits to be transferred or new licenses and permits to be issued to Purchaser.

**8.4**    <u>Employees</u>. Sellers shall terminate (or cause the termination by its manager of) the employment of all Employees effective as of the Closing, and Purchaser shall offer employment to such terminated Employees on the same terms. (The terminated Employees who accept such offers of employment are referred to herein as the "<u>Rehired Employees</u>").

**8.5**    <u>Tax Contests</u>.

    8.5.1.    <u>Taxable Period Terminating Prior to Closing Date</u>. Sellers shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. Sellers represent that they have not initiated any tax contest for a taxable period which includes the Closing Date and any periods thereafter.

**8.6**    <u>Notices and Filings</u>. Sellers and Purchaser shall use commercially reasonable efforts to cooperate with each other (at no cost or expense to the Party whose cooperation is requested, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to provide written notice to any Person under any Contracts, Licenses and Permits, and to effect any registrations or filings with any Governmental Authority or other Person, regarding the change in ownership of the Properties or the Business.

**8.7**    <u>Further Assurances</u>. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Sellers and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement.

**8.8**    <u>Assignment and Assumption of the Franchise Agreements</u>. Subject to the express terms of this Section 8.8, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, or cause to be done, all reasonable things necessary to consummate the assignment and assumption of the Franchise Agreements.  At Purchaser's sole cost and expense, Purchaser shall be responsible for taking all necessary actions that the Franchisor may reasonably require related to Sellers' assignment of the Franchise Agreement to Purchaser ("<u>Assignment and Assumption of the Franchise Agreements</u>").  Purchaser, at its cost and expense, shall submit all necessary applications and other materials to the Franchisor and take such other actions to effect the Assignment and Assumption of the Franchise Agreements as of the Closing, but the failure of any one or more of the Franchisors to accept, consent to or otherwise allow such assignment shall not be a condition to the Closing.

## ARTICLE IX
## CLOSING CONDITIONS

**9.1**    Mutual Closing Condition.

9.1.1.    Satisfaction of Mutual Closing Condition. The respective obligations of Sellers and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following condition precedent (the "Mutual Closing Condition"): The Bankruptcy Court shall have entered the Sale Order and there shall be no applicable stay ordered by the Bankruptcy Court which is in effect.

9.1.2.    Failure of Mutual Closing Condition. If the Mutual Closing Condition is not satisfied at Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination. For the avoidance of doubt, in no event shall Purchaser be entitled to receive the Breakup Fee if the Mutual Closing Condition is not satisfied.

**9.2**    Purchaser Closing Conditions.

9.2.1.    Satisfaction of Purchaser Closing Conditions. In addition to the Mutual Closing Condition, Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Purchaser Closing Conditions"):

(a)    Seller's Deliveries. All of the Sellers Closing Deliveries shall have been delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser upon the consummation of the Closing.

(b)    Representations and Warranties. The representations or warranties of Sellers in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(c)    Covenants and Obligations. The material covenants and material obligations of Sellers in this Agreement shall have been performed in all material respects.

9.2.2. Failure of Purchaser Closing Condition. If any of the Purchaser Closing Conditions are not satisfied on the Closing Date (as the same may be extended, adjourned, or postponed by Sellers or Purchasers to the extent they have the express right to do so under this Agreement), then Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Sellers, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, expressly excluding any right of Purchaser to receive the Breakup Fee except to the extent the Purchaser Closing Conditions are also a default by Sellers pursuant to the provisions of Section 13.1 hereof and Purchaser is entitled to receive the Breakup Fee as provided in Section 10.5 hereof, or (ii) to waive any of the Purchaser Closing Conditions at

US.356163480.09

or prior to Closing, without offset or deduction from the Purchase Price; provided, however, that any such waiver shall be made in writing by Purchaser.  Nothing contained herein shall be deemed or construed to limit Purchaser's rights under Section 13.1 hereof.

**9.3**   Sellers Closing Conditions.

9.3.1.   Satisfaction of Sellers Closing Conditions. In addition to the Mutual Closing Condition, Sellers' obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Sellers Closing Conditions"):

(a)   Receipt of the Purchase Price. Purchaser shall have (A) paid to Sellers or deposited with Escrow Agent with written direction to disburse the same to Sellers, the Purchase Price (as adjusted pursuant to Section 3.1 hereof), and (B) delivered written direction to Escrow Agent to disburse the Earnest Money to Sellers.

(b)   Purchaser's Deliveries. All of the Purchaser Closing Deliveries shall have been delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers at Closing.

(c)   Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(d)   Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

9.3.2.   Failure of Sellers Closing Condition. If any of the Sellers Closing Conditions is not satisfied on the Closing Date, then Sellers shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Sellers in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Sellers Closing Conditions at or prior to Closing; provided, however, that any such waiver shall be made in writing executed by Sellers.  Nothing contained herein shall be deemed or construed to limit Sellers' rights under Section 13.2 and/or 13.3 hereof.

**ARTICLE X**
**CLOSING**

**10.1**   Closing Date. The closing of the transaction described in this Agreement (the "Closing") shall occur on the date which is _____ (__) days following the entry of the Sale Order, or such other date as agreed to in writing between Sellers and Purchaser (the date on which the Closing occurs is referred to herein as the "Closing Date"). The Closing shall be effected through the Closing Escrow pursuant to the Closing Escrow Agreement as provided in Section 10.2 hereof. At Purchaser's option the Closing may be postponed on not more than two occasions for a period of up to seven (7) Business Days each upon Purchaser's delivery of written notice thereof to Sellers given not less than three (3) Business Days prior to the then scheduled Closing Date, and in

US.356163480.09

consideration for therefor, Purchaser shall deposit with Escrow Agent the additional sum of $_____ for each such postponement, which shall be added to the Earnest Money and credited against the Purchase Price at Closing, but subject to the applicable provisions of this Agreement including Section 3.2 hereof.

**10.2**   Closing Escrow. The Closing shall take place by means of an escrow (the "Closing Escrow"), and, at or prior to the Closing, the Parties shall enter into a closing escrow agreement with the Escrow Agent with respect to the Closing Escrow in form and substance reasonably acceptable to Sellers, Purchaser and the Escrow Agent (the "Closing Escrow Agreement") pursuant to which (i) the Purchase Price to be paid by Purchaser pursuant to Section 3.3 hereof shall be deposited with Escrow Agent, (ii) all of the documents required to be delivered by Sellers and Purchaser at Closing pursuant to this Agreement shall be deposited with Escrow Agent, and (iii) at Closing, the Purchase Price (as adjusted pursuant to this Agreement) and the Earnest Money shall be disbursed to Sellers and the documents deposited into the Closing Escrow shall be delivered to Sellers and Purchaser (as the case may be) pursuant to the Closing Escrow Agreement.

**10.3**   Closing Deliveries.

10.3.1.   Seller's Deliveries. At the Closing, Sellers shall deliver or cause to be delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser at Closing, all of the (i) documents set forth in this Section 10.3.1, each of which shall have been duly executed by Sellers and acknowledged (if required) and (ii) other items set forth in this Section 10.3.1 (the "Sellers Closing Deliveries"), as follows:

(a)   A closing certificate in the form of Exhibit D, together with all exhibits thereto;

(b)   Deeds in the form of Exhibit E, conveying the Real Properties to Purchaser, subject to the Permitted Exceptions, to the extent applicable, respectively, to the Real Properties (collectively, the "Deeds");

(c)   A Bill of Sale in the form of Exhibit F, transferring the FF&E, Supplies, IT Systems, F&B, Retail Merchandise, Intellectual Property, Books and Records, Plans and Specifications, Warranties, Bookings and Accounts Receivable to Purchaser on the terms set forth therein;

(d)   An Assignment and Assumption of Contracts and Licenses and Permits in the form of Exhibit G, assigning the Contracts and Licenses and Permits to Purchaser on the terms set forth therein;

(e)   A certificate or registration of title for any owned vehicle[5] or other Personal Property included in the Properties which requires such certification or registration, duly executed, conveying such vehicle or such other Personal Property to Purchaser, or in the event that such certificate or registration is lost, such documentation as is required to convey title to such vehicle;

(f)   Such agreements, affidavits or other documents as may be reasonably and customarily required by the Title Company from Sellers;

---

[5] **[Note: To determine if there are any vehicles owned by and to be transferred by Sellers.]**

(g)  Any real estate transfer tax declaration, tax returns or similar documents required under Applicable Law in connection with the conveyance of the Real Property;

(h)  A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(i)  A certificate from the applicable state or local Governmental Authority stating that all sales and use taxes with respect to the Properties or Business have been paid through the date of the issuance of such certificate, and, if any such taxes have not been paid, the amount due and payable as of the date of issuance of the certificate, which shall be paid by Sellers at Closing; provided that if despite Sellers' commercially reasonable efforts such certificate setting forth the amount due and payable is not obtained on or before the Closing Date, then Sellers may postpone the Closing for a period of up to thirty (30) days from the originally scheduled Closing Date upon Sellers' delivery of notice thereof to Purchaser given not less than Five (5) Business Days prior to the Closing Date;[6]

(j)  A resolution of each party comprising Seller, signed by each party comprising Seller's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(k)  The Sale Order;

(l)  A Certificate of Good Standing from _____ evidencing that each Seller is in good standing under the laws of _____;

(m)  To the extent not previously delivered to Purchaser, all originals (or copies if originals are not available) of the Assigned Operating Agreements, Licenses and Permits, Books and Records, keys and lock combinations, which shall be located at the Hotels on the Closing Date;

(n)  An Assignment and Assumption of the Franchise Agreements;

(o)  The Closing Statement prepared pursuant to Section 11.1 hereof;

(p)  Such other documents and instruments as may be reasonably requested by Purchaser in order to consummate the transaction described in this Agreement;

(q)  The Executory Contract Order; and

(r)  An Assignment and Assumption of Tenant Leases.

10.3.2.  _Purchaser's Deliveries_. At the Closing, Purchaser shall deliver or cause to be delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers all of the (i) documents set forth in this Section 10.3.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.3.2 (the "Purchaser Closing Deliveries"), as follows:

---

[6] **[Note: Query, is this necessary? Are the taxing authorities part of the Bankruptcy Case and setting paid taxes as a matter of course?]**

(a)     The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser;

(b)     A letter of direction to Escrow Agent authorizing and  directing Escrow Agent to disburse the Earnest Money to Sellers or to such party or parties as Sellers shall designate;

(c)     A closing certificate in the form of <u>Exhibit H</u>, together with all exhibits thereto;

(d)     A resolution of Purchaser, signed by Purchaser's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(e)     A Certificate of Good Standing from _____ evidencing that Purchaser is in good standing under the laws of _____;

(f)     A counterpart of each of the documents and instruments to be delivered by Sellers under Section 10.3.1 hereof which require execution by Purchaser;

(g)     Such other documents and instruments as may be reasonably requested by Sellers or the Title Company in order to consummate the transaction described in this Agreement;

(h)     An Assignment and Assumption of the Franchise Agreements; and

(i)     An Assignment and Assumption of Tenant Leases.

**10.4**     <u>Possession</u>. Sellers shall deliver possession of the Real Properties and tangible Personal Property to Purchaser upon completion of the Closing, subject to transient hotel guest occupancy and use.

**10.5**     <u>Breakup Fee</u>.  In the event that: (1) (i) the Bankruptcy Court approves, following entry of the Sale Procedures Order, a sale offer other than to the Purchaser and this Agreement is terminated by Sellers or Purchaser in accordance with the terms of this Section 10.5, (ii) the auction for the Properties that is contemplated by the Sale Procedures Order is cancelled in accordance with the terms of the Sale Procedures Order and this Agreement is terminated by Sellers or Purchaser in accordance with the terms of this Section 10.5 or (iii) a Sellers' Breach Termination Event has occurred and, as a result, this Agreement is terminated by Purchaser in accordance with Section 13.1 hereof and (2) in any such case, the Purchaser is not then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement, then (x) the Earnest Money shall be returned to Purchaser and (y) Purchaser shall be paid the Breakup Fee (a) to the extent there is a termination of this Agreement as contemplated by this Section 10.5(1)(i), solely from the proceeds of such sale reasonably promptly following the consummation of such sale or (b) to the extent there is a termination of this Agreement as contemplated by Section 10.5(1)(ii) or by Section 10.5(1)(iii), within five (5) Business Days of following such termination. The Parties agree that if this Agreement is terminated in circumstances under which the Breakup Fee is expressly payable, Purchaser's receipt of the Breakup Fee in accordance with this Agreement (in addition to the return of the Earnest Money) shall be the sole and exclusive remedy of Purchaser against Sellers and/or any of their respective Affiliates for any Liability, damage or other loss suffered as a result of any breach of any representation, warranty, covenant or agreement in this Agreement or the failure of the transactions contemplated hereby to be consummated, and upon payment of such amounts, none of the Sellers or any of their respective Affiliates shall have

29

any further Liability of any kind or nature whatsoever relating to or otherwise arising out of or under this Agreement and/or the transactions contemplated by this Agreement, except to the extent that Purchaser suffers losses as a result of Sellers' fraud, in which case Purchaser shall be entitled to additional relief and remedies otherwise available at law or in equity by reason of such fraud.

**10.6**   Backup Purchaser.  Notwithstanding anything contained in this Agreement to the contrary, in the event the Bankruptcy Court approves the sale to a Successful Bidder and such Successful Bidder fails to close on the acquisition of the Properties in accordance with the terms of such Bankruptcy Court order, upon receipt of ten (10) days' written notice to Purchaser of such failure to close (the "Reinstatement Notice"), if Purchaser is the next highest and otherwise best bidder, as determined by Sellers (as debtors in the Bankruptcy Case) with the consent of the secured lender in the Bankruptcy Case, Purchaser shall be obligated to acquire the Properties upon the terms and provisions of this Agreement at the Purchase Price or at the amount of any higher bid submitted by Purchaser. The Closing Date shall be deemed to be ten (10) Business Days following the date of the Reinstatement Notice. If the Earnest Money was returned to Purchaser, Purchaser shall deposit with the Escrow Agent the sum which is equal to the Earnest Money theretofore refunded to Purchaser (plus such addition sum as may be required such that the Earnest Money shall be the sum which is equal to five percent (5%) of Purchaser's higher bid), whereupon the Agreement shall be reinstated on its identical terms and provisions except only as otherwise provided in Section 10.5 hereof.  The failure of Purchaser to reinstate this Agreement by duly and timely making the deposit of the Earnest Money as aforesaid shall thereupon automatically render Purchaser in default and with no right to purchase the Properties and Sellers shall be free to sell the Properties to any other party or parties.

**ARTICLE XI**
**PRORATIONS AND EXPENSES**

**11.1**   Closing Statement. No later than the day prior to Closing, the Parties, through their respective employees, agents or representatives, jointly shall make such examinations, audits and inventories of the Hotels as may be necessary to make the adjustments and prorations to the Purchase Price as set forth in Sections 11.2 and 11.3 hereof or any other provisions of this Agreement. Based upon such examinations, audits and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "Closing Statement"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement, except to the extent any such items shall be reprorated after the Closing as expressly set forth in Section 11.2 hereof.

**11.2**   Prorations. The items of revenue and expense set forth in this Section 11.2 shall be prorated between the Parties (the "Prorations") as of 11:59 p.m. on the day preceding the Closing Date (the "Cut-Off Time"), or such other time expressly provided in this Section 11.2, so that the Closing Date is a day of income and expense for Purchaser.

   11.2.1.   Taxes. All real property, personal property, and similar Taxes shall be prorated as of the Cut-Off Time between Sellers and Purchaser. If the amount of any such Taxes is not ascertainable on the Closing Date, the proration for such Taxes shall be based on the most recent

30

available bill; provided, however, that after the Closing, Sellers and Purchaser shall reprorate the Taxes and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant taxable period. This Section 11.2.1 shall survive the Closing.

11.2.2.    Contracts. Any amounts prepaid, accrued or due and payable under the Contracts (other than for utilities which proration is addressed separately in Section 11.2.4 hereof) shall be prorated as of the Cut-Off Time between Sellers and Purchaser, with Sellers being credited for amounts prepaid, and Purchaser being credited for amounts accrued and unpaid. Purchaser shall receive a credit for all deposits held by Sellers under the Contracts (together with any interest thereon if interest is required to be paid to the counterparty) which are not transferred to Purchaser, and Purchaser thereafter shall be obligated to refund or apply such deposits in accordance with the terms of such Contracts. Sellers shall receive a credit for all deposits made by Sellers under the Contracts (together with any interest thereon) which are transferred to Purchaser or remain on deposit for the benefit of Purchaser.

11.2.3.    Licenses and Permits. All amounts prepaid, accrued or due and payable under any Licenses and Permits transferred to Purchaser shall be prorated as of the Cut-Off Time between Sellers and Purchaser. Sellers shall receive a credit for all deposits made by Sellers under the Licenses and Permits (together with any interest thereon) which are transferred to Purchaser or which remain on deposit for the benefit of Purchaser. For all Excluded Contracts, Purchaser shall be responsible to pay all termination fees and other costs thereunder which are due by reason of the Sellers' termination thereof.

11.2.4.    Utilities. All utility services shall be prorated as of the Cut-Off Time between Sellers and Purchaser. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings are not obtained as of the Closing Date, the cost of such utilities shall be prorated between Sellers and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, the Parties shall reprorate the amount for such utilities and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant billing period, which obligation shall survive the Closing. Sellers shall receive a credit for all fuel stored at the Hotels based on Sellers' cost for such fuel. Sellers shall receive a credit for all deposits transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts.

11.2.5.    Compensation. Sellers shall pay directly to the Rehired Employees all Employee Compensation due to such Rehired Employees through the date immediately prior to the Closing Date on or before Sellers' first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Employee Compensation; provided, however, that any portion of Employee Compensation consisting of tax withholdings, employer taxes, and the like shall be paid to the appropriate collecting entity.

11.2.6.    Accrued Vacation Pay. Sellers shall pay directly to the Rehired Employees all Accrued Vacation Pay due to such Rehired Employees through the date immediately prior to the Closing Date on or before each of Seller's first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Accrued Vacation Pay.

US.356163480.09

11.2.7.    Bookings. Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Purchaser.

11.2.8.    Retail Merchandise and F&B. Sellers shall receive a credit at Closing from Purchaser for all Retail Merchandise and unopened items of F&B (including, without limitation, all F&B in any "mini bars" in the guest rooms) based on Sellers' cost for such items.

11.2.9.    Restaurants and Bars. Sellers shall close out the transactions in the restaurants and bars in the Hotels as of the regular closing time for such restaurants and bars during the night in which the Cut-Off Time occurs and retain all monies collected and receivables arising from such transactions as of such closing, and Purchaser shall be entitled to any monies collected from the restaurants and bars thereafter.

11.2.10.    Vending Machines. Sellers shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

11.2.11.    Trade Payables. Except to the extent an adjustment or proration is made under another subsection of this Section 11.2, (i) Sellers shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Business (the "Trade Payables") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotels prior to Closing, and (ii) Purchaser shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Sellers and Purchaser shall reprorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for such goods or services. Sellers shall receive a credit for all advance payments or deposits made with respect to FF&E, Supplies, F&B and Retail Merchandise ordered, but not delivered to the Hotels prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, Supplies, F&B and Retail Merchandise which were ordered prior to Closing. This Section 11.2.11 shall survive the Closing.

11.2.12.    Cash. Sellers shall receive a credit for all cash on hand or on deposit in any house bank at the Hotels which shall remain on deposit for the benefit of Purchaser.

11.2.13.    All Adjustments and Prorations. All of the foregoing adjustments and prorations as well as all other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a hotel property similar to the Properties shall be adjusted and prorated between Sellers and Purchaser in accordance with the prevailing Uniform System of Accounts for the Lodging Industry.

**11.3**    Accounts Receivable.

11.3.1.    Guest Ledger. At Closing, Sellers shall receive a credit from Purchaser in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs, and (ii) one half ($^1/_2$) of all amounts

charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger which shall be prorated in accordance with Section 11.2.9 hereof), and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

11.3.2.    Accounts Receivable (Other than Guest Ledger). Sellers shall retain the right to collect all Accounts Receivable (other than the Guest Ledger which is addressed in Section 11.3.1 hereof), and Purchaser shall not receive a credit for the Accounts Receivable. Purchaser shall cooperate with Sellers in collecting the Accounts Receivable, at no cost or expense to Purchaser other than any de minimis cost and expense or any cost or expense which Sellers agree in writing to reimburse. If any Accounts Receivable are paid to Purchaser after the Closing, Purchaser shall pay to Sellers the amounts received by Purchaser within five (5) days after receipt of such amounts, without any commission or deduction for Purchaser.

**11.4**    Transaction Costs.

11.4.1.    Seller's Transaction Costs. In addition to the other costs and expenses to be paid by Sellers set forth elsewhere in this Agreement, Sellers shall pay for the following items in connection with this transaction: (i) the fees and expenses of removing or curing any Unpermitted Exceptions which Sellers elect to cure or remove pursuant to this Agreement; (ii) the commission due to Broker; (iii) one half ($^{1}/_{2}$) of the fees and expenses for the Escrow Agent; (iv) any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Properties, except as may otherwise be set forth in an order of the Bankruptcy Case; and (v) the fees and expenses of its own attorneys, accountants and consultants.

11.4.2.    Purchaser's Transaction Costs. In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction: (i) the fees and expenses incurred by Purchaser for Purchaser's Inspectors or otherwise in connection with the Inspections; (ii) all of the fees, costs, and expenses for the Title Commitments and Title Policies; (iii) all of the fees, costs, and expenses for any Updated Surveys; (iv) any mortgage tax, title insurance fees and expenses for any loan title insurance policies, recording charges or other amounts payable in connection with any financing obtained by Purchaser; (v) one half ($^{1}/_{2}$) of the fees and expenses for the Escrow Agent; (vi) the fees and expenses of its own attorneys, accountants and consultants; and (vii) any fees or expenses payable for the assignment, transfer or conveyance of any Assigned Operating Agreements, Licenses and Permits, IT Systems, Intellectual Property, Plans and Specifications and Warranties and

11.4.3.    Other Transaction Costs. All other fees, costs and expenses not expressly addressed in this Section 11.4 or elsewhere in this Agreement shall be allocated between Sellers and Purchaser or paid by the applicable Party, as the case may be, in accordance with the prevailing Uniform System of Accounts for the Lodging Industry, and to the extent not covered thereby in accordance with the prevailing applicable custom and practice for similar transactions.

US.356163480.09

## ARTICLE XII
## TRANSITION PROCEDURES

**12.1**    <u>Safe Deposit Boxes</u>. Prior to the Closing, Sellers shall notify all guests or customers who are then using a safe deposit box at the Hotels advising them of the pending change in ownership of the Hotels and requesting them to conduct an inventory and verify the contents of such safe deposit box. All inventories by such guests or customers shall be conducted under the joint supervision of employees, agents or representatives of the Parties. Upon such inventory and verification and upon the completion of the Closing, Sellers shall deliver to Purchaser all keys, receipts and agreements for such safe deposit box (and thereafter such safe deposit box shall be deemed an "<u>Inventoried Safe Deposit Box</u>"). Upon Closing, Sellers shall deliver to Purchaser a list of all safe deposit boxes which are then in use, with the name and room number of such depositor. After the Closing, the Parties shall make appropriate arrangements for guests and customers at the Hotels to inventory and verify the contents of the non Inventoried Safe Deposit Boxes, and upon such inventory and verification, Sellers shall deliver to Purchaser all keys, receipt and agreements for such safe deposit box (and such safe deposit box thereafter shall constitute an Inventoried Safe Deposit Box). Purchaser shall be responsible for, and shall indemnify, defend, save and hold harmless the Seller Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to, any theft, loss or damage to the contents of any safe deposit box from and after the time such safe deposit box is deemed an Inventoried Safe Deposit Box pursuant to this Section 12.1. Sellers shall be responsible for, and shall indemnify, defend, save and hold harmless the Purchaser Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Purchaser Indemnitees with respect to, any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is deemed an Inventoried Safe Deposit Box.

**12.2**    <u>Baggage</u>. On the Closing Date, employees, agents or representatives of the Parties jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Sellers at the Hotels, and Sellers shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "<u>Inventoried Baggage</u>"). Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage, boxes or similar items left in the care of Purchaser which was not inventoried by the Parties. Sellers shall be responsible for, and shall indemnify and hold harmless the Purchaser Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Purchaser Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage, boxes or similar items left in the care of Sellers which was not inventoried by the Parties.

## ARTICLE XIII
## DEFAULT AND REMEDIES

**13.1**    <u>Sellers Default</u>. If, at the time of Closing, Sellers fail to perform their material covenants or material obligations under this Agreement and no Purchaser Default has occurred (a "<u>Seller Default</u>") that has prevented the satisfaction of the conditions to the obligations of Purchaser to

34

close the transactions set forth in Sections 9.2.1(b) or 9.2.1(c) hereof, then Purchaser, as its sole and exclusive remedy, may elect upon written notice to Sellers to (a) terminate this Agreement, and if Sellers fail to remedy the Seller Default within thirty (30) days thereafter, this Agreement shall terminate (a "Sellers' Breach Termination Event") and the Earnest Money shall be refunded to Purchaser, Sellers shall pay to Purchaser the Breakup Fee if and to the extent applicable under the provisions of Section 10.5 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without offset or deduction to the Purchase Price; or (c) obtain a court order for specific performance. Purchaser hereby waives any and all other rights and/or remedies it may otherwise have at law and/or in equity.  It is expressly understood and agreed to that in no event shall Purchaser be entitled to the Breakup Fee if there is a Purchaser Default.

**13.2**   Purchaser's Default. If Purchaser fails to perform any of its material covenants or material obligations under this Agreement and no Seller Default has occurred which remains uncured (a "Purchaser Default"), then Sellers, as their sole and exclusive remedy, may elect to (A) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Sellers in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing pursuant to this Agreement.

**13.3**   LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 13.2 HEREOF, THE DAMAGES THAT SELLERS WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLERS SHALL RETAIN THE EARNEST MONEY AS A FAIR AND REASONABLE SUM AND AS FAIR MEASURE OF DAMAGES, AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLERS' SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION. NOTWITHSTANDING THE FOREGOING, THE REMEDY OF LIQUIDATED DAMAGES SHALL NOT LIMIT, AND SHALL NOT BE DEEMED TO LIMIT, IN ANY WAY THE RIGHTS AND REMEDIES AVAILABLE TO SELLERS WHICH SURVIVE TERMINATION OF THIS AGREEMENT.

### ARTICLE XIV
### RISK OF LOSS

**14.1**   Casualty. If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Properties or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Sellers shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

14.1.1.   Material Casualty. If the amount of the repair restoration of the Properties required by a Casualty equals or exceeds ten percent (10%) of the Purchase Price, as estimated by Sellers' architect (a "Material Casualty") then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of the estimate from Sellers' architect, to (a) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.3 hereof, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b)

proceed to Closing, without terminating this Agreement, in which case Sellers shall (i) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (A) the applicable insurance deductible, and (B) and the reasonable estimated costs for the repair or restoration of the Properties required by such Material Casualty, and (ii) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Sellers with respect to the Properties or the Business. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period. It is expressly understood and agreed to that in no event shall Purchaser be entitled to the Breakup Fee if there is a Material Casualty.

14.1.2.    Non Material Casualty. In the event of any Casualty which is not a Material Casualty, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall (A) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (1) the applicable insurance deductible under Sellers' applicable insurance policy, and (2) the reasonable estimated costs for the repair or restoration required by such Casualty, and (B) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty insurance policies maintained by Sellers with respect to the Hotels.

**14.2**    Condemnation. If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Real Properties (a "Condemnation"), Sellers shall give written notice of such Condemnation to Purchaser promptly after Sellers receive notice of such Condemnation.

14.2.1.    Material Condemnation. If the Condemnation would (i) result in the permanent loss of more than five percent (5%) of the fair market value of the Land or Improvements, (ii) result in any permanent material reduction or restriction in access to the Land or Improvements, or (iii) have a permanent materially adverse effect on the Business as conducted prior to such Condemnation (a "Material Condemnation"), then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of Sellers' written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.3 hereof, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Material Condemnation. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period. It is expressly understood and agreed to that in no event shall Purchaser be entitled to the Breakup Fee if there is a Material Condemnation.

14.2.2.    Non-Material Condemnation. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Condemnation.

36

## ARTICLE XV
## SURVIVAL, INDEMNIFICATION AND RELEASE

**15.1**    <u>Survival</u>. Except only as expressly set forth in this Section 15.1, all representations, warranties, covenants, liabilities and obligations shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

       15.1.1.    <u>Survival of Representations and Warranties</u>. The payment of the Purchase Price and the delivery of the deed(s) by Sellers to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

       15.1.2.    <u>Survival of Covenants and Obligations</u>. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

       15.1.3.    <u>Survival of Indemnification</u>. This ARTICLE XV and all other rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

**15.2**    <u>Indemnification by Sellers</u>. Subject to the limitations set forth in any express provision of in this Agreement, Sellers shall indemnify, defend, save and hold harmless the Purchaser Indemnitees from and against any Indemnification Loss incurred by any Purchaser Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Sellers in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) the breach by Sellers of any of their covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Retained Liabilities.

**15.3**    <u>Indemnification by Purchaser</u>. Subject to the limitations set forth in any express provision of this Agreement, Purchaser shall indemnify, defend, save and hold harmless the Seller Indemnitees from and against any Indemnification Loss incurred by any Seller Indemnitee to the extent resulting from (i) any breach of any express representations or warranties of Purchaser in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) any breach by Purchaser of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Assumed Liabilities.

**15.4**    <u>Limitations on Indemnification Obligations</u>.

       15.4.1.    <u>Indemnification Deductible and Cap</u>. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide indemnification to the Purchaser Indemnitees pursuant to clause (i) of Section 15.2 hereof to the extent that (a) the aggregate of all Indemnification Losses under clause (i) of Section 15.2 hereof does not exceed $150,000.00, (b)

with respect to any individual Indemnification Loss, such Indemnification Loss does not exceed $25,000.00, or (c) such Indemnifications Losses exceed 25% of the Purchase Price, in the aggregate.

15.4.2.    <u>Negligence or Willful Misconduct of Indemnitee</u>. Notwithstanding anything to the contrary in this Agreement, (i) a Purchaser Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Purchaser Indemnitee, and (ii) a Seller Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Seller Indemnitee.

15.4.3.    <u>WAIVER OF CERTAIN DAMAGES</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, SELLERS (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ALL RIGHTS TO CLAIM OR SEEK ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1**    <u>Notices</u>

16.1.1.    <u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address, facsimile number or e-mail address:

If to Seller:

c/o AD1 Management, Inc.
1955 Harrison Street, Suite 200
Hollywood, Florida  33020
Attn: Alex Fridzon
E-mail address: alex@ad1global.com

With a copy to:

Faegre Drinker Biddle & Reath LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Attn: Scott Gautier
E-mail address: scott.gautier@faegredrinker.com

38

With a copy to:

Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas
41st Floor
New York, New York 10036
Attn: Joe Brasile
E-mail address: joe.brasile@faegredrinker.com


If to Purchaser:

_____
_____
_____
Attn: _____
E-mail address: _____

With a copy to:

_____
_____
_____
Attn: _____
E-mail address:_____

16.1.2.    <u>Receipt of Notices</u>. All Notices sent by a Party (or its counsel pursuant to Section 16.1.4 hereof) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. **[Eastern]** on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 16.1.3 hereof.

16.1.3.    <u>Change of Address</u>. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 16.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 16.1.

16.1.4.    <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**16.2**    <u>No Recordation</u>. No Party shall record this Agreement, or any memorandum of this Agreement, in any public records.

**16.3** <u>Time is of the Essence</u>. Time is of the essence as to all dates and/ or times, as applicable, set forth in this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**16.4** <u>Assignment</u>. Purchaser shall not assign this Agreement or any interest therein to any Person, without the prior written consent of Sellers, which consent may be withheld in Sellers' sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to designate any affiliate(s) (which is intended to be broader than the defined term "Affiliate") as its nominee to receive title to the Properties, or assign all of its right, title and interest in this Agreement to any affiliate(s) of Purchaser by providing written notice to Sellers no later than five (5) days prior to the Closing, provided that in any such event the originally named Purchaser shall remain liable for all Purchaser obligations hereunder.

**16.5** <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**16.6** <u>Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**16.7** <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF FLORIDA, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**16.8** <u>Rules of Construction</u>. The following rules shall apply to the construction and interpretation of this Agreement:

16.8.1.  Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

16.8.2.  All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

16.8.3.  The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

16.8.4.  Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted

US.356163480.09

the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

16.8.5.    The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

16.8.6.    The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

16.8.7.    The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**16.9**    Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

**16.10**    JURISDICTION AND VENUE. ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE BANKRUPTCY COURT AND SELLERS (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURT AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**16.11**    WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY WAIVE ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

**16.12**    Survival. The payment of the Purchase Price and the delivery of the deed(s) by Sellers to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement excepting only that the provisions of Sections 2.2(b)(ii), 2.4, 2.5, 6.1, 8.1, 8.1.2, 8.5, 8.6, 11.2.1 and 11.4 hereof and Articles XV and XVI hereof shall survive the Closing. Notwithstanding anything to the contrary contained herein, Sections 8.1, 8.1.2, 10.5 and Articles XIII, XV and XVI hereof shall survive the termination of this Agreement.

**16.13**    Incorporation of Recitals, Exhibits and Schedules. The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 16.15 hereof) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**16.14**    Entire Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede the Letter of Intent and any other agreements and

41

understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**16.15**  Amendments, Waivers and Termination of Agreement. No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**16.16**  Not an Offer. The delivery by Sellers of this Agreement executed by Sellers shall not constitute an offer to sell the Properties, and Sellers shall have no obligation to sell the Properties to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

**16.17**  Execution of Agreement. A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**[Remainder of page intentionally left blank;
Signatures on following pages]**

42

**IN WITNESS WHEREOF,** each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.


**SELLER:**

[_____]

By: _____,
Its _____

　　By: _____,
　　Its _____

　　　　By:_____
　　　　　Name:
　　　　　Title:


**PURCHASER:**

[_____]

By: _____,
Its _____

　　By: _____,
　　Its _____

　　　　By:_____
　　　　　Name:
　　　　　Title:

US.356163480.09

**Exhibit A**

**SELLERS ENTITIES**

1. AD1 LBV1, LLC, a Delaware limited liability company ("**Crowne Plaza Orlando Seller**")

2. AD1 CELEBRATION HOTELS, LLC, a Florida limited liability company ("**Staybridge Seller**")

3. AD1 DAYTONA HOTELS, LLC, a Florida limited liability company ("**Rushhh Seller**")

4. AD1 PB AIRPORT HOTELS, LLC, a Delaware limited liability company ("**Holiday Inn Seller**")

5. AD1 URBAN PALM BAY PLACE, LLC, a Delaware limited liability company ("**Hyatt Seller**")

6. AD1 URBAN PALM BAY, LLC, a Delaware limited liability company ("**Home2 Suites Seller**")

7. AD1 SW PROPERTY HOLDINGS, LLC, a Delaware limited liability company ("**Aloft/Element Seller**")

**Exhibit B**

**DEBTOR ENTITIES AND CASE NUMBERS**

1.  IN RE: AD1 URBAN PALM BAY, LLC, Case No. 23-10074

2.  IN RE: AD1 URBAN PALM BAY PLACE, LLC, Case No. 23-10075

3.  IN RE: AD1 URBAN STRATEGY PALM BAY, LLC, Case No. 23-10076

4.  IN RE: AD1 LBV1, LLC, Case No. 23-10077

5.  IN RE: AD1 LBV HOTELS, LLC, Case No. 23-10078

6.  IN RE: AD1 SW PROPERTY HOLDINGS, LLC, Case No. 23-10079

7.  IN RE: AD1 URBAN SW, LLC, Case No. 23-10080

8.  IN RE: AD1 PALM BEACH AIRPORT HOTELS, LLC, Case No. 23-10081

9.  IN RE: AD1 PB AIRPORT HOTELS, LLC, Case No. 23-10082

10. IN RE: AD1 CELEBRATION HOLDINGS, LLC, Case No. 23-10084

11. IN RE: AD1 CELEBRATION HOTELS, LLC, Case No. 23-10085

12. IN RE: AD1 DAYTONA HOLDINGS, LLC, Case No. 23-10086

13. IN RE: AD1 DAYTONA HOTELS, LLC, Case No. 23-10087

## Exhibit C

## FORM OF EARNEST MONEY ESCROW AGREEMENT

This escrow agreement (the "Escrow Agreement") is made as of this ___ day of _____, 20__ by and between _____ ("Seller"), _____ ("Purchaser"), and COMMONWEALTH LAND TITLE INSURANCE COMPANY, having an address at 685 Third Avenue, 20th Floor, New York, New York 10017 ("Escrow Agent").

## WITNESSETH:

WHEREAS, and Purchaser have entered into a Purchase and Sale Agreement with an effective date of _____, 20__ (the "Agreement") for the sale of that certain premises which is commonly known as _____ and is located in _____ (the "Transaction").  A copy of the Agreement has been received by Escrow Agent.

WHEREAS, Purchaser is obligated to deposit certain monies into escrow with Escrow Agent to be held as earnest money for the benefit of Sellers pursuant to the Agreement in connection with the Transaction (the "Earnest Money").

WHEREAS, in furtherance of the Transaction, the parties desire and Escrow Agent is willing to hold the Earnest Money in escrow on the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable considerations, the receipt of and sufficiency thereof, is duly acknowledged, the parties hereto agree as follows:

1.      The terms of the Agreement are incorporated herein by reference, and Escrow Agent agrees to abide by such terms as they may be applicable to Escrow Agent.  All capitalized items not otherwise defined therein shall have the meanings ascribed to them in the Agreement.

2.      Upon receipt of a fully executed Internal Revenue Service Form W-9, Escrow Agent shall be authorized to invest any Earnest Money funds in an interest bearing money market account at **[Citibank, N.A.]**

3.      When the closing of the Transaction takes place, Escrow Agent shall deliver the Earnest Money to or upon Sellers, provided Purchaser has executed and delivered to Escrow Agent a letter certifying that all of the conditions precedent to be performed by Sellers set forth in the Agreement between Sellers and Purchaser have been duly satisfied or have been expressly waived by Purchaser, which letter shall be delivered by email to Escrow Agent.

4.      Pursuant to Paragraph ___ of the Agreement, Purchaser may, prior to _____, 20__, elect to terminate the Agreement by giving written notice thereof to Sellers and to Escrow Agent, and, in such event, the Earnest Money shall be returned to Purchaser by Escrow Agent, whereupon the Agreement and this Escrow Agreement shall be cancelled and none of the parties hereto shall have any further rights and obligations hereunder, except as provided in the Agreement.

5.      If Purchaser does not terminate the Agreement in the manner described in Section ___ of the Agreement, but the closing of the sale does not take place, Escrow Agent shall pay the Earnest Money to, or upon the instruction of, the party entitled thereto in accordance with the provisions of the Agreement; provided, however, that Escrow Agent shall not pay the Earnest Money in such event unless and until (a) it delivers written notice to the other party notifying such other party of its intention to deliver the Earnest Money, and (b) such other party or its attorney as designated below shall not deliver to Escrow Agent a written notice objecting to such delivery of the Earnest Money within ten (10) days after delivery of Escrow Agent's notice.

6.      With respect to delivering the Earnest Money in accordance with Paragraphs 3 or 5, in the event that Escrow Agent receives conflicting instructions from the parties or determines in good faith that a bona fide dispute exists as to whether Escrow Agent is obligated to deliver the Earnest Money, or as to whom said Earnest Money is to be delivered, Escrow Agent, at its option, may: (a) refuse to comply with any claims or demands on it and continue to hold the Earnest Money until (i) Escrow Agent receives written notice signed by Sellers and Purchaser directing the release and delivery of the Earnest Money, in which event Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (ii) Escrow Agent receives a certified copy of a final non-appealable judgment of a court of competent jurisdiction directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction; (b) deliver the Earnest Money to the Clerk of the Supreme Court of the State of Florida, for the County of _____; or (c) take such affirmative steps as Escrow Agent may elect in order to substitute another impartial party reasonably satisfactory to Sellers and Purchaser (whose consents to such substitution shall not be unreasonably withheld), to hold the Earnest Money, including, without limitation, the deposit thereof in a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be the joint and several obligation of Sellers and Purchaser (but, as between Sellers and Purchaser, such costs shall be borne by whichever of Sellers or Purchaser is the losing party, or in accordance with any mutual agreement of Sellers and Purchaser if neither party is the losing party).

7.      Escrow Agent is acting as a stakeholder only with respect to the Earnest Money.  It is agreed that the duties of the Escrow Agent are only as herein specifically provided, and are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or gross negligence.  Sellers and Purchaser each release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder.

8.      Sellers and Purchaser acknowledge that Escrow Agent's duties are solely limited to holding and disbursement of the Earnest Money as set forth herein and that Escrow Agent shall have no obligations, responsibilities or duties, fiduciary or otherwise, under this Escrow Agreement and shall incur no liability to either Sellers or Purchaser pursuant to the terms hereof, unless and until the first deposit of funds is made by or on behalf of Purchaser pursuant to the terms of the Agreement.

9.      Sellers and Purchaser shall jointly and severally indemnify, defend (with counsel acceptable to Escrow Agent) and save harmless Escrow Agent from and against all loss, cost, claim, liability, damage and expense, including reasonable attorneys' fees and disbursements incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this Escrow Agreement, or involving gross negligence on the part of Escrow Agent (the "Indemnified Matters") (but, as between Sellers and Purchaser, the cost of such Indemnified Matters shall be shared equally, except to the extent that such Indemnified Matters are attributable to the breach by Sellers or Purchaser of the Agreement or this Escrow Agreement, in which event the cost shall be borne by whichever of Sellers or Purchaser is the breaching party).

10.     The parties agree and acknowledge that Escrow Agent has no liability in connection with the Earnest Money in the event of the failure or insolvency of the financial institution in which the Earnest Money is deposited.

11.     All notices, demands, offers, elections or other communications required or permitted by this Escrow Agreement shall be in writing and shall be personally delivered by (a) express mail or by reputable overnight courier which delivers only upon receipt of addresses, and addressed to the party at its address set forth below by either of the aforesaid methods; (b) electronic mail (i.e., email) to the address set forth below; or (c) by registered or certified mail, postage prepaid, with a return receipt requested, with copies as follows:

To Seller:

  c/o AD1 Management, Inc.
  1955 Harrison Street, Suite 200
  Hollywood, Florida  33020
  Attn: Alex Fridzon
  E-mail address: alex@ad1global.com

  With a copy to:

  Faegre Drinker Biddle & Reath LLP
  1800 Century Park East, Suite 1500
  Los Angeles, California 90067
  Attn: Scott Gautier
  E-mail address: scott.gautier@faegredrinker.com

  With a copy to:

  Faegre Drinker Biddle & Reath LLP
  1177 Avenue of the Americas
  41st Floor
  New York, New York 10036
  Attn: Joe Brasile
  E-mail address: joe.brasile@faegredrinker.com

To Purchaser:

With a copy to:

To Escrow Agent: Commonwealth Land Title Insurance Company
685 Third Avenue, 20th Floor
New York, NY 10017
Attention:
Email:

or at such other address as, from time to time, shall be supplied by a party to the others by like notice, and shall be deemed to have been given or sent, (i) if sent by express mail or by registered or by certified mail, when properly deposited with the United States Postal Services with the proper address and postage paid therewith, and shall be deemed to have been received when actually delivered to or refused receipt at the specified address; (ii) if sent by email, when sent to the recipient; or (iii) if sent by overnight courier, when delivered to said courier service with the proper address and delivery charges either prepaid or charged to a proper account, and deemed to have been received when actually delivered to the specified address.

Notwithstanding the foregoing paragraph to the contrary, in the event any notice, demand, offer, election or other communication is sent by email, then (i) a copy shall also be sent by one of the other methods set forth in this Section 11, and (ii) if any notice, demand, offer, election or other communications is delivered on a non-business day or after 5:00 p.m. (local time of the recipient) on a business day, then, in either event, it shall not be deemed given and received until 9:00 a.m. (local time of the recipient) on the following business day.

Notwithstanding preceding paragraphs in this Section 11 to the contrary, and solely with respect to Escrow Agent, notice shall be deemed to have been given or delivered to Escrow Agent on the date of Escrow Agent's actual receipt or refusal of such notice. Each party shall be entitled to rely on all communications which purport to be on behalf of the party and purport to be signed by an authorized party or the above-indicated attorneys or such other attorney as may be designated from time to time by any of the parties hereto.

12. Escrow Agent hereunder may resign at any time giving ten (10) business days prior written notice to that effect to each of the Sellers and Purchaser. In such event, the successor Escrow Agent shall be selected by the Purchaser and approved by Sellers, such approval not to be unreasonably withheld or delayed. Escrow Agent shall then deliver to successor Escrow Agent

the Earnest Money, to be held by successor Escrow Agent pursuant to the terms of this Escrow Agreement and the Agreement.

13.     In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained herein, and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and believed by Escrow Agent to have been signed by the proper person.  Escrow Agent may assume that any person purporting to give any notice hereunder and representing that they have authority to do so has been duly authorized to do so.

14.     Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein.  Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery or to enforce any obligation of any person to perform any other act. Escrow Agent shall be under no liability to the other parties hereto or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document.

15.     Escrow Agent shall be entitled to approve (not to be unreasonably withheld or delayed) any and all counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Escrow Agreement.

16.     It is expressly agreed that this Escrow Agreement is for the sole benefit of the parties hereto and shall not be construed or deemed to be made for the benefit of any third party or parties.

17.     This Escrow Agreement and the obligations of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Florida.

18.     If any provision of this Escrow Agreement or the application thereof to any entity, person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Escrow Agreement and the application of such provisions to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

19.     This Escrow Agreement contains the entire understanding between the parties hereto.  No variations, modifications or changes hereof shall be binding upon any party hereto unless set forth in a document duly executed by all parties hereto.

20.     Whenever used herein, the singular number shall include the plural, and the use of any gender shall include all genders.  Obligations under this Escrow Agreement shall be binding upon Sellers and Purchaser, jointly and severally.  This Escrow Agreement shall be binding upon and enforceable between Sellers and Purchaser, their heirs, executors, administrators, legal representatives, successors, assigns or trustees.

21.     This Escrow Agreement may be executed in multiple original counterparts, all of which shall be deemed originals and with the same effect as if all parties hereto had signed the same document.  All such counterparts shall be construed together and shall constitute one and the same instrument. Further, for purposes of executing this Escrow Agreement, a document signed and transmitted by email in pdf format shall be treated as an original document, the signature of any party thereon shall be considered an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document. At the request of any party, any document transmitted by email shall be re-executed by the parties in original form.  No party may raise the fact that any signature was transmitted through the use of email as a defense to the enforcement of this Escrow Agreement or any amendment executed in compliance with this Section 21.

22.     Each party waives the right to a jury trial of any dispute relating to this Escrow Agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the date first above-written.


**Seller:**

By: _____

Printed Name: _____

Title: _____


**Purchaser:**

By: _____

Printed Name: _____

Title: _____


**Escrow Agent:**     **COMMONWEALTH LAND TITLE INSURANCE COMPANY**

By: _____

Printed Name: _____

Title: _____


C-6

## LIST OF SCHEDULES

Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____
Schedule _____        _____

## Exhibit 4

**(Sale Procedures Notice and Notice of Auction(s))**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AD1 Urban Palm Bay, LLC,[1] | Case No. 23-10074 (KBO) |
| Debtor. | (Jointly Administered) |
| | **Docket Ref. Nos. ___ & ___** |

**NOTICE OF SALE PROCEDURES FOR THE
SALE OF HOTEL ASSETS AND AUCTIONS RELATED THERETO**

AD1 Urban Palm Bay, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), are seeking to sell certain properties (collectively, the "Hotel Assets"), described below, and associated personal property. The Debtors will consider bids to acquire one or more Hotel Assets through a "free and clear" sale transaction that is proposed to be implemented either through a chapter 11 plan of reorganization or a separate sale order entered after notice and a hearing. The Debtors may, with the consent of their primary secured lender, appoint one or more parties to serve as a stalking horse bidder (each a "Stalking Horse Bidder") with respect to an auction process.

By order, dated [*], 2023 [Docket No. [*]] (the "Sale Procedures Order"),[2] the Court approved certain procedures (the "Sale Procedures") that will govern the bidding and auction process that will result in an acquisition(s) of the Hotel Assets by the highest and best bidders.

The Debtors will request that the Court enter an order or orders (the "Sale Orders"), which provide, among other things, for the sale of the Hotel Assets free and clear of all liens, claims, encumbrances and other interests, to the extent permissible by law, and the assumption of certain liabilities. Note that the Debtors contemplate that the Sale Orders may be included within orders confirming a plan or plans in these chapter 11 cases, however, if a plan is not approved on or before May 9, 2023, then the Debtors shall seek approval of the sale(s) by separate hearing to approve the sale(s) of the Hotel Assets to the Successful Bidder(s).  A separate notice will be provided to

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AD1 Celebration Hotels, LLC (7980); AD1 Daytona Hotels, LLC (7940); AD1 LBV1, LLC (1125); AD1 PB Airport Hotels, LLC (6855); AD1 SW Property Holdings, LLC (2507); AD1 Urban Palm Bay, LLC (3713); AD1 Urban Palm Bay Place, LLC (2385); AD1 Celebration Holdings, LLC (3363); AD1 Daytona Holdings, LLC (2761); AD1 LBV Hotels, LLC (7709); AD1 Palm Beach Airport Hotels, LLC (2187); AD1 Urban Strategy Palm Bay, LLC (9412); and AD1 Urban SW, LLC (6934).  The mailing address for each of the Debtors is 1955 Harrison Street, Suite 200, Hollywood, FL 33020.

[22]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Procedures Order.

counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned in connection with the Sale Orders.

A copy of the Sale Procedures Order, including the Sale Procedures as Exhibit 1 thereto, is attached hereto as **Schedule 1**.

**Any interested bidder should contact:**

**RobertDouglas**
**350 Fifth Avenue, Suite 4200**
**New York, NY  10118**
**Attn: Douglas Hercher**
**Email: dhercher@robert-douglas.com**

**PLEASE TAKE NOTE OF THE FOLLOWING INFORMATION AND IMPORTANT DEADLINES:**

- The deadline to be qualified as a Qualified Bidder and to submit a Qualified Bid with respect to any of the Hotel Assets are set forth in the Sale Procedures. Qualified Bids must be accompanied with a Good Faith Deposit equal to five percent (5%) of the Purchase Price to be paid under the proposed Transaction Agreement.

- Auctions for the Hotel Assets will commence at the offices of Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, or such other location that the Debtors, in consultation with the Secured Lender and advisors, determine will enhance the prospects for higher and better bidding for the Hotel Assets at the following dates and times:

| Hotel Asset | Auction Date |
|---|---|
| Home2 Palm Bay<br>1425 Sportsman Lane NE<br>Palm Bay, FL 32905 | May 9, 2023 at [TBD] |
| Hyatt Place<br>1435 Sportsman Lane NE<br>Palm Bay, FL 32905 | May 9, 2023 at [TBD] |
| Crowne Plaza Orlando Lake Buena Vista<br>8686 Palm Parkway<br>Orlando, FL 32836 | May 9, 2023 at [TBD] |
| Aloft Orlando International Drive<br>5730 Central Florida Parkway<br>Orlando, FL 32821 | May 9, 2023 at [TBD] |

| | |
|---|---|
| Element Orlando Universal Blvd.<br>8278 Universal Blvd.<br>Orlando, FL 32819 | May 9, 2023 at [TBD] |
| Staybridge Suites Orlando Royale Parc Suites<br>5876 W. Irlo Bronson Memorial Hwy.<br>Kissimmee, FL 34746 | May 9, 2023 at [TBD] |
| Rushhh Tapestry by Hilton<br>2323 South Atlantic Avenue<br>Daytona Beach Shores, FL 32118<br>(the "Daytona") | August 4, 2023 at [TBD] |
| Holiday Inn Palm Beach Airport-Crowne Plaza<br>1301 Belvedere Rd.<br>West Palm Beach, FL 33405<br>(the "Crowne Plaza") | July 12, 2023 at [TBD] |

Dated: Wilmington, Delaware
    [*], 2023

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ [DRAFT]*_____

Ian J. Bambrick (No. 5455)
Katharina Earle (No.6348)
222 Delaware Ave. Suite 1410
Wilmington, DE  19801
Tel:  (302) 467-4200
Fax:  (302) 467-4201
ian.bambrick@faegredrinker.com
katharina.earle@faegredrinker.com

Scott F. Gautier (admitted *pro hac vice*)
Maria J. Cho (admitted *pro hac vice*)
1800 Century Park East, Suite 1500
Los Angeles, CA  90067
Tel:  (310) 203-4000
Fax:  (310) 229-1285
scott.gautier@faegredrinker.com
maria.cho@faegredrinker.com

Michael T. Gustafson (admitted *pro hac vice*)
320 South Canal Street, Suite 3300
Chicago, Ill 60606
Tel:  (312)569-1000
Fax:  (312) 569-3000
mike.gustafson@faegredrinker.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

## Schedule 1

**(Sale Procedures Order)**

## Exhibit 5

**(Assumption Notice)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AD1 Urban Palm Bay, LLC,[1] | Case No. 23-10074 (KBO) |
| Debtor. | (Jointly Administered) |
| | Docket Ref. Nos. _____ & ___ |

## NOTICE OF ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS

AD1 Urban Palm Bay, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), are seeking to sell certain properties (collectively, the "<u>Hotel Assets</u>"), described on **Schedule 1** hereto, and associated personal property. The Debtors will consider bids to acquire one or more Hotel Assets through a "free and clear" sale transaction that is proposed to be implemented either through a chapter 11 plan of reorganization or a separate sale order entered after notice and a hearing. The Debtors may, with the consent of their primary secured lender, appoint one or more parties to serve as a stalking horse bidder (each a "<u>Stalking Horse Bidder</u>") with respect to an auction process.

The Debtors will request that the Court enter an order or orders (the "<u>Sale Orders</u>"), which provide, among other things, for the sale of the Hotel Assets free and clear of all liens, claims, encumbrances and other interests, to the extent permissible by law, and the assumption by the applicable purchaser of certain liabilities. The Debtors contemplate that such Sale Orders may be part of order confirming a plan or plans in these chapter 11 cases, however, if a plan is not approved on or before May 9, 2023, then the Debtors shall seek approval of the sale(s) by separate hearing to approve the sale(s) of the Hotel Assets to the Successful Bidder(s). In connection with the marketing and Sale Process, the Debtors contemplate that they will assume and assign certain of their executory contracts and unexpired leases related to the Hotel Assets (collectively, the "<u>Assumed Contracts</u>") based upon the designation of the Assumed Contracts by parties bidding to purchase the Hotel Assets.

By order, dated [*], 2023 [Docket No. [*]] (the "<u>Sale Procedures Order</u>"),[2] the Court approved the Sale Procedures that govern the sale of all of the Hotel Assets to the highest and best

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AD1 Celebration Hotels, LLC (7980); AD1 Daytona Hotels, LLC (7940); AD1 LBV1, LLC (1125); AD1 PB Airport Hotels, LLC (6855); AD1 SW Property Holdings, LLC (2507); AD1 Urban Palm Bay, LLC (3713); AD1 Urban Palm Bay Place, LLC (2385); AD1 Celebration Holdings, LLC (3363); AD1 Daytona Holdings, LLC (2761); AD1 LBV Hotels, LLC (7709); AD1 Palm Beach Airport Hotels, LLC (2187); AD1 Urban Strategy Palm Bay, LLC (9412); and AD1 Urban SW, LLC (6934). The mailing address for each of the Debtors is 1955 Harrison Street, Suite 200, Hollywood, FL 33020.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Procedures Order.

bidders. By entry of the Sale Procedures Order, the Court has also approved certain Assumption and Assignment Procedures**.**

**You are receiving this Notice because you may be a Counterparty to a potential "Assumed Contract," an executory contract which, if designated by a Successful Bidder, will be assumed by the Debtors and assigned to the Successful Bidder. A list of the potential Assumed Contracts is attached hereto as Schedule 2,** which includes an indication of the current amounts that the Debtors believe are due and owing (the "Cure Amounts") under each potential Assumed Contract.  The Cure Amounts, plus any future amounts that may accrue from the date of this Notice to any sale date, are the only amounts proposed to be paid upon any assumption and assignment of the Assumed Contracts, in full satisfaction of all amounts outstanding under the Assumed Contracts.

**To the extent that a Counterparty to an Assumed Contract objects to (i) the assumption and assignment of such Counterparty's Assumed Contract or (ii) the applicable Cure Amounts, the Counterparty must file and serve an objection ("Contract Objection") in accordance with the Assumption and Assignment Procedures, so as to be received by the Notice Parties as specified therein by [TBD], 2023 at 4:00 p.m. (ET).**

If no Contract Objection is timely received with respect to an Assumed Contract: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtors and (if applicable) assignment of such Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance); (ii) any and all defaults under such Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount included in the Assumption Notice or Supplemental Assumption Notice, if applicable, for such Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors and (if applicable) the Debtors' assignee, or the property of any of them, that existed prior to the entry of the Sale Order**.**

Provided that there are two or more Qualified Bidders, an auction (the "Auction") for the Hotel Assets, including any Assumed Contracts designated by bidders, will be conducted on the dates and times set forth on **Schedule 3** hereto. After the Auction occurs (or after the cancellation of the Auction, if applicable), the Debtors will file and serve a notice that identifies the proposed acquirers of the Hotel Assets, and the proposed assignees of any Assumed Contracts. **The deadline to object to adequate assurance of future performance with respect to such proposed assignees ("Adequate Assurance Objection") shall be [TBD], 2023 at 4:00 p.m. (ET); provided that the deadline to make any other objection to assumption of the Assumed Contracts or to object to the Cure Amounts with respect to such Assumed Contracts shall not be extended.**

The Debtors will seek to assume and assign the Assumed Contracts that have been designated by a Successful Bidder in connection with either the confirmation of a plan that contains provisions approving a sale of the Hotel Assets or pursuant to a separate noticed motion and hearing related solely to the sale of the Hotel Assets.  Your rights to object to the assumption and assignment of your executory contract and to any Cure Amount in connection therewith are set forth in the Sale Procedures Order. Note that a hearing regarding the Cure Amounts, if any, may be adjourned by agreement of the Debtors and applicable objecting party or by order of the Court.

Dated: Wilmington, Delaware
     [*], 2023

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ [DRAFT]*           
Ian J. Bambrick (No. 5455)
Katharina Earle (No.6348)
222 Delaware Ave. Suite 1410
Wilmington, DE  19801
Tel:  (302) 467-4200
Fax:  (302) 467-4201
ian.bambrick@faegredrinker.com
katharina.earle@faegredrinker.com

Scott F. Gautier (admitted *pro hac vice*)
Maria J. Cho (admitted *pro hac vice*)
1800 Century Park East, Suite 1500
Los Angeles, CA  90067
Tel:  (310) 203-4000
Fax:  (310) 229-1285
scott.gautier@faegredrinker.com
maria.cho@faegredrinker.com

Michael T. Gustafson (admitted *pro hac vice*)
320 South Canal Street, Suite 3300
Chicago, Ill 60606
Tel:  (312)569-1000
Fax:  (312) 569-3000
mike.gustafson@faegredrinker.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## **Schedule 1**

(Hotel Assets)

**The "Group Properties"**

| Hotel Name and Address | Debtor Name | Address |
|---|---|---|
| Home2 Palm Bay | AD1 Urban Palm Bay, LLC | 1425 Sportsman Lane NE, Palm Bay, FL 32905 |
| Hyatt Place | AD1 Urban Palm Bay Place, LLC | 1435 Sportsman Lane NE, Palm Bay, FL 32905 |
| Crowne Plaza Orlando Lake Buena Vista | AD1 LBV1, LLC | 8686 Palm Parkway, Orlando, FL 32836 |
| Aloft[1] Orlando International Drive | AD1 SW Property Holdings, LLC | 5730 Central Florida Parkway, Orlando, FL 32821 |
| Element Orlando Universal Blvd | | 8278 Universal Blvd, Orlando, FL 32819 |
| Staybridge Suites Orlando Royale Parc Suites | AD1 Celebration Hotels, LLC | 5876 W. Irlo Bronson Memorial Hwy., Kissimmee, FL 34746 |

**The "Daytona"**

The property owned by Debtor AD1 Daytona Hotels, LLC known as the "Rushhh Tapestry by Hilton" and located at 2323 South Atlantic Avenue, Daytona Beach Shores, FL 32118 (the "Daytona").

**The "Crowne Plaza"**

The property owned by Debtor AD1 PB Airport Hotels, LLC known as the "Holiday Inn Palm Beach Airport-Crowne Plaza" and located at 1301 Belvedere Rd., West Palm Beach, FL 33405 (the "Crowne Plaza").

---

[1] For the avoidance of doubt, the "Aloft Orlando International Drive" and the "Element Orlando Universal Blvd," despite having two different addresses, comprise together only one (1) of the Hotel Assets.

## **Schedule 2**

**(Assumed Contracts and Cure Amounts)**

**[TO BE PROVIDED]**

**<u>Schedule 3</u>**

**(Auction Dates)**

Auctions for the Hotel Assets will commence at the offices of Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, or such other location that the Debtors, in consultation with the Secured Lender and advisors, determine will enhance the prospects for higher and better bidding for the Hotel Assets at the following dates and times:

| Hotel Asset | Auction Date |
|---|---|
| Home2 Palm Bay<br>1425 Sportsman Lane NE<br>Palm Bay, FL 32905 | May 9, 2023 at [TBD] |
| Hyatt Place<br>1435 Sportsman Lane NE<br>Palm Bay, FL 32905 | May 9, 2023 at [TBD] |
| Crowne Plaza Orlando Lake Buena Vista<br>8686 Palm Parkway<br>Orlando, FL 32836 | May 9, 2023 at [TBD] |
| Aloft Orlando International Drive<br>5730 Central Florida Parkway<br>Orlando, FL 32821 | May 9, 2023 at [TBD] |
| Element Orlando Universal Blvd.<br>8278 Universal Blvd.<br>Orlando, FL 32819 | May 9, 2023 at [TBD] |
| Staybridge Suites Orlando Royale Parc Suites<br>5876 W. Irlo Bronson Memorial Hwy.<br>Kissimmee, FL 34746 | May 9, 2023 at [TBD] |
| Rushhh Tapestry by Hilton<br>2323 South Atlantic Avenue<br>Daytona Beach Shores, FL 32118<br>(the "Daytona") | August 4, 2023 at [TBD] |
| Holiday Inn Palm Beach Airport-Crowne Plaza<br>1301 Belvedere Rd.<br>West Palm Beach, FL 33405<br>(the "Crowne Plaza") | July 12, 2023 at [TBD] |

## Exhibit 6

**(Notice of Designation of Stalking Horse Bidder)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AD1 Urban Palm Bay, LLC,[1] | Case No. 23-10074 (KBO) |
| Debtor. | (Jointly Administered) |
| | Docket Ref. Nos. ___ & ___ |

## NOTICE OF DESIGNATION OF STALKING HORSE BIDDER(S)

AD1 Urban Palm Bay, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), are seeking to sell certain properties (collectively, the "Hotel Assets"), described below, and associated personal property. The Debtors will consider bids to acquire one or more Hotel Assets through a "free and clear" sale transaction that is proposed to be implemented either through a chapter 11 plan of reorganization or a separate sale order entered after notice and a hearing.

By order, dated [*], 2023 [Docket No. [*]] (the "Sale Procedures Order"),[2] the Court approved the Sale Procedures that govern the sale of all of the Hotel Assets to the highest and best bidders.

In accordance with the Sale Procedures, the Debtors, with the consent of their primary secured lender, have designated [TBD] to serve as a stalking horse bidder(s) (each a "Stalking Horse Bidder") to acquire the Hotel Assets pursuant to a Stalking Horse Transaction Agreement(s) between the applicable Debtor(s) and the Stalking Horse Bidder(s). An unredacted copy of the Stalking Horse Transaction Agreement is attached hereto as **Schedule 1**.

By entry of the Sale Procedures Order, the Court has also approved certain dates and times for Auctions for the Hotel Assets to be held. Auctions for the Hotel Assets will commence at the offices of Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, or such other location that the Debtors, in consultation with the Secured Lender and advisors, determine will enhance the prospects for higher and better bidding for the Hotel Assets at the following dates and times:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AD1 Celebration Hotels, LLC (7980); AD1 Daytona Hotels, LLC (7940); AD1 LBV1, LLC (1125); AD1 PB Airport Hotels, LLC (6855); AD1 SW Property Holdings, LLC (2507); AD1 Urban Palm Bay, LLC (3713); AD1 Urban Palm Bay Place, LLC (2385); AD1 Celebration Holdings, LLC (3363); AD1 Daytona Holdings, LLC (2761); AD1 LBV Hotels, LLC (7709); AD1 Palm Beach Airport Hotels, LLC (2187); AD1 Urban Strategy Palm Bay, LLC (9412); and AD1 Urban SW, LLC (6934). The mailing address for each of the Debtors is 1955 Harrison Street, Suite 200, Hollywood, FL 33020.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Procedures Order.

| Hotel Asset | Auction Date and Time |
|---|---|
| Home2 Palm Bay<br>1425 Sportsman Lane NE<br>Palm Bay, FL 32905 | May 9, 2023 at [*] |
| Hyatt Place<br>1435 Sportsman Lane NE<br>Palm Bay, FL 32905 | May 9, 2023 at [*] |
| Crowne Plaza Orlando Lake Buena Vista<br>8686 Palm Parkway<br>Orlando, FL 32836 | May 9, 2023 at [*] |
| Aloft Orlando International Drive<br>5730 Central Florida Parkway<br>Orlando, FL 32821 | May 9, 2023 at [*] |
| Element Orlando Universal Blvd.<br>8278 Universal Blvd.<br>Orlando, FL 32819 | May 9, 2023 at [*] |
| Staybridge Suites Orlando Royale Parc Suites<br>5876 W. Irlo Bronson Memorial Hwy.<br>Kissimmee, FL 34746 | May 9, 2023 at [*] |
| Rushhh Tapestry by Hilton<br>2323 South Atlantic Avenue<br>Daytona Beach Shores, FL 32118<br>(the "Daytona") | August 4, 2023 at [*] |
| Holiday Inn Palm Beach Airport-Crowne Plaza<br>1301 Belvedere Rd.<br>West Palm Beach, FL 33405<br>(the "Crowne Plaza") | July 12, 2023 at [*] |

Dated: Wilmington, Delaware
      [*], 2023

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ [DRAFT]*_____
Ian J. Bambrick (No. 5455)
Katharina Earle (No.6348)
222 Delaware Ave. Suite 1410
Wilmington, DE  19801
Tel:  (302) 467-4200
Fax:  (302) 467-4201
ian.bambrick@faegredrinker.com
katharina.earle@faegredrinker.com

Scott F. Gautier (admitted *pro hac vice*)
Maria J. Cho (admitted *pro hac vice*)
1800 Century Park East, Suite 1500
Los Angeles, CA  90067
Tel:  (310) 203-4000
Fax:  (310) 229-1285
scott.gautier@faegredrinker.com
maria.cho@faegredrinker.com

Michael T. Gustafson (admitted *pro hac vice*)
320 South Canal Street, Suite 3300
Chicago, Ill 60606
Tel:  (312)569-1000
Fax:  (312) 569-3000
mike.gustafson@faegredrinker.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit 7</u>**

**(Notice of Successful Bidder and Back-Up Bidder)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AD1 Urban Palm Bay, LLC,[1] | Case No. 23-10074 (KBO) |
| Debtor. | (Jointly Administered) |
| | Docket Ref. Nos. ___ & ___ |

## NOTICE OF SUCCESSFUL BIDDER AND BACK-UP BIDDER

AD1 Urban Palm Bay, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), have conducted various Auctions for the Hotel Assets that revealed Successful Bidders and Back-Up Bidders as described in further detail herein in accordance with the "Sale Procedures Order" dated [*], 2023 [Docket No. [*]].

**PLEASE TAKE NOTICE** that, on [TBD], 2023, Debtor [INSERT NAME OF DEBTOR] closed the Auction for [INSERT NAME OF HOTEL ASSET] and selected [TBD] as the successful bidder (the "") pursuant to the terms of its bid documents and the final bid amount at the Auction of [$INSERT] (the "Successful Bid"), which are attached hereto as **Schedule 1**. Attached hereto as **Schedule 2** is a list of the Successful Bidder-designated contracts that are proposed to be assumed and assigned to the Successful Bidder.

**ALL EXHIBITS ATTACHED TO THIS NOTICE REMAIN SUBJECT TO ONGOING REVIEW, AND MAY BE AMENDED, MODIFIED, SUPPLEMENTED, OR WITHDRAWN, IN WHOLE OR IN PART, INCLUDING, WITHOUT LIMITATION, TO ADD OR REMOVE UNEXPIRED LEASES OR EXECUTORY CONTRACTS FROM SCHEDULE 2. THE DEBTORS WILL PROVIDE ADEQUATE NOTICE OF ANY CHANGES HERETO.**

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Procedures Order, the Debtors have designated [TBD], as the Back-Up Bidder.

**PLEASE TAKE FURTHER NOTICE** that any objections to the conduct of the Auction or selection of the Successful Bid and any objections to the adequate assurance of future performance under a contract or lease to be assumed and assigned to the Successful Bidder ("**Adequate Assurance Objection**," and collectively, the "**Objections**") must be: (i) made in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AD1 Celebration Hotels, LLC (7980); AD1 Daytona Hotels, LLC (7940); AD1 LBV1, LLC (1125); AD1 PB Airport Hotels, LLC (6855); AD1 SW Property Holdings, LLC (2507); AD1 Urban Palm Bay, LLC (3713); AD1 Urban Palm Bay Place, LLC (2385); AD1 Celebration Holdings, LLC (3363); AD1 Daytona Holdings, LLC (2761); AD1 LBV Hotels, LLC (7709); AD1 Palm Beach Airport Hotels, LLC (2187); AD1 Urban Strategy Palm Bay, LLC (9412); and AD1 Urban SW, LLC (6934). The mailing address for each of the Debtors is 1955 Harrison Street, Suite 200, Hollywood, FL 33020.

writing and filed on the Court's docket for these Chapter 11 Cases; (ii) state the basis of such objection with specificity; (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules; and (iv) be served on the following, so as to be actually received by them on or before [TBD], 2023, at [TBD]m. (prevailing Eastern Time): (i) the Debtors, AD1 Urban Palm Bay, LLC, 1955 Harrison Street, Suite 200, Hollywood, Florida 33020 (Attn. Alex Fridzon) and Email: alex@ad1global.com; (ii) counsel to the Debtors, Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Katharina Earle, Esq.) and Email: Katharina.earle@faegredrinker.com, (Attn: Ian J. Bambrick, Esq.) and Email: Ian.Bambrick@faegredrinker.com, and (Attn: Scott F. Gautier, Esq.) and Email: Scott.Gautier@faegredrinker.com; and (iii) counsel to Secured Lender, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166, and (Daniel Ginsberg, Esq.) and Email: danielginsberg@paulhastings.com.

Dated: Wilmington, Delaware      **FAEGRE DRINKER BIDDLE & REATH LLP**
      [*], 2023

*/s/ [DRAFT]*_____
Ian J. Bambrick (No. 5455)
Katharina Earle (No.6348)
222 Delaware Ave. Suite 1410
Wilmington, DE  19801
Tel:  (302) 467-4200
Fax:  (302) 467-4201
ian.bambrick@faegredrinker.com
katharina.earle@faegredrinker.com

Scott F. Gautier (admitted *pro hac vice*)
Maria J. Cho (admitted *pro hac vice*)
1800 Century Park East, Suite 1500
Los Angeles, CA  90067
Tel:  (310) 203-4000
Fax:  (310) 229-1285
scott.gautier@faegredrinker.com
maria.cho@faegredrinker.com

Michael T. Gustafson (admitted *pro hac vice*)
320 South Canal Street, Suite 3300
Chicago, Ill 60606
Tel:  (312)569-1000
Fax:  (312) 569-3000
mike.gustafson@faegredrinker.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## **Schedule 1**

**(Successful Bid Transaction Agreement)**

## **Schedule 2**

**(Successful Bidder's Designated Contracts and Leases)**